# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

|  |  |
|---|---|
| FREE SPEECH COALITION, INC., AYLO PREMIUM LTD, AYLO FREESITES LTD, WEBGROUP CZECH REPUBLIC, A.S., NKL ASSOCIATES, S.R.O., SONESTA TECHNOLOGIES, S.R.O., SONESTA MEDIA, S.R.O., YELLOW PRODUCTION, S.R.O., PAPER STREET MEDIA, LLC, NEPTUNE MEDIA, LLC, MEDIAME SRL, MIDUS HOLDINGS, INC., | Case No. 1:24-cv-00980-RLY-TAB |
|        Plaintiffs, | |
|    v. | |
| TODD ROKITA, in his official capacity as the Attorney General of the State of Indiana, | |
|        Defendant. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR EXPEDITED PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................2

INTRODUCTION ................................................................................................................6

BACKGROUND ..................................................................................................................7

LEGAL STANDARD.........................................................................................................10

ARGUMENT ....................................................................................................................11

I.      PLAINTIFFS MAY BRING A PRE-ENFORCEMENT CHALLENGE .........................11

II.     THE ACT DRAWS STRICT SCRUTINY, WHICH IT FAILS ......................................12

        A.      The Act Draws Strict Scrutiny For At Least Two Reasons ...................................13

                1.      The Act Burdens Adults' Access To Protected Speech............................15

                2.      The Act Pursues Speaker-Based Discrimination ......................................17

        B.      The Act Fails Strict Scrutiny Because It Is Not Narrowly Tailored In Light
                Of Superior Alternatives ................................................................................18

                1.      There Are Multiple Superior Alternatives ................................................18

                2.      The Act Is Severely Under- And Over-inclusive......................................20

                3.      The General Assembly Shirked Its Burden ..............................................22

III.    PLAINTIFFS FACE IRREPARABLE FIRST AMENDMENT INJURY.......................23

IV.     THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR PLAINTIFFS ........24

V.      SCOPE OF THE INJUNCTION ................................................................................24

CONCLUSION..................................................................................................................25

CERTIFICATE OF SERVICE ..........................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACLU v. Ashcroft,*
   322 F.3d 240 (3d Cir. 2003)..................................................................17

*ACLU v. Johnson,*
   194 F.3d 1149 (10th Cir. 1999) ............................................................12

*ACLU v. Mukasey,*
   534 F.3d 181 (2008)........................................................................12, 17

*ACLU of Illinois v. Alvarez,*
   679 F.3d 583 (7th Cir. 2012) .....................................................11, 23, 24

*American Booksellers Foundation v. Coakley,*
   2010 WL 4273802 (D. Mass. 2010) ......................................................12

*American Booksellers Foundation v. Dean,*
   342 F.3d 96 (2d Cir. 2003)....................................................................12

*American Booksellers Foundation v. Sullivan,*
   799 F. Supp. 2d 1078 (D. Alaska 2011) ...............................................12

*Anderson Federation of Teachers v. Rokita,*
   546 F. Supp. 3d 733 (S.D. Ind. 2021) ...................................................24

*Ashcroft v. ACLU,*
   542 U.S. 656 (2004)............................................6, 10, 12, 13, 14, 15, 18

*Brewer v. City of Albuquerque,*
   18 F.4th 1205 (10th Cir. 2021) .............................................................22

*Brown v. Entertainment Merchants Association,*
   564 U.S. 786 (2011)..................................................................14, 20, 21

*Bruni v. City of Pittsburgh,*
   824 F.3d 353 (3d Cir. 2016)..................................................................22

*Citizens United v. Federal Election Commission,*
   558 U.S. 310 (2010).............................................................................14

*City of Ladue v. Gilleo,*
   512 U.S. 43 (1994)...............................................................................20

2

*Cyberspace Communications, Inc. v. Engler*,
238 F.3d 420 (6th Cir. 2000) ................................................................12

*Dahlstrom v. Sun-Times Media, LLC*,
777 F.3d 937 (7th Cir. 2015) ................................................................17

*Elrod v. Burns*,
472 U.S. 347 (1976)................................................................................23

*Entertainment Software Association v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) ..........................................................11, 14

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ................................................................24

*Fabulous Associates v. Pennsylvania Public Utilities Commission*,
896 F.2d 780 (3d Cir. 1990)............................................................16, 19

*FF Cosmetics FL, Inc. v. City of Miami Beach*,
866 F.3d 1290 (11th Cir. 2017) ............................................................22

*Free Speech Coalition, Inc. v. Paxton*,
95 F.4th 263 (5th Cir. 2024) ................................................................12

*Garden District Book Shop, Inc. v. Stewart*,
184 F. Supp. 3d 331 (M.D. La. 2016)....................................................12

*Ginsberg v. New York*,
390 U.S. 629 (1968)................................................................................14

*Higher Society of Indiana v. Tippecanoe Cnty., Indiana*,
858 F.3d 1113 (7th Cir. 2017) ..............................................................10

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013) ................................................................10

*Life Spine, Inc. v. Aegis Spine, Inc.*,
8 F.4th 531 (7th Cir. 2021) ..................................................................23

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
466 U.S. 789 (1984)................................................................................25

*Miller v. California*,
413 U.S. 15 (1973)..............................................................................9, 13

*Milwaukee Police Association v. Flynn*,
863 F.3d 636 (7th Cir. 2017) ................................................................11

3

*Minneapolis Star & Tribune Co. v. Minnesota Commissoner of Revenue*,
    460 U.S. 575 (1983) ...........................................................................................17

*National Institute of Family & Life Advocates v. Raoul*,
    685 F. Supp. 3d 688 (N.D. Ill. 2023) ...............................................................20

*Nken v. Holder*,
    556 U.S. 418 (2009)...........................................................................................24

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ...........................................................................12

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)...........................................................................................14

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)...................................................................................13, 18

*Reno v. ACLU*,
    521 U.S. 844 (1997).............................................12, 13, 14, 15, 16, 17, 18

*Sable Commcunications of California, Inc. v. FCC*,
    492 U.S. 115 (1989)...................................................................................12, 14

*Shakman v. Clerk of Cook Cty.*,
    994 F.3d 832 (7th Cir. 2021). ...........................................................................11

*Smith v. City of Chicago*,
    457 F.3d 643 (7th Cir. 2006) ...........................................................................21

*Smith v. Daily Mail Publishing Co.*,
    443 U.S. 97 (1979)............................................................................................21

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)...................................................................................14, 18

*St-Hilaire v. Commissioner of Indiana Bureau of Motor Vehicles*,
    2024 WL 125982 (S.D. Ind. Jan. 11, 2024).....................................................24

*Surita v. Hyde*,
    665 F.3d 860 (7th Cir. 2011) ...............................................................10, 14, 17

*Turner Broadcasting Systems, Inc. v. F.C.C.*,
    512 U.S. 622 (1994)...........................................................................................22

*Turner Broadcasting Systems, Inc. v. F.C.C.*,
    520 U.S. 180 (1997)...........................................................................................22

*United States v. Playboy Entertainment Group, Inc.,*
    529 U.S. 803 (2000)..................................................................12, 14, 15, 17, 18

*United States v. Stevens,*
    559 U.S. 460 (2010)..................................................................................24, 25

*Virginia v. American Booksellers Association, Inc.,*
    484 U.S. 383 (1988)..........................................................................................11

*Williams-Yulee v. Florida Bar*
    575 U.S. 433 (2015)..........................................................................................20

*Willis v. Commissioner, Indiana Department of Correction*,
    753 F. Supp. 2d 768 (S.D. Ind. 2010).............................................................22

**Statutes**

I.C. 24-4-23, *et seq.*................................................................6, 8, 9, 10, 15, 16, 17

I.C. 35-49-2-2...........................................................................................................9

I.C. 9-13-2-103.4......................................................................................................8

Plaintiffs, consisting of platforms and publishers of online adult content, seek a preliminary injunction preventing the Indiana Attorney General from enforcing Senate Bill 17, codified at IC-24-4-23, *et seq.* (the "Act"), because it violates the First Amendment of the U.S. Constitution. The Act takes effect on July 1, 2024,[1] and on pain of fines and enjoinment, the Act will require website operators that host constitutionally protected adult content to shutter their websites in Indiana unless they systematically require visitors to those websites provide personal information showing they are at least eighteen years old. These requirements are patently unconstitutional, as Supreme Court precedent has held. This Court should enter a preliminary injunction barring enforcement of the Act because Plaintiffs are overwhelmingly likely to succeed on the merits and the Act poses irreparable harm, by definition, by infringing upon the First Amendment rights of Plaintiffs along with Indiana adults.

Like prior laws that have sought to restrict *minors'* access to online sexual content, Indiana's law impermissibly burdens *adults'* access to constitutionally protected speech. Adult users will avoid adult websites that require the disclosure of private identifying information, chilled by the dangers of hacking and other misuse of their information over the Internet, while smaller platforms will be forced out of business due to the inordinate costs and burdens of compliance. Court after court has invalidated analogous state and federal laws—over and over— on First Amendment grounds. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656 (2004); *see also infra* at 12 & n.2 (collecting cases). Court after court has agreed that laws like the Act cannot

---

[1] Given the straightforward nature of the legal issue here, Plaintiffs believe there is sufficient time for the Attorney General to respond and the Court to rule prior to the Act's effective date; Plaintiffs have proposed a briefing schedule consistent with that understanding. Should the Court conclude differently, however, Plaintiffs respectfully request that the Court temporarily restrain the Attorney General from enforcing the law while the Court considers its decision.

constitutionally burden vast amounts of speech that is protected for adults absent adequate tailoring. Moreover, the Act selectively targets operators of adult-oriented websites. The Act, therefore, draws strict scrutiny, which it cannot withstand. The Act is not "narrowly tailored" because there are less restrictive alternatives, including the blocking of adult content at the level of minors' devices. By contrast, age verification at the level of adult platforms is ineffective because minors can easily circumvent it. The Act itself is underinclusive to such a degree that it fails its purported purpose: It leaves unregulated search engines and social media sites, which teem with adult content, and turns a blind eye to written sexual materials. These glaring omissions are indefensible for a law whose stated goal is to protect minors from sexual content on the Internet. In short, the Act swings a sledgehammer against a subset of websites that host constitutionally protected sexual expression—an unacceptable approach when, as here, less restrictive, *superior* solutions abound.

Plaintiffs satisfy all remaining requirements for a preliminary injunction. Infringement of First Amendment rights constitutes irreparable harm as a matter of law. In addition, enforcement will cause economic injury to Plaintiffs that cannot be calculated, particularly through the loss of goodwill, as Indiana adults turn away from Plaintiffs to seek adult content on, for example, social media platforms, search engines, and even the dark web, all of which the Act fails to address. Because the Act confers no meaningful benefits while inflicting grave constitutional injuries, the balance of harms weighs heavily in Plaintiffs' favor. And the public interest favors an injunction for corresponding reasons. Plaintiffs' motion for a preliminary injunction should be granted.

## BACKGROUND

Plaintiffs have filed suit against Todd Rokita, the Attorney General of the State of Indiana, in his official capacity, seeking injunctive relief against the enforcement of the Act. Plaintiffs are a collection of entities in the adult entertainment industry, including the Free Speech Coalition,

Inc. ("FSC"), the adult industry's primary trade association; Aylo Freesites Ltd, the operator of the popular adult website Pornhub.com; and Sonesta Media, s.r.o., which creates the content for BangBros.com. Plaintiffs are supported by Jane Doe declarants who will be injured by the Act. All oppose the restrictions that the Act places on adults' rights to share and enjoy legal adult content. *See, e.g.*, Declaration of Alison Boden (ECF 4-1) at ¶ 7; Declaration of Andreas Alkiviades Andreou (ECF 4-2) at ¶ 1; Declaration of Robert Seifert (ECF 4-3) at ¶ 1; Declaration of Sadiq Muhamed (ECF 4-4) at ¶ 1; Declaration of Jonathan Todd (ECF 4-5) at ¶ 1; Declaration of Jane Doe No. 1 (ECF 4-6) at ¶¶ 6, 8; Declaration of Jane Doe No. 2 (ECF 4-7) at ¶¶ 6, 20.

The Act goes into effect July 1, 2024. It applies to "adult oriented website operator[s]," requiring them to implement "a reasonable age verification method to prevent a minor from accessing the adult oriented website." I.C. 24-4-23-10. To comply, website operators must compel visitors to provide a "mobile credential" such as a digital driver's license, *see* I.C. 9-13-2-103.4; must hire an "independent third party age verification service that compares the identifying information entered by the individual … with material that is available from a commercially available data base"; or must deploy a "commercially reasonable method that relies on public or private transactional data to verify the age of the individual." I.C. 24-4-23-7. Such "[t]ransactional data" includes "a sequence of information that documents an exchange, agreement, or transfer between an individual, commercial entity, or third party used for the purpose of satisfying a request or event," such as "records that relate to a mortgage, education, or employment." I.C. 24-4-23-8. The adult-oriented website and the hired age-verification company, if any, "may not retain identifying information of the person seeking access," and an "individual whose identifying information is retained in violation of this section may bring an action against the person that unlawfully retained the individual's identifying information." I.C. 24-4-23-13.

The Act exempts the news media, search engines, social media platforms, and erotica. I.C. 24-4-23-2. In particular, it exempts a "newspaper or news service that publishes news related information through a website" or "cloud service provider[s]." I.C. 24-4-23-2(1)-(2). It also exempts any "Internet provider, an affiliate or subsidiary of an Internet provider, or a search engine that solely provides access or connection to a website or other Internet content that is not under the control of that Internet service provider, affiliate or subsidiary, or search engine; and … is not responsible for creating or publishing the content that constitutes material harmful to minors." I.C. 24-4-23-2(3). And it exempts most social media sites and erotic literature *de facto*, because it applies only to websites that publish "images and videos," "at least one-third" of which "depict material harmful to minors." I.C. 24-4-23-1.

The Act defines "material harmful to minors," by reference to I.C. 35-49-2-2, as a "matter or performance" that: (1) "describes or represents, in any form, nudity, sexual conduct, sexual excitement, or sado-masochistic abuse; (2) considered as a whole, it appeals to the prurient interest in sex of minors;" (3) "is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable matter for or performance before minors; and (4) considered as a whole, it lacks serious literary, artistic, political, or scientific value for minors." I.C. 24-4-23-3. This definition modifies the Supreme Court's definition of obscenity unprotected by the First Amendment to fit what a jury would deem sexually inappropriate for minors, adding the phrases "with respect to minors" and "for minors." *See Miller v. California*, 413 U.S. 15, 24 (1973). A "minor" is "a person less than eighteen (18) years of age." I.C. 24-4-23-4.

The Attorney General may "bring an action under this chapter … against an adult oriented website, accessible by an Indiana resident, that does not implement or properly use a reasonable age verification method," and may "enjoin future violations of this chapter," seek a "civil penalty

of not more than two hundred fifty thousand dollars ($250,000)," and/or recover the "attorney general's reasonable costs" from "the investigation of the violations under this chapter" and "maintaining the action." I.C. 24-4-23-15.

## LEGAL STANDARD

"To win a preliminary injunction, the moving party must demonstrate that (1) it has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied; and (2) there is some likelihood of success on the merits of the claim." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013) (citation omitted). "If the moving party meets this threshold burden, the court weighs the competing harms to the parties if an injunction is granted or denied, and also considers the public interest." *Id.* (citation omitted). "This equitable balancing proceeds on a sliding scale-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor." *Korte*, 735 F.3d at 665 (citation omitted).

In free speech cases, "the likelihood of success on the merits will often be the determinative factor." *Higher Soc'y of Indiana v. Tippecanoe Cnty., Indiana*, 858 F.3d 1113, 1116 (7th Cir. 2017) (cleaned up). "[E]ven short deprivations of First Amendment rights constitute irreparable harm, and the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Id.* (cleaned up). Thus, "the analysis begins and ends with the likelihood of success on the merits of the [First Amendment] claim." *Id.* (alteration in original; quoting *Korte*, 735 F.3d at 666). Because the First Amendment is vital to a free society, courts should grant a preliminary injunction even "[i]f the underlying constitutional question is close." *Ashcroft*, 542 U.S. at 664. And where heightened scrutiny applies, Plaintiffs "must be deemed likely to prevail unless the Government has shown that [the] proposed less restrictive alternatives are less effective[.]" *Id.* at 666.

**ARGUMENT**

**I.     PLAINTIFFS HAVE STANDING FOR A PRE-ENFORCEMENT CHALLENGE**

Indiana's sovereign immunity is no barrier here.  As an exception to Eleventh Amendment sovereign immunity, "[t]he Supreme Court has authorized suits against state officials in their official capacities when plaintiffs seek to enjoin allegedly unconstitutional statutes."  *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 644 (7th Cir. 2006) (citing *Ex parte Young*, 209 U.S. 123, 157 (1908)).

Plaintiffs also have Article III standing because they face imminent injuries, both to their constitutional rights and in the form of monetary penalties and enjoinment, fairly traceable to the Act and redressable by an injunction barring enforcement by the Attorney General.  *See Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017).   As a representative of its members, FSC has associational standing because its "members would have individual standing to sue," the interests FSC seeks to protect "are germane to the organization's purpose," and "neither the claim asserted nor the requested relief requires are the type that would require individual member participation."  *Shakman v. Clerk of Cook Cty*., 994 F.3d 832, 840 (7th Cir. 2021).  In the context of a pre-enforcement challenge, Plaintiffs' injuries are imminent because "the threat is latent in the existence of the statute."  *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 591 (7th Cir. 2012) (cleaned up).  Indeed, the Act "is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures," which more than suffices to show pre-enforcement injury.  *Virginia v.  Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988).

Plaintiffs' standing is beyond question:  "[L]itigants ... are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from

11

constitutionally protected speech or expression." *Id.* at 392-93 (cleaned up) (permitting booksellers to challenge, on behalf of the general public, a law penalizing the display of "visual or written material that depicts sexually explicit nudity … which is harmful to juveniles"). As demonstrated here by the declarations of persons affected by the Act, this is a paradigmatic case for vindicating that important principle. *See* ECF 4-6 at ¶¶ 5-8; ECF 4-7 at ¶¶ 6-20.

## II.     THE ACT DRAWS STRICT SCRUTINY, WHICH IT FAILS

Numerous courts have struck down laws, like the Act, that limit adult content in the name of protecting minors, because such laws are content-based, overbroad, and fail strict scrutiny.[2] As discussed further below, the Supreme Court handed down four decisions on this issue, concluding in "[e]ach of these cases" the challenged law was unconstitutional "under strict scrutiny." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 289 & nn.9-10 (5th Cir. 2024) (Higginbotham, J., dissenting). These four cases are *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989); *Reno v. ACLU*, 521 U.S. 844 (1997); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000); and *Ashcroft v. ACLU*, 542 U.S. 656 (2004).

The federal courts of appeals have consistently obeyed the Supreme Court's clear instruction on this matter, with the Fifth Circuit being a single anomalous outlier. *Compare ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008), *PSINet v. Chapman*, 362 F.3d 227 (4th Cir. 2004), *Am. Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003), *and ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999), *with Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024), *cert. pending* (No. 23-1122). Indiana's Act is no different than its misguided predecessors. It draws strict

---

[2] *See, e.g.*, *Garden Dist. Book Shop, Inc. v. Stewart*, 184 F. Supp. 3d 331 (M.D. La. 2016) (Louisiana); *Am. Booksellers Foundation v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) (Alaska); *Am. Booksellers Foundation v. Coakley*, 2010 WL 4273802 (D. Mass. 2010) (Massachusetts); *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (Virginia); *Am. Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) (Vermont); *Cyberspace Commc'n, Inc. v. Engler*, 238 F.3d 420 (6th Cir. 2000) (Michigan); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (New Mexico).

scrutiny not only as a content-based restriction that burdens adults' access to protected speech, but also as a regulation targeting a specific set of adult websites, without concern for myriad other sources of sexually explicit content on the Internet. As a result, the Attorney General must show that the Act is "narrowly tailored to serve a compelling governmental interest" and that no "less restrictive alternatives were available." *Ashcroft*, 542 U.S. at 661.

The Attorney General cannot make to the required showing. The Act contains fatal defects, including its *over*-inclusivity in blocking two-thirds of a website's non-sexual content and its *under*-inclusivity in permitting unfettered access to other sources of online sexual content. By contrast, ready alternatives are both less restrictive and far more effective. For instance, the Act's defects are addressed by the alternative of content-filtering software that can be installed on minors' devices, a solution that the Supreme Court explained was a less restrictive, superior alternative to age verification in *Ashcroft v. ACLU*. *See infra* at 18-19. The General Assembly here nevertheless disregarded not only that alternative but also every alternative available to it, contrary to the First Amendment's requirements. That approach is constitutionally infirm and by itself justifies a preliminary injunction pending full adjudication of the merits.

## A. The Act Draws Strict Scrutiny For At Least Two Reasons

It is a first principle of First Amendment jurisprudence that content-based restrictions draw strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 165, 169 (2015). Even a content-based restriction meant to "protect[] children from harmful materials . . . does not justify an unnecessarily broad suppression of speech addressed to adults[.]" *Reno*, 521 U.S. at 875. Obscenity is one of few categories of unprotected speech, narrowly defined as expression that "appeals to the prurient interest," "depicts or describes in a patently offensive way, sexual conduct," and "lacks serious literary, artistic, political, or scientific value" according to community standards. *Miller v. California*, 413 U.S. 15, 24 (1973). Likewise, the "definition of obscenity" may be adjusted for

minors, so that the State may prevent *minors* from accessing sexual content that adults have a right to view. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (citing *Ginsberg v. New York*, 390 U.S. 629, 638 (1968)). But when a law implicates *both* principles—restricting minors' access while burdening adults' access to protected content—"[t]he standard is strict scrutiny." *Playboy*, 529 U.S. at 814. The Supreme Court has reiterated this principle over and over. *See Sable*, 492 U.S. at 126; *Reno*, 521 U.S. at 874; *Playboy*, 529 U.S. at 814; *Ashcroft*, 542 U.S. at 665-66. Indeed, in this circuit, strict scrutiny applies to all content-based restrictions, full stop. *Blagojevich*, 469 F.3d at 643-46 (applying strict scrutiny to a sexual-speech restriction affecting *only* minors, while treating the law's attempt to define obscenity with respect to minors as an aspect of narrow tailoring).

Furthermore, and independently, speaker-based distinctions require strict scrutiny review. *See Surita v. Hyde*, 665 F.3d 860, 870 (7th Cir. 2011); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011) (applying strict scrutiny to law targeting pharmaceutical manufacturers). The First Amendment mandates deep suspicion of "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). When a statute exhibits "[s]electivity of this sort," it goes even beyond mere content discrimination" into speaker- and viewpoint-based discrimination, which "alone [is] enough to render the ordinance presumptively invalid[.]" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391, 393-94 (1992). Notably, when disfavored sexual content is at issue, this principle is not blunted—it is *sharpened*. *See Playboy*, 529 U.S. at 812, 826 (applying strict scrutiny to a law that "limited Playboy's market as a penalty for its programming choice, though other channels capable of transmitting like material are altogether exempt.").

Because the Act discriminates among content and among speakers, it meets both these criteria for strict scrutiny.

### 1.    The Act Burdens Adults' Access To Protected Speech

The Supreme Court settled the level of scrutiny that applies here when it decided *Reno v. ACLU* and *Ashcroft v. ACLU*. Both cases involved materially indistinguishable regulations that sought to protect minors, prohibiting the dissemination of sexual content online unless age verification was used. *Reno*, 521 U.S. at 859-61; *Ashcroft*, 542 U.S. at 661-63. In both cases, the Court applied strict scrutiny. The Court in *Reno* explained that "[i]n order to deny minors access to potentially harmful speech, the [law] effectively suppresses a large amount of speech that adults have a constitutional right to receive and to address to one another," which "is unacceptable if less restrictive alternatives would be at least as effective." 521 U.S. at 874. Subsequently, in *Ashcroft*, the Court considered a revised version of the law that it had found lacking in *Reno*, and its conclusion was the same: the fact that "the statute was likely to burden some speech that is protected for adults" again triggered strict scrutiny and the requirement for government to employ the least-restrictive means. 542 U.S. at 665.

The same analysis governs here. Like the laws in *Reno* and *Ashcroft*, the Act aims to restrict minors' access to sexual material that is inappropriate for them but protected for adults. Like the laws in *Reno* and *Ashcroft*, the Act—due to its "one-third" threshold—burdens websites even if most of their content is appropriate for minors. IC-24-4-23-1. And like the laws in *Reno* and *Ashcroft*, the Act places wide swathes of protected speech behind the barrier of risky online age verification, burdening adults' access to protected speech. IC-24-4-23-3 In other words, "the answer" regarding the tier of constitutional scrutiny "should be clear: The standard is strict scrutiny." *Playboy*, 529 U.S. at 812, 814 ("Government's content-based burdens must satisfy the same rigorous scrutiny as … content-based bans.").

Even more than was true in 2004 when the Court decided *Ashcroft*, contemporary age verification over the Internet, particularly as a barrier to intimate, sensitive content, will profoundly chill protected expression and trample individual privacy rights. *See* Declaration of Richard Sonnier (ECF 4-9) at ¶¶ 12-46; Declaration of Kian Hudson (ECF 4-10), Ex. 1 ("2 out of 3 Americans are not comfortable sharing their identification document … [or] biometric information with platforms"); ECF 4-7 at ¶¶ 12-19. The Act requires age verification by burdensome, intrusive, even dangerous means, ECF 4-9 at ¶¶ 12-46, yet offers cold comfort to those harmed by hacks or leaks, offering only burdensome litigation as a supposed remedy. I.C. 24-4-23-13(c); ECF 4-7 at ¶ 15. The Act's digital barrier even operates as a *de facto ban* for many adults who do not possess qualifying documents or are misjudged by age-verification technology. *See* ECF 4-10, Ex. 2. The Act's nominal data-deletion requirement brings the problem into stark relief. Such a requirement is not only technologically naïve, ECF 4-9 at ¶¶ 35-46, it is illusory: While it binds the regulated website and any third-party verification service, such entities remain free to *transmit* adults' sensitive information to unregulated third parties, effectively casting it into the Internet's dangerous depths.[3] *See* ECF 4-7 at ¶ 14. Even beyond chilling expression between providers and willing adults, the Act will extinguish much of the underlying expression because the costs of compliance are prohibitive for smaller websites. *See* ECF 4-1 at ¶ 11; *see also Fabulous Assocs. v. Pa. Pub. Util. Comm'n*, 896 F.2d 780, 788 (3d Cir. 1990) (considering compliance costs).

The Act's "ambiguities" make it even more "problematic for purposes of the First Amendment." *Reno*, 521 U.S. at 870. For example, the Act's definition of material harmful to minors is hopelessly opaque. "Minors" is a broad category that encompasses age groups with

---

[3] Section 14 of the Act confirms this reality by requiring that "website operators … use commercially reasonable methods to secure all information collected and transmitted," even though such "security" is not possible, *see* ECF 4-9 at ¶ 35-46, and the Act fails to regulate the third parties that receive the data.

significant differences between them. *See Mukasey*, 534 F.3d at 205. "The type of material that might be considered harmful to a younger minor is vastly different—and encompasses a much greater universe of speech—than material that is harmful to a minor just shy of seventeen years old. . . . [S]ex education materials may have 'serious value' for, and not be 'patently offensive' as to, sixteen-year-olds. The same material, however, might well be considered 'patently offensive' as to, and without 'serious value' for, children aged, say, ten to thirteen[.]" *ACLU v. Ashcroft*, 322 F.3d 240, 268 (3d Cir. 2003), *affirmed in relevant part*, 542 U.S. 656 (2004). Here, too, the Act chills protected expression, its vagueness likely leading to overcompliance by website operators left to guess about the scope of their potential liability. Taken together, the Act's "obvious chilling" and "deterrent effect[s]," *Reno*, 521 U.S. at 872, leave no doubt that "[t]he standard is strict scrutiny." *Playboy*, 529 U.S. at 814.

### 2.    The Act Pursues Speaker-Based Discrimination

Even where the government engages in otherwise-permissible regulation, it "may not discriminate among speakers." *Surita*, 665 F.3d at 870 (cleaned up). For instance, while the government can tax media companies alongside other companies, an "ink and paper tax violates the First Amendment" because "it singles out the press" and "because it targets a small group of newspapers." *Minneapolis Star & Trib. Co. v. Minn. Com'r of Revenue*, 460 U.S. 575, 591 (1983). The Act violates this core principle: It not only exempts the news media,[4] but also exempts obvious alternative sources of online sexual content. The Act exempts search engines, even though adult content abounds on them. IC-24-4-23-2. It exempts social media sites, which will not meet the "one-third" threshold, even though they, too, teem with adult content. IC-24-4-23-1 And it takes no account of erotic literature because it only regulates "images and videos." *Id*. The Act is

---

[4]  *See Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 946 (7th Cir. 2015) ("It is important to note that the First Amendment provides no special solicitude for members of the press.").

17

thus no different than the cable-television law that withered under strict scrutiny in *Playboy*, where the "speech in question was not thought by Congress to be so harmful that all channels were subject to restriction," yet was restricted on the channels operated by the adult industry "as a penalty for its programming choice." 529 U.S. at 812. In "burden[ing] disfavored speech by disfavored speakers," the Act cannot survive unless it meets strict scrutiny, *Sorrell*, 564 U.S. at 564, which the next section demonstrates it cannot.

## B. The Act Fails Strict Scrutiny Because It Is Not Narrowly Tailored In Light Of Superior Alternatives

Because the Act imposes a content- and speaker-based burden subject to strict scrutiny, it must be "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163 (citations omitted). As such, it must not only employ the least restrictive means of protecting minors, *see Reno*, 521 U.S. at 874, but actually serve that goal. *Ashcroft*, 542 U.S. at 670. Indiana bears the burden of showing both, *id.* at 663, and here it can show neither.

### 1. There Are Multiple Superior Alternatives

There are at least two less-restrictive alternatives that could produce superior outcomes. First, Indiana could make freely available or require the use or pre-installation of filtering technology on minors' devices. ECF 4-9 at ¶¶ 47-63. The Supreme Court explained this alternative years ago in *Ashcroft*, when it struck down a law just like the Act. 542 U.S. at 666-73. The Court specifically held that "[b]locking and filtering software is an alternative that is less restrictive … and, in addition, likely more effective as a means of restricting children's access to materials harmful to them." *Id.* at 666-67. It elaborated that filtering software is less restrictive because "adults without children may gain access to speech they have a right to see without having to identify themselves or provide their credit card information." *Id.* at 667. And it pointed out that filtering is "more effective than age-verification requirements" because "a filter can prevent

minors from seeing all pornography[.]" *Id*. at 667-68  Speaking to future lawmakers, the Court emphasized that a narrowly tailored law could protect minors from online sexual content. *Id.* at 672.

Second, Indiana could require internet service providers ("ISPs") to pre-block adult content, subject to an adult's un-blocking request.  ECF 4-9 at ¶¶ 48, 64.  The Third Circuit explained an analogue to this alternative in *Fabulous Associates v. Pennsylvania Public Utility Commission*, 896 F.2d 780, 788 (3d Cir. 1990).  There, the court held that phone-sex companies could not be required to verify their customers' ages, because the government could instead require the telephone companies to do so.  *Id.*  The law at issue required phone-sex companies to implement an "access code" system for adult users.  *Id.* at 781-82.  But the court held that such a requirement violated the First Amendment by imposing unnecessary burdens on phone-sex companies and infringing the right of adults to exchange expression anonymously.  *Id.* at 785-87.  As the court explained, requiring age verification at the level of the telephone company would be less restrictive.  *Id.* at 788.  Revealing one's identity "to the telephone company is far less chilling than is loss of anonymity to the message service."  *Id.*  "[P]re-blocking [would also not] necessitate … increased operating costs by the message services[.]"  *Id.*  The court thus affirmed that responsibility for minors' wellbeing lies "where our society has traditionally placed it—on the shoulders of the parent."  *Id.*

Here, the General Assembly cast aside such superior alternatives, barreling forward with a discredited approach that is more restrictive, less effective, and even dangerous.  ECF 4-9 at ¶¶ 12-46.  Minors who wish to view adult content will continue to do so with ease, bypassing the Act's virtual barrier by using virtual private networks ("VPNs") to spoof their physical location and browse the web in jurisdictions without age-verification laws.  ECF 4-9 at ¶¶ 21-23.  Minors

may also turn to the dark web using the "Tor" browser, exposing themselves to the Internet's criminal underbelly.  ECF 4-9 at ¶¶ 26-27; *see also* ECF 4-10, Ex. 3.  Even beyond widely available technological circumventions, minors will continue to encounter adult content through exempted search engines, social media sites, and online erotica.  Because platform-based age verification on the Internet is both more restrictive *and* less effective than obvious, readily available alternatives, the Act cannot survive strict scrutiny.

## 2.    The Act Is Severely Under- And Over-inclusive

Beyond failing to avail itself of less-restrictive alternatives, the Indiana General Assembly transgressed the First Amendment by enacting a law that is nowhere close to narrowly tailored. "Restrictions that are underinclusive or overinclusive are not narrowly tailored," *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688, 704 (N.D. Ill. 2023), and "[t]he overbreadth in achieving one goal is not cured by the underbreadth in achieving the other."  *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 805 (2011).  Such fatal defects vitiate the Act here.

The Act is over-inclusive, as follows from its "one-third" threshold that designedly penalizes websites where the *majority* of the content is appropriate even for minors to view.  By nevertheless deeming that content Act age-restricted, the Act sweeps in far more speech than necessary to pursue its stated interest of shielding minors from sexual content.  That interest, in turn, is cast into doubt by the Act's dramatic *under*-inclusivity—a red flag that the State is pursuing forbidden discrimination under false auspices.  *See City of Ladue v. Gilleo*, 512 U.S. 43, 52 36 (1994) (underinclusivity "diminish[e]s the credibility of the government's rationale for restricting speech in the first place").  As the Supreme Court has explained, "underinclusiveness can raise doubts about whether the government is in fact pursuing the interest it invokes."  *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 448-49 (2015) (citations omitted).  "For example, a State's decision to prohibit newspapers, but not electronic media, from releasing the names of juvenile defendants

suggested that the law did not advance its stated purpose of protecting youth privacy." *Id.* at 449

(citing *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 104-105 (1979)).  Accordingly, when a

"regulation is wildly underinclusive when judged against its asserted justification," that "is alone

enough to defeat it."  *Brown*, 564 U.S. at 802 (faulting a law that "singled out the purveyors of

video games for disfavored treatment … compared to booksellers, cartoonists, and movie

producers[.]").

In this context, *Smith v. Daily Mail Publishing Company* is particularly instructive.  443

U.S. 97, 104 (1979).  There, the Court struck down a law purporting to protect the identities of

juvenile criminal defendants by banning newspapers from publishing their names.  *Id.* at 98-106.

As the Court explained, "even assuming the statute served a state interest of the highest order, it

does not accomplish its stated purpose."  *Id.* at 105.  "In this very case, three radio stations

announced the alleged assailant's name before the Daily Mail decided to publish it."  *Id.*  Justice

Rehnquist put it bluntly:  "It is difficult to take very seriously [the state's] asserted need to preserve

the anonymity of its youthful offenders when it permits other, equally, if not more, effective means

of mass communication to distribute this information without fear of punishment."  *Id.* at 110.

Just as the law in *Smith* ignored "equally, if not more, effective" mediums of

communication, the Act exempts internet search engines—the primary method for accessing

content online, including adult content that is just as explicit as the content on adult websites.  ECF

4-9 at ¶¶ 31-33.  Bing, for example, is the default search engine for the web browser Microsoft

Edge.  It comes pre-installed in most computers using the Windows operating system.  Because

Bing is exempted by the Act, any minor can continue to use Bing to access endless amounts of

adult content in seconds.  ECF 4-9 at ¶¶ 31-32.  Similarly, while the Act singles out adult websites

for adverse treatment, it leaves unregulated all the equally explicit adult content found on social

media sites whose larger volume of non-adult content brings them outside the Act's scope. *See* Hudson Decl., Ex. 4 at 417. The Act further discriminates by addressing only "images and videos." Consequently, the Act is so under-inclusive that it if it pursues any coherent goal, it is not protecting minors; it is discriminating against the adult industry and adults who would otherwise patronize it. *Cf. Brown*, 564 U.S. at 802.

### 3. The General Assembly Shirked Its Burden

The Act fails strict scrutiny for an additional reason: Indiana cannot present evidence supporting the General Assembly's judgments. *See Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195–96 (1997). It cannot do so because the General Assembly passed the Act without making a considered judgment at all. *See Willis v. Comm'r, Indiana Dep't of Correction*, 753 F. Supp. 2d 768, 780 (S.D. Ind. 2010) (ruling against the government under strict scrutiny because it "has not met its burden of demonstrating that it considered and rejected the many obvious alternatives"). To be sure, the General Assembly "is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or court does," but it cannot fail to seriously consider less-restrictive alternatives. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994); *see also Brewer v. City of Albuquerque*, 18 F.4th 1205, 1255 (10th Cir. 2021) ("[W]hile such a less-restrictive-means analysis need not entail the government affirmatively proving that it tried less-restrictive mean . . . it does entail the government giving serious consideration to such less-restrictive means before opting for a particular regulation."); *Bruni v. City of Pittsburgh*, 824 F.3d 353, 357 (3d Cir. 2016) (same); *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1301 (11th Cir. 2017) (same).

Here, the General Assembly gave no serious consideration to alternatives. The Act contains no findings of fact, and the legislative record is devoid of evidence supporting age-verification over other options. Notably, the General Assembly embraced that emptiness. When

confronted with the alternative of content-filtering software, Senator Mike Bohacek, principal among the Act's authors, stated: "I shouldn't have to do that." House Judiciary Committee Hearing, 2024 Leg., 123rd Sess. (Ind. 2024) at 35:58-36:01, available at: https://iga.in.gov/session/2024/video/committee_judiciary_1200/. The General Assembly seemingly agreed that the Act would "take[] a little bit of the financial pressure of off parents to buy these filters … and can also be difficult to navigate the technology." *Id.* at 32:53-33:17 (statement of Alexander Mingus, Associate Director of the Indiana Catholic Conference). But that reasoning shirks the requirement, imposed by the Constitution, to try alternatives first, such as educating parents as to the free filtering services that are widely available currently and requiring such free filtering services to be made available. The Assembly's indifference to the First Amendment may be attributable to the misconception of certain members that the First Amendment should not apply at all. For instance, Senator Liz Brown, another of the Act's authors and Chair of the Indiana Senate Judiciary Committee, erroneously stated: "this is not free speech." Senate Judiciary Committee Hearing, 2024 Leg., 123rd Sess. (Ind. 2024) at 2:59:45-50, available at: https://iga.in.gov/session/2024/video/committee_judiciary_4200/. In these circumstances, Indiana cannot satisfy heightened scrutiny by constructing a satisfactory legislative rationale post-hoc. *See Smith v. City of Chicago*, 457 F.3d 643, 652 (7th Cir. 2006) (post-hoc rationalization is reserved for rational-basis review).

## III. PLAINTIFFS FACE IRREPARABLE FIRST AMENDMENT INJURY

There is irreparable harm here. The Act threatens the "loss of First Amendment freedoms," which, "for even minimal periods of time, unquestionably constitutes irreparable injury[.]'" *Alvarez*, 679 F.3d at 589 (quoting *Elrod v. Burns*, 472 U.S. 347, 373 (1976)). Independently, "it is well established that the loss of goodwill and reputation, if proven, can constitute irreparable harm." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) (citations omitted).

Plaintiffs face just such a loss: Indiana adults will abandon their platforms if they adopt the Act's intrusive burdens.  *See* ECF 4-10, Ex. 1.

## IV.     THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR PLAINTIFFS

The Seventh Circuit has made clear that "injunctions protecting First Amendment freedoms are always in the public interest."  *Alvarez*, 679 F.3d at 590 (cleaned up).  That ends the inquiry where, as here, the public interest and the balance of harms "merge" because "the government is the defendant."  *Anderson Fed'n of Tchrs. v. Rokita*, 546 F. Supp. 3d 733, 753 (S.D. Ind. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Moreover, given how little the Act does to protect minors from online sexual material, *see supra* at 20, the State cannot show that harm to its interests outweighs the profound harms inflicted upon Plaintiffs and Indiana adults.  Nor does Indiana have any cognizable interest in singling out disfavored viewpoints and speakers, even as the same content continues to flow even more widely to minors through other channels.

Plaintiffs thus satisfy the requirements for a preliminary injunction and this Court should preserve the status quo pending further proceedings and ultimate adjudication of the merits.  *See Alvarez*, 679 F.3d at 590 n.1 (explaining that a preliminary injunction in the pre-enforcement context aims to preserve the status quo).

## V.      SCOPE OF THE INJUNCTION

The Court should enjoin the Attorney General from enforcing the Act against anyone because "the claimed constitutional violation inheres in the terms of the statute, not its application."  *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011).  Where, as here, "the statute is wholly invalid and cannot be applied *to anyone*," "[t]he remedy is necessarily directed at the statute itself."  *Id.*; *see, e.g.*, *St-Hilaire v. Comm'r of Indiana Bureau of Motor Vehicles*, 2024 WL 125982, at *22 (S.D. Ind. Jan. 11, 2024) (enjoining all enforcement).  Just so here, the Act unconstitutionally burdens huge swathes of protected speech, *see United States v. Stevens*, 559

U.S. 460, 473 (2010), and will "significantly compromise recognized First Amendment protections of parties not before the Court," including Indiana adults. *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). The Court should accordingly enjoin the Act's enforcement *in toto*.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court preliminarily enjoin enforcement of the Act pending a final determination of this action.

Dated: June 10, 2024        By      /s/    *Kian Hudson*

Derek L. Shaffer (*pro hac vice forthcoming*)
derekshaffer@quinnemanuel.com
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 538-8000
Fax: (202) 538-8100

Taylor E. Comerford (*pro hac vice forthcoming*)
taylorcomerford@quinnemanuel.com
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave Suite 520
Boston, MA 02199
Telephone: (617) 712-7100
Fax: (617) 712-7200

Kian Hudson (Bar No. 32829-02)
Kian.hudson@btlaw.com
BARNES & THORNBURG LLP
11 S Meridian St
Indianapolis, Indiana 46204
Telephone: (317) 236-1313
Fax: (317) 231-7433

Michael T. Zeller (*pro hac vice forthcoming*)
Arian Koochesfahani (*pro hac vice forthcoming*)
michaelzeller@quinnemanuel.com
ariankoochesfahani@quinnemanuel.com
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
Fax: (213) 443-3100

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2024 a copy of the foregoing was filed electronically with the Clerk of the Court using the Court's ECF system. I am also serving the foregoing by email and by certified mail, return receipt requested, to the address below:

James Barta
Indiana Solicitor General
Office of the Indiana Attorney General
302 W. Washington St., IGCS - 5th Floor
Marion County, Indianapolis, IN 46204
james.barta@atg.in.gov

*/s/ Kian Hudson*
Kian Hudson
*Attorney for Plaintiffs*