UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| FREE SPEECH COALITION, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 1:24-cv-00980-RLY-MG |
| TODD ROKITA, in his official capacity as the | ) | |
| Attorney General of the State of Indiana, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

THEODORE E. ROKITA
Attorney General of Indiana

JAMES A. BARTA
Solicitor General

JENNA M. LORENCE
Deputy Solicitor General

KATELYN E. DOERING
Deputy Attorney General

Office of the Attorney General
IGC South, Fifth Floor
Indianapolis, Indiana 46204
Tel: (317) 232-0709
Fax: (317) 232-7979
Email: James.Barta@atg.in.gov

*Counsel for Defendant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

I.      The Pornographers' Websites Harm Minors ...................................................... 3

II.     Indiana's Age-Verification Law .......................................................................... 6

ARGUMENT ........................................................................................................................ 7

I.      The Pornographers Lack Standing ...................................................................... 8

     A.     The pornography websites lack standing .................................................. 8

     B.     Free Speech Coalition cannot establish associational standing ............ 11

     C.     The anonymous "Jane Does" are not proper plaintiffs and lack standing ............ 13

II.     Requiring Pornography Websites To Keep Minors from Accessing Obscene Materials Poses No First Amendment Problem ........................................................... 15

     A.     The Pornographers' speech is obscene and subject to zero First Amendment protection ................................................................. 15

     B.     Rational-basis review applies, and the Act satisfies it ........................... 16

     C.     Alternatively, the Act satisfies intermediate scrutiny under the secondary-effects doctrine ..................................................................... 20

     D.     Strict scrutiny does not apply, but the Act satisfies it in any event ...................... 22

III.    The Remaining Preliminary-Injunction Factors Favor the State ........................ 30

     A.     The Pornographers Cannot Show Irreparable Harm ............................... 30

     B.     The Balance of Equities Favors the State .............................................. 31

IV.    Any Relief Should Be No Broader Than Necessary ......................................... 31

CONCLUSION ................................................................................................................... 32

# TABLE OF AUTHORITIES

**CASES**

*Abbott v. Perez,*
  585 U.S. 579 (2018).....................................................................................31

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
  591 U.S. 430 (2020).................................................................................10, 11

*Agostini v. Felton,*
  521 U.S. 203 (1997).....................................................................................19

*Anderson v. Jeanpierre,*
  No. 23-1807, 2024 WL 1478029 (7th Cir. Apr. 5, 2024).......................................30

*Armour v. City of Indianapolis,*
  566 U.S. 673 (2012).....................................................................................20

*Ashcroft v. Am. Civil Liberties Union,*
  542 U.S. 656 (2004).......................................................................17, 18, 19, 24

*Barnes v. Glen Theatre, Inc.,*
  501 U.S. 560 (1991)................................................................................22, 25

*Bd. of Trs. of State Univ. of N.Y. v. Fox,*
  492 U.S. 469 (1989).....................................................................................32

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011)...........................................................................15, 17, 19

*California v. Texas,*
  593 U.S. 659 (2021)......................................................................................9

*City of Renton v. Playtime Theatres, Inc.,*
  475 U.S. 41 (1986)..................................................................................20, 21

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)................................................................................13, 14

*Do No Harm v. Pfizer Inc.,*
  96 F.4th 106 (2d Cir. 2024) ............................................................................11

*Doe v. Blue Cross Blue Shield of Wisc.,*
  112 F.3d 869 (7th Cir. 1997) ..........................................................................13

*Doe v. Fenix Internet, LLC,*
  No. 1:21-cv-06624, 2024 WL 2845961 (N.D. Ill. June 5, 2024).............................14

*Doe v. Loyola Univ. Chi.,*
  100 F.4th 910 (7th Cir. 2024) .........................................................................14

*Doe v. Rokita,*
  54 F.4th 518 (7th Cir. 2022) ..........................................................................31

*Draper v. Healey,*
  827 F.3d 1 (1st Cir. 2016)..............................................................................11

*Erznoznik v. City of Jacksonville,*
  422 U.S. 205 (1975) ............................................................................................. 15

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ............................................................................... 16

*FDA v. All. for Hippocratic Med.,*
  Nos. 23-235 & 23-236, 2024 WL 2964140 (U.S. June 13, 2024) ........................ 13

*Fieger v. Mich. Sup. Ct.,*
  553 F.3d 955 (6th Cir. 2009) ............................................................................... 10

*Free Speech Coal. v. Paxton,*
  95 F.4th 263 (5th Cir. 2024) ....................................................................... 2, 17, 19

*Free Speech Coal. v. Paxton,*
  No. 23A925, 2024 WL 1698178 (U.S. Apr. 12, 2024) ........................................... 2

*Free Speech Coal. v. Paxton,* 144 S. Ct. 1473
  (Mem) (U.S. Apr. 30, 2024) (No. 23A925) ............................................................ 2

*Ga. Republican Party v. SEC,*
  888 F.3d 1198 (11th Cir. 2018) ........................................................................... 11

*Ginsberg v. New York,*
  390 U.S. 629 (1968) .................................................... 2, 3, 15, 16, 17, 19, 20, 28

*Ginzburg v. United States,*
  383 U.S. 463 (1966) ....................................................................................... 15, 16

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of Am., Inc.,*
  549 F.3d 1079 (7th Cir. 2008) ....................................................................... 30, 31

*Haaland v. Brackeen,*
  599 U.S. 255 (2023) ........................................................................................ 9, 10

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ............................................................................................ 11

*Jones v. Markiewicz-Qualkinbush,*
  842 F.3d 1053 (7th Cir. 2016) ............................................................................. 31

*L.W. v. Skrmetti,*
  83 F.4th 460 (6th Cir. 2023) ............................................................................... 31

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ...................................................................................... 8, 10, 13

*Miller v. California,*
  413 U.S. 15 (1973) ......................................................................................... 15, 28

*Prairie Rivers Network v. Dynegy Midwest Gen., LLC,*
  2 F.4th 1002 (7th Cir. 2021) .......................................................................... 12, 13

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ............................................................................................ 27

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)........................................................................................22

*Religious Sisters of Mercy v. Becerra*,
  55 F.4th 583 (8th Cir. 2022) ..........................................................................11

*Reno v. Am. Civil Liberties Union*,
  521 U.S. 844 (1997).............................................................................17, 18, 21

*Roe v. Dettelbach*,
  59 F.4th 255 (7th Cir. 2023) ..........................................................................13

*S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*,
  713 F.3d 175 (4th Cir. 2013) ..........................................................................11

*Sable Commc'ns of Cal., Inc. v. FCC*,
  492 U.S. 115 (1989)........................................................................................15

*Satanic Temple, Inc. v. Rokita*,
  No. 1:22-cv-01859-JMS-MG, 2023 WL 7016211 (S.D. Ind. Oct. 25, 2023)...................11, 12

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
  467 U.S. 947 (1984)........................................................................................10

*Speech First, Inc. v. Killeen*,
  968 F.3d 628 (7th Cir. 2020) ............................................................................8

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997).............................................................................................19

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023)........................................................................................11

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009).............................................................................11, 12, 14

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994)........................................................................................25

*United States v. Hansen*,
  599 U.S. 762 (2023)........................................................................................25

*United States v. O'Brien*,
  391 U.S. 367 (1968)........................................................................................26

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000)........................................................................................19

*United States v. Verdugo-Urquidez*,
  494 U.S. 259 (1990)........................................................................................10

*Virginia v. Am. Booksellers Ass'n*,
  484 U.S. 383 (1988)........................................................................................10

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989)........................................................................................20

iv

*Whole Woman's Health v. Jackson,*
  595 U.S. 30 (2021) ..................................................................9, 32

*Williams-Yulee v. Florida Bar,*
  575 U.S. 433 (2015) ...............................................................27, 28

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ..........................................................................7

STATUTES AND RULES

42 U.S.C. § 1983 ..............................................................................10

Ind. Code § 1-5-1.1-17 ....................................................................26

Ind. Code § 2-5-1.1-16 ....................................................................26

Ind. Code § 24-4-23-1 .......................................................................6

Ind. Code § 24-4-23-3 .......................................................................6

Ind. Code § 24-4-23-7 .......................................................................7

Ind. Code § 24-4-23-10 ..................................................................6, 14

Ind. Code § 24-4-23-11 ...................................................................8, 9

Ind. Code § 24-4-23-12 ...................................................................8, 9

Ind. Code § 24-4-23-13 .......................................................................7

Ind. Code § 24-4-23-14 .......................................................................7

Ind. Code § 35-49-2-2 ...........................................................6, 15, 28

Ind. Code § 35-49-2-2(4) ................................................................20

Ark. Code Ann. § 4-88-1305 .............................................................9

La. Stat. Ann. § 2800:29 ...................................................................9

N.C. Gen. Stat. § 66-501(d) ..............................................................9

Utah Code Ann. § 78B-3-1002(1) ......................................................9

Va. Code Ann. § 8.01-40.5 ................................................................9

2024 Ind. Legis. Serv. P.L. 98-2024 (S.E.A. No. 17),
  codified at Ind. Code § 24-4-23-1, *et seq.* ...................................6

Fed. R. Civ. P. 65(a)(1) ...................................................................32

Fed. R. Civ. P. 65(d)(2) ...............................................................9, 32

OTHER AUTHORITIES

*Community Guidelines,* INSTAGRAM,
  https://bit.ly/46y3fnL (last visited June 24, 2024) .....................28

*Nudity & Sexual Content Policy,* YOUTUBE,
  https://bit.ly/3xzuYc7 (last visited June 24, 2024) .....................28

**INTRODUCTION**

Plaintiffs (the "Pornographers") are prolific purveyors of graphic and obscene internet pornography, which they make freely accessible to minors online. Their content emphasizes extreme forms of obscenity, including sexual violence, choking, rape fantasies, sex slavery, and sex with teen girls. Abundant evidence shows that minors are accessing this material in large numbers. The average age of first exposure to internet pornography is 11, and by age 18, more than 72% of adolescents (and more than 90% of boys) say they have viewed pornography online.

Adolescent exposure to pornography carries severe physical and psychological harms. It makes boys more likely to perpetrate sexual violence and girls more likely to be sexually victimized. It promotes unhealthy beliefs about sexual relationships, leads to earlier and riskier sexual experiences, and negatively affects social integration, mental health, and behavioral problems.

The Indiana General Assembly enacted Senate Enrolled Act 17 (the "Act") to address the harms to minors caused by internet pornography. The Act does not restrict the Pornographers' ability to publish pornographic content on their websites. Instead, it targets only the pressing problem of adolescent exposure by requiring the Pornographers to verify the age of their users. This age verification is commonly used in online transactions and is familiar to consumers; it relies on rigorous data security similar to what protects personal data when making purchases online; and it is inexpensive, costing as little as 12 cents for an age verification that can be used across many platforms and websites.

The Act is a commonsense and tailored solution to a pressing problem affecting minors in Indiana, but because the Pornographers would prefer to take *no* responsibility for the harms their pornographic content causes in the hands of minors, they ask this Court to preliminarily enjoin the Act as violating the First Amendment's guarantee of free speech. But the Pornographers lack

standing to bring these claims, and the Act does not violate the First Amendment. Indeed, the Pornographers lost bids to halt enforcement of a similar Texas statute, at both the Fifth Circuit and U.S. Supreme Court. *See* Application for Stay of Judgment, *Free Speech Coal. v. Paxton*, No. 23A925, 2024 WL 1698178 (U.S. Apr. 12, 2024), *stay denied*, 144 S. Ct. 1473 (Mem) (U.S. Apr. 30, 2024) (No. 23A925); *Free Speech Coal. v. Paxton*, 95 F.4th 263 (5th Cir. 2024).

The Pornographers lack standing because the Act carries potent mechanisms of *private* enforcement that their lawsuit cannot prevent, and the Pornographers do not aver that they would operate in Indiana while this private enforcement is available. Many of the Pornographers are also foreign websites, which are not entitled to the protections of the First Amendment. The Free Speech Coalition's alleged associational standing on behalf of its members fares no better, since that entity refuses to disclose the identity of its members—a requirement for entities relying on membership to assert standing. The Pornographers also offer declarations from two Jane Doe individuals (and reference a third woman), but these individuals are not plaintiffs, cannot become plaintiffs anonymously, and would lack standing in any event.

There is no First Amendment problem either. To start, the First Amendment does not protect the Pornographers' websites. Much of their content is obscene, even for adults, and to the extent any non-obscene content exists on their websites, the websites as a whole are calculated to appeal to the prurient interest. Moreover, even if the First Amendment protects the Pornographers' websites, the Act's age-verification requirement is subject to only rational-basis review under *Ginsberg v. New York*, 390 U.S. 629, 642–43 (1968). And requiring pornographic websites to verify users are 18 years old is rationally related to Indiana's interest in protecting minors from the harmful effects of online pornography. In fact, the Act's age-verification requirement is closely tailored enough to a compelling governmental interest that it survives even strict scrutiny.

Because the Pornographers cannot make a strong showing on the merits, the Court need not consider the other preliminary-injunction factors. But if the Court considers those factors, they also weigh against granting a preliminary injunction. The Pornographers—who delayed nearly three months in filing this case—have not proven they would be irreparably harmed absent an injunction, and the balance of the equities favors the State. And the State's importance of protecting minors overcomes the tenuous First Amendment arguments the Pornographers have ventured.

The Pornographers' motion for a preliminary injunction should be denied.

## BACKGROUND[1]

### I.   The Pornographers' Websites Harm Minors

"Most of today's pornography does not reflect consensual, loving, healthy relationships" but "teaches dominance, aggression, disrespect, and objectification," and the Pornographers' websites are prime examples. Ex. 1,[2] Byrin Romney, *Screens, Teens, and Porn Scenes: Legislative Approaches to Protecting Youth from Exposure to Pornography*, 45 Vᴛ. L. Rᴇᴠ. 43, 43 (2020). One study found that 45% of Pornhub scenes and 35% of Xvideo scenes contained aggression, most commonly "[s]panking, gagging, slapping, hair pulling, and choking," with women the target of the physical aggression "in 97% of the scenes." Ex. 2, Niki Fritz et al., *A Descriptive Analysis of the Types, Targets, and Relative Frequency of Aggression in Mainstream Pornography*, 49 Aʀᴄʜɪᴠᴇs ᴏғ Sᴇxᴜᴀʟ Bᴇʜᴀᴠ. 3041, 3041 (2020).

Indiana State Police Captain Peter Glogoza easily discovered this type of content on the

---

[1] In light of the Pornographers' nearly three-month delay before filing this case and the extremely abbreviated briefing schedule on their preliminary injunction motion, the State's evidentiary record is necessarily limited to what was feasible to assemble in the time allowed.
[2] All exhibits referenced hereinafter are attached to the Declaration of James Barta (June 24, 2024), filed along with this brief.

Pornographers' websites. At Xvideos, he observed content categories labeled "Gangbang," "Hard-core," "Rough," and "Teen." Glogoza Decl. ¶ 9. Searching for "bondage" returned more than 47,000 free video results and more than 5,800 that required a subscription. *Id*. ¶ 10. A search for "teen bondage" returned 241,443 results. *Id*. He also encountered videos depicting violent sexual acts. One video depicted two purportedly "Adorable Teen[]" girls bound, gagged, and choked while being penetrated orally and vaginally. *Id*. ¶ 12. The video had more than 9 million views. *Id*. Another video titled "4 slaves punished and humiliated by master he fucks and slaps them" depicted a man beating, gagging, fondling, and engaging in non-consensual violent and sexual acts with four bound women. *Id*. ¶ 13. The video has more than 2.6 million views. *Id*.

Unsurprisingly, in light of the aggressive and domineering themes in modern pornography, studies show a strong relationship between pornography use and beliefs related to "male dominance and female submission, a power imbalance in sexual relationships, and that women exist as sex objects for men's sexual pleasure." Ex. 1 at 53. Pornography use is "strongly correlated with sexual aggression in boys and sexual victimization in girls." *Id*. at 54. Youth pornography exposure also carries a host of other negative physical and psychological consequences. "Youth who are exposed to pornography report 'lower degrees of social integration, increases in conduct problems, [and] higher levels of delinquent behavior." *Id*. at 53 (brackets in original). Adolescent pornography use "is also related to the early occurrence of sexual intercourse, more experience with casual sex behavior, and riskier sex practices," including "prostitution." *Id*. Female adolescents who viewed pornography "are more likely to become victims of sexual violence," while male adolescents exposed to violent pornography were three times as likely to perpetrate sexual teen dating violence. *Id*. at 54–55. Pornography viewing also encourages adolescents to create, send, and share child sexual abuse material as sexually explicit images and recordings of themselves (sexting). *Id*.

at 56–57; *see also* Brown Decl. ¶ 7.

Yet despite these known harms to minors, the Pornographers' websites are pumping enormous amounts of pornographic content onto the internet, where minors can and do freely access it. In 2019 alone, Pornhub reported 42 billion visits to its site, 1.36 million hours (169 years) of new uploaded content, and 6,597 petabytes of data transferred (easily more bandwidth than the entire internet consumed in 2002). *Id.* at 50. Unlike the dirty magazines and VHS tapes of yesteryear, pornography today consists of high-definition recordings that are affordable to access (Pornhub and Xvideo are mostly free), available from virtually any device without restriction, and depict unlimited sexual content, including risky or illegal sexual practices. Ex. 3, Aina M. Gassó & Anna Bruch-Granados, *Psychological and Forensic Challenges Regarding Youth Consumption of Pornography: A Narrative Review*, 1 ADOLESCENTS 108, 108–09 (2021).

And minors *are* accessing pornography online. "Even with modern filtering services, American youths' exposure to pornographic content online is almost inevitable." Ex. 1 at 48. The "average age of first exposure to pornographic material is commonly reported as eleven years old." *Id.* By their teens, generalized consumption of pornography is commonplace. As one study found, 50% of teenagers between 14 and 17 years old watch pornography online. Ex. 3 at 109. In another study, 72.8% of participants (93.2% of boys, 62.1% of girls) reported seeing online pornography before they turned 18 years old. Ex. 4, Chiara Sabina et al., *The Nature and Dynamics of Internet Pornography Exposure for Youth*, 11 CYBERPSYCHOLOGY & BEHAV. 1, 1 (2008). The Pornographers' websites facilitate this youth exposure. The only "obstacle" to minors viewing their free content is a single warning box that allows any user to enter the site by clicking "I am 18 years old or older," whether or not that is true. Glogoza Decl. ¶ 6.

## II.   Indiana's Age-Verification Law

In light of the extreme harms online pornography poses to minors, the Indiana General

Assembly enacted Senate Bill 17 to require age verification before an individual accesses material harmful to minors online. 2024 Ind. Legis. Serv. P.L. 98-2024 (S.E.A. 17), codified at Ind. Code § 24-4-23-1 *et seq.* (the "Act"). The Act applies to any "[a]dult oriented website," defined as "a publicly accessible website that publishes material harmful to minors, if at least one-third (1/3) of the images and videos published on the website depict material harmful to minors." § 24-4-23-1. The Act relies on an existing definition of "material harmful to minors" in Indiana law:

> A matter or performance is harmful to minors . . . if:
>
> (1)      it describes or represents, in any form, nudity, sexual conduct, sexual excitement, or sado-masochistic abuse;
>
> (2)      considered as a whole, it appeals to the prurient interest in sex of minors;
>
> (3)      it is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable matter for or performance before minors; and
>
> (4)      considered as a whole, it lacks serious literary, artistic, political, or scientific value for minors.

Ind. Code § 35-49-2-2; *cf.* § 24-4-23-3.

The Act provides that "[a]n adult oriented website operator may not knowingly or intentionally publish an adult oriented website unless the adult oriented website operator uses a reasonable age verification method to prevent a minor from accessing the adult oriented website." Ind. Code § 24-4-23-10. The Act defines a "reasonable age verification method" to include any one or more of the following methods:

> (1)      A mobile credential.
>
> (2)      An independent third party age verification service that compares the identifying information entered by the individual … with material that is available from a commercially available data base … that is regularly used by government agencies and businesses for the purpose of age and identity verification. [or]

> (3)  Any commercially reasonable method that relies on public or private transactional data to verify the age of the individual attempting to access the material.

§ 24-4-23-7.

The Act also builds in privacy protections. Any "person that uses or purports to use a reasonable age verification method to grant or deny access to an adult oriented website . . . may not retain identifying information of the person seeking access" unless ordered to do so by a court. Ind. Code § 24-4-23-13. Additionally, "[a]dult oriented website operators must use commercially reasonable methods to secure all information collected and transmitted" pursuant to the Act. § 24-4-23-14.

## ARGUMENT

The Pornographers' motion for a preliminary injunction should be denied. "A preliminary injunction is an extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking [one] must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

All four factors cut against a preliminary injunction. The Pornographers lack standing and any viable First Amendment claims. The Pornographers cannot show irreparable harm from the Act's reasonable requirement that websites block minors from accessing content that minors have no First Amendment right to access. There is a strong public interest in protecting minors from demonstrably harmful materials and in enforcing democratically enacted laws. And the Pornographers' months-long delay in bringing this suit cuts against any emergency relief.

## I.      The Pornographers Lack Standing

To obtain a preliminary injunction, a plaintiff must first establish standing. *See Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). To do so, the plaintiff must demonstrate

he has "suffered an injury in fact—an invasion of a legally protected interest" that is "concrete and particularized and actual or imminent"—that the asserted injury is "fairly traceable to the challenged action of the defendant," and that the asserted injury is likely to be "redressed by a favorable judgment." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). Standing allegations must be supported "in the same way as any other matter on which the plaintiff bears the burden of proof." *Id.* at 561. This means that, at the preliminary-injunction stage, the plaintiff cannot rest on "general factual allegations of injury," but "must set forth by affidavit or other evidence specific facts." *Speech First*, 968 F.3d at 638 (cleaned up). No concrete facts establish standing here.

### A.    The pornography websites lack standing

The Pornographers operating websites assert standing to sue the Attorney General based on alleged compliance costs, penalties for non-compliance, and impacts on nonparties. Dkt. 5, Pls.' Br. in Supp. of Mot. for Prelim. Inj. at 11–12 (June 10, 2024) ("PI Br."). But no evidence establishes that enjoining the Attorney General from enforcing the Act will redress these alleged injuries, and redressability is a bedrock requirement of Article III standing. Critically, the Attorney General is not the only one able to enforce the Act. The Act also gives parents and guardians of minors a private right of action for damages and injunctive relief, Ind. Code § 24-4-23-11, and it allows "any person" to seek injunctive relief, § 24-4-23-12. In any privately filed lawsuit, the Act puts pornography websites on the hook for court costs, attorney's fees, and other litigation expenses as well. §§ 24-4-23-11, 24-4-23-12.

Through this litigation against the Attorney General, the pornography websites cannot eliminate the threat of private enforcement. The Act's provisions providing for private enforcement "'operate independently'" of the provisions providing for the Attorney General's enforcement. *Haaland v. Brackeen*, 599 U.S. 255, 296 (2023) (quoting *California v. Texas*, 593 U.S. 659,

679 (2021)). No private parties who might enforce the Act in the future are parties to this litigation and capable of being enjoined. *See* Fed. R. Civ. P. 65(d)(2). And even if some were made defendants, "under traditional equitable principles, no court may lawfully enjoin the world at large, or purport to enjoin challenged laws themselves." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (cleaned up). Thus, regardless of how this litigation ends, the pornography websites must either comply with the Act or risk expensive litigation from private parties who can seek damages, injunctions enforceable by contempt sanctions, and awards of litigation expenses. In other words, the remedy they seek will not redress their injuries.

None of the declarations from the pornography websites aver that the websites will operate in violation of the Act while these potent avenues for private enforcement remain. In fact, the pornography websites' conduct elsewhere indicates that the pornography websites will not flout the Act. Louisiana, Utah, and other States have enacted laws requiring age verification that are only enforceable by private parties. *See, e.g.*, La. Stat. Ann. § 2800:29; Utah Code Ann. § 78B-3-1002(1); Ark. Code Ann. § 4-88-1305; N.C. Gen. Stat. § 66-501(d); Va. Code Ann. § 8.01-40.5. Yet PornHub, xHamster, and other pornography websites have chosen either to comply with the age-verification laws, or to cut off access in those States rather than operate in non-compliance and risk private enforcement. *See* Ex. 5, Jacob Kastrenakes, *Pornhub to block five more states over age verification laws*, THE VERGE (June 19, 2024); Ex. 6, Ashley Belanger, *Pornhub prepares to block five more states rather than check IDs*, ARSTECHNICA (June 20, 2024). Preventing the Attorney General from enforcing the Act therefore will not redress the pornography websites' feared injuries. They will "continue to incur the complained-of costs." *Haaland*, 599 U.S. at 296.

The foreign websites face another standing problem—the lack of a "legally protected interest." *Lujan*, 504 U.S. at 560. A "clear rule of American law" is that "[f]oreign organizations

operating abroad do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 438 (2020). "[T]he people" protected by the Constitution are those "who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). And consistent with that rule, § 1983 only affords a cause of action to "citizen[s] of the United States" and "other person[s] *within* the jurisdiction thereof." 42 U.S.C. § 1983 (emphasis added). Here, however, the foreign pornography websites are not part of our national community. They are foreign entities formed in and operating out of the Czech Republic, Cyprus, and Romania. *See* Compl. ¶¶ 14–23, Dkt. No. 1 (June 10, 2024).

That foreign pornography websites raise overbreadth arguments does not relieve them of demonstrating injury to their own legally protected interests. The "'Supreme Court has made clear that the injury in fact requirement still applies to overbreadth claims under the First Amendment.'" *Fieger v. Mich. Sup. Ct.*, 553 F.3d 955, 961 (6th Cir. 2009) (citing *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988); *see Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984). So foreign pornography websites cannot raise concerns about how the Act might affect *third parties* unless they show an actual, concrete invasion of *their own legally protected interests*. *See Lujan*, 504 U.S. at 560. The foreign pornography websites cannot do so: As the Supreme Court held, it has "never been the law" that foreign entities "outside the United States or such U.S. territory" possess First Amendment rights. *All. for Open Soc'y Int'l*, 591 U.S. at 434.

### B.    Free Speech Coalition cannot establish associational standing

Plaintiff Free Speech Coalition, Inc., which describes itself as "the adult industry's primary trade association," PI Br. at 7–8, lacks standing as well. It does not assert any direct injury from

the Act but invokes associational standing. Associational standing requires an organization to establish (among other things) that its members would "have standing to sue in their own right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

To prove members would have standing, it is necessary for an organization to provide evidence of harm "specific" to an "identified member." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). An organization ordinarily must "name[] an injured individual" for associational standing on the pleadings, *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016), and provide "individual affidavits" from members at later stages, *Summers*, 555 U.S. at 499; *see Satanic Temple, Inc. v. Rokita*, No. 1:22-cv-01859-JMS-MG, 2023 WL 7016211, at *6 (S.D. Ind. Oct. 25, 2023) (observing prior statements from the Seventh Circuit do not survive the Supreme Court's decision in *Summers*). An organization is excused from naming affected members "only where *all* the members of the organization are affected by the challenged activity." *Summers*, 555 U.S. at 499. Otherwise, "identifiable members" are required. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023); *accord Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 118 (2d Cir. 2024); *Religious Sisters of Mercy v. Becerra*, 55 F.4th. 583, 601 (8th Cir. 2022); *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018); *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

In this case, however, the Free Speech Coalition does not identify any members by name or provide affidavits from them. Instead, it refuses to name its members. *See* Boden Decl. ¶ 5, Dkt. No. 4-1 (June 9, 2024). As Judge Magnus-Stinson held in dismissing a case where an association refused to identify members by name, that "simply will not do." *Satanic Temple*, 2023 WL 7016211, at *7. A declaration from an organization is "insufficient" to establish standing when it

"d[oes] not name the individuals who were harmed." *Summers*, 555 U.S. at 498. Free Speech Coalition, moreover, provides no evidence that the Act affects "all" members equally. *Id.* To the contrary, Free Speech Coalition admits that it assists a wide variety of people involved in the pornography industry, including "filmmakers, producers, distributors, wholesalers, manufacturers, retailers, internet platforms, performers, writers, educators, and other creative artists located throughout North America." Boden Decl. ¶ 3. The organization, however, does not claim that *all* members are operators of adult-oriented websites subject to the Act's requirements or otherwise harmed.

Even if Free Speech Coalition is not required to name members, it still cannot carry its burden of establishing that unidentified, anonymous members have standing in their own right. Free Speech Coalition claims to act "especially on behalf" of "individual adult performers" distributed "throughout North America." *Id*. ¶¶ 3, 5. But it describes those performers only vaguely. Its declarant provides no factual averments establishing that specific, anonymous performer members are subject to the Act. It does not say whether (or how many) operate websites, whether the websites are accessible in Indiana, whether the websites meet Indiana's statutory definition of "adult oriented website," or whether the websites contain "material harmful to minors," as that term is defined in Indiana law. Free Speech Coalition provides no factual details about individual members' activities whatsoever, choosing to speak of "members only as a collective." *Prairie Rivers Network v. Dynegy Midwest Gen., LLC*, 2 F.4th 1002, 1009 (7th Cir. 2021). Such generic statements are insufficient. *See id.*

Nor does Free Speech Coalition establish that a favorable judgment against the Attorney General would redress any injuries suffered by any members who might be subject to the Act. To the contrary, Free Speech Coalition's executive director suggests that the "risk" of *private* lawsuits

would deter members from operating non-compliant websites. Boden Decl. ¶ 8. Theoretically, the director suggests, members might choose to comply with the Act and incur costs related to age verification. *Id.* ¶ 10. But the director demeans compliance as "unworkable for most FSC members," and does not say that any members intend to comply. *Id.* The director at best recites "generalized harm to a group of individual members," not "concrete and particularized" harm to specific individual members. *Prairie Rivers*, 2 F.4th at 1010; *Lujan*, 504 U.S. at 560.

To the extent that Free Speech Coalition is alleging that members not subject to the Act have standing, its problems multiply. When a plaintiff challenges the government's regulation "of *someone else*," standing is "ordinarily substantially more difficult to establish." *FDA v. All. for Hippocratic Med.*, Nos. 23-235 & 23-236, 2024 WL 2964140, at *7 (U.S. June 13, 2024) (quoting *Lujan*, 504 U.S. 562). Here, however, Free Speech Coalition's director does not explain how regulation of others will harm members who do not operate websites themselves. She does not explain whether those members deliver content to persons in Indiana, whether those specific members deliver content on websites subject to the Act, how those unidentified websites will respond to the Act, or how those responses will impact individual members. All is left to "'speculation.'" *Id.* at *7 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 415 n.5 (2013)).

### C.    The anonymous "Jane Does" are not proper plaintiffs and lack standing

The Pornographers cannot establish standing through the Jane Doe declarants. First, the Jane Does are not plaintiffs. Second, the Federal Rules do not permit the Jane Does to serve as plaintiffs without disclosing their identities. Adults are permitted to sue anonymously only in "'exceptional circumstances.'" *Roe v. Dettelbach*, 59 F.4th 255, 259–60 (7th Cir. 2023) (quoting *Doe v. Blue Cross Blue Shield of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997)). The Jane Does here have not demonstrated exceptional circumstances. Jane Doe 1, an adult performer, and Jane Doe 2, a

licensed sex therapist, express concerns about "government and public retaliation." Jane Doe 1 Decl. ¶ 8, Dkt. No. 4-6 (June 9, 2024); Jane Doe 2 Decl. ¶ 20, Dkt. No. 4-7 (June 10, 2024). But abstract, unsubstantiated fear that the disclosure of embarrassing or unpopular information "may lead to 'retaliation'" does "not justify anonymity." *Doe v. Loyola Univ. Chi.*, 100 F.4th 910, 913 (7th Cir. 2024); *see Doe v. Fenix Internet, LLC*, No. 1:21-cv-06624, 2024 WL 2845961, at *2 n.2 (N.D. Ill. June 5, 2024).

Third, the Jane Does do not allege a redressable injury in fact traceable to the Act. The Act "neither require[s] nor forbid[s] any action on the part of [the Jane Does]." *Summers*, 555 U.S. at 493. Instead, it regulates "adult oriented website operator[s]." Ind. Code § 24-4-23-10. The Jane Does, moreover, do not identify harm to themselves caused by the Act. Jane Doe 1, a performer, fears a reduction in her "ability to post and distribute legal adult content." Jane Doe 1 Decl. ¶ 6. But she does not allege that Indiana adults currently view her content through websites that will be subject to the Act or will stop doing so if the Act takes effect. Jane Doe 2, a therapist, says she will not use websites subject to age-verification requirements because of "risks posed by a hack or leak of the information created or collected during age verification." Jane Doe 2 Decl. ¶¶ 12–13. Concerns about hypothetical risks, however, are "too speculative" for standing. *Clapper*, 568 U.S. at 401 (cleaned up).

## II.   Requiring Pornography Websites To Keep Minors from Accessing Obscene Materials Poses No First Amendment Problem

### A.   The Pornographers' speech is obscene and subject to zero First Amendment protection

The First Amendment does not protect obscenity. *Miller v. California*, 413 U.S. 15, 23 (1973). The Act precisely tracks the Court's definition of obscenity, while specifying the analysis is to be done with respect to minors specifically. *Compare Miller*, 413 U.S. at 24–25, *with* Ind.

Code § 35-49-2-2. The Pornographers' content is undoubtedly obscene for minors, Glogoza Decl. ¶¶ 12–14, and therefore falls outside the First Amendment's protection. Indeed, the Supreme Court has repeatedly endorsed States' ability to "shield[] minors from the influence of literature that is not obscene by adult standards." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989); *see Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212 (1975); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 793–94 (2011).

And Pornographers' content is obscene not only for minors, but also for adults, a fact that dooms their facial challenge. The State's investigator viewed a video titled "PunishTeens – Adorable Teens (Chloe Couture) (Trisha Parks) Tied up and" during which a man tied and gagged two girls, repeatedly penetrated them orally and vaginally, and ejaculated onto their faces. Glogoza Decl. ¶ 12. Another video titled "4 slaves punished and humiliated by master he fucks and slaps them" depicted nonconsensual sexual activity accompanied by graphic violence. *Id*. ¶ 13. The Pornographers' websites returned hundreds of thousands of search results for terms like "teen bondage." *Id*. ¶ 11. This material is obscene for all ages.

The "question of obscenity" may also "include consideration of the setting in which the publications were presented." *Ginzburg v. United States*, 383 U.S. 463, 465–66 (1966). "Where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity." *Id*. at 470. Here, the Pornographers' websites, as evidenced both by the nature of their content, *see* Glogoza Decl., and by even the names of the websites themselves, are in "the business of purveying textual or graphic matter openly advertised to appeal to the erotic interest of their customers." *Ginzburg*, 383 U.S. at 468. The fact that they reflect a "deliberate and studied arrangement . . . editorialized for the purpose of appealing predominantly to prurient interest" makes the Pornographers' *entire* websites obscene and therefore

unprotected by the First Amendment, even if some portion of their content could be considered non-obscene if set in a different context or considered in the abstract. *Id*. at 471–72. Under *Ginzburg*, the Pornographers' speech is wholly unprotected, and their challenge is subject only to rational-basis review.

The Pornographers cannot hide behind their factual assertion that some modicum of non-obscene material exists on their websites. Not only do their websites as a whole reflect that they were "created or exploited entirely on the basis of [their] appeal to prurient interests," which renders their entire websites obscene, *id*. at 474, the Pornographers also make no effort to segregate any allegedly non-obscene content from the obscene content they also make available. So it is not possible for the State to more narrowly target only the Pornographers' unprotected, obscene material. The Pornographers cannot show that they are likely to succeed in their facial claim that "the statute is wholly invalid and cannot be applied *to anyone*," PI Br. at 24 (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011)), since the Act can constitutionally be applied to them as purveyors of material expressly aimed at the prurient interest of their customers.

### B.   Rational-basis review applies and the Act satisfies it

Even if the Pornographers' speech is not wholly unprotected, rational-basis review still applies under *Ginsberg v. New York*, 390 U.S. 629, 642–43 (1968), because the Act targets material that is obscene to minors. *Ginsberg* concerned the sale of "girlie picture magazines" that were not obscene for adults but met New York's statutory definition of obscenity as to minors. *Id*. at 634–35 (cleaned up). The Court upheld the statute after applying rational-basis review. The Court concluded that "[t]he well-being of its children is of course a subject within the State's constitutional power to regulate," and that New York's law satisfied the First Amendment "at least if it was rational for the legislature to find that minors' exposure to [the prohibited] material might be harmful." *Id*. at 639. New York did have such a rational basis for its law, both because the law supported

the authority of parents to direct the rearing of their children and because New York "has an independent interest in the well-being of its youth." *Id*. at 639–40.

The Pornographers fail to contend with *Ginsberg*, even though it remains good law. In *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), the Supreme Court described *Ginsberg* as holding that "the legislature could 'adjust the definition of obscenity to social realities . . . in terms of the sexual interests of minors," and "because obscenity is not protected expression, the New York statute could be sustained so long as the legislature's judgment that the proscribed materials were harmful to children was not irrational." *Id*. at 794 (cleaned up). Because *Brown* concerned violent content rather than obscenity as to minors, the Court held that *Ginsberg* did not apply. But here, where the Act is materially indistinguishable from the New York law at issue in *Ginsberg*, rational-basis review is compelled by binding Supreme Court precedent. *See Free Speech Coal. v. Paxton*, 95 F.4th 263, 269 (5th Cir. 2024).

Neither *Reno* nor *Ashcroft II* compels otherwise. *Reno* distinguished *Ginsberg* on the grounds that the New York law at issue in *Ginsberg* was narrower than the federal Communications Decency Act at issue in *Reno* in four ways: (1) the CDA did not allow for parental consent; (2) it did not apply only to commercial transactions; (3) the CDA's definition of material harmful to minors did not include the restriction that it be "utterly without redeeming social importance for minors," and (4) the CDA defined "minor" as under 18 years of age rather than 17. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 865–66 (1997) (cleaned up). Here, the Act as applied to the Pornographers mimics the *Ginsberg* statute in three of those four ways—all but its application to those under age 18. Parents can provide their teens access to websites the Act age-restricts; the Pornographers are engaged only in commercial activities; and material with serious social value for minors is excluded from the Act's coverage. Other differences also exist: the CDA "included

17

prohibitions on non-sexual material," "did not specifically define the proscribed material," and at the time of *Reno*, "a viable age verification process" was not available—none of which is true here. *Free Speech Coal.*, 95 F. 4th at 272.

*Ashcroft II* cannot be construed to require a ruling for the Pornographers. *Ashcroft II* reached the Court only under an abuse-of-discretion standard of review, and in remanding the case, the Court left open that the government could prevail depending on the factual record to be developed below. *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 672 (2004) ("*Ashcroft II*"). This was due, in part, to the fast-changing pace of technology, given that the evidence in *Ashcroft II* had been entered in 1999 and was already five years old, and during the intervening time "certain facts about the Internet [we]re known to have changed." *Id*. at 671. There are other differences, too. In *Ashcroft II*, the government did not address the ineffectiveness of filtering technology, which the State does address here, *see* pp. 23–25, *infra*; the Court emphasized the chill of criminal penalties, which are not present here, *Ashcroft II*, 542 U.S. at 670–71; and there were significant underinclusivity problems not present here, including that the statute did not screen out minors with credit cards and did not apply to materials originating overseas, *id*. at 657. Finally, *Ashcroft II* reaches no holding as to what tier of First Amendment scrutiny should apply. *Id*. at 660–61. The petitioner in *Ashcroft II* briefed the case as applying strict scrutiny and narrow tailoring, so the Supreme Court had no occasion to take up the issue. *See* Brief for Pet'r, *Ashcroft II*, 542 U.S. 656 (2004) (No. 03-218), 2003 WL 22970843, at *iii; *see Free Speech Coal.*, 95 F.4th at 272. This is the best reading of *Ashcroft II* because the Supreme Court not only did not overrule *Ginsberg* in *Ashcroft II*, but subsequently restated and distinguished *Ginsberg* in *Brown*—which would have been unnecessary if *Ginsberg* were no longer good law. *Brown*, 564 U.S. at 793–94. And it is the Supreme "Court's prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522

U.S. 3, 20 (1997); *see also Agostini v. Felton*, 521 U.S. 203, 237–38 (1997) (a lower court "should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions").

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000), also does not demand that the Act be subjected to strict scrutiny. *Playboy* concerned a "nationwide daytime speech ban" of adult-oriented cable channels. 529 U.S. at 805. Here, the Act does not ban *any* speech at *any* time of day. Rather, as in *Ginsberg*, the Act simply requires the Pornographers to take steps to ensure that speech that everyone admits may constitutionally be limited to adults is limited to adults.

Nor is the Act subject to strict scrutiny as a speaker-based limitation on speech. Again, *the Act is not a restriction on protected speech at all*—children have no right to access material that is obscene for minors. Whether or not it is speaker-based therefore is irrelevant. In any event, the Pornographers' claims fail on their own terms. The Pornographers claim the Act engages in speaker-based discrimination because it exempts news media and search engines and does not apply to social media sites if less than one-third of their content is harmful to minors. PI Br. at 17–18. But as explained in more detail pp. 22–30, *infra*, these distinctions tailor the law to the General Assembly's most pressing concern: minors accessing online pornography. The news media exemption reflects part of the definition of material harmful to minors, which must "lack[] serious literary" or "political . . . value." Ind. Code § 35-49-2-2(4). The search engine exception eliminates a redundancy in the Act's coverage—search engines merely produce results from websites like the Pornographers, which the Act regulates directly instead. *See* Glogoza Decl. ¶¶ 4–5. And to the extent any social media platform falls outside the Act's scope, it is not because of a *speaker-based*

distinction, but because the platform does not meet the Act's definition of an adult-oriented web-site.

The Act only restricts obscenity to minors from being accessed by minors, and as such, it warrants *Ginsberg*'s rational-basis review, which it easily satisfies in light of the abundant evidence of the serious harms online pornography causes to minors. *See* pp. 3–5, *supra*. Because rational-basis review does not require the government to "draw the perfect line nor even to draw a line superior to some other line it might have drawn," the Act passes constitutional muster. *Armour v. City of Indianapolis*, 566 U.S. 673, 685 (2012).

## C.     Alternatively, the Act satisfies intermediate scrutiny under the secondary-effects doctrine

If the Court believes the Act requires heightened scrutiny, then the appropriate standard is intermediate scrutiny under the secondary-effects doctrine, which the Act satisfies.

Under the secondary-effects doctrine, a statute aimed at the secondary effects of expressive conduct need not survive strict scrutiny. Rather, a regulation of secondary effects is constitutional if it "promotes a substantial government interest that would be achieved less effectively absent the regulation," and "the means chosen are not substantially broader than necessary to achieve the government's interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 799–800 (1989) (cleaned up).

The Supreme Court has applied the secondary-effects doctrine to statutes aimed at the secondary effects of sexually explicit but non-obscene expressive conduct. In *City of Renton v. Playtime Theatres, Inc.*, a municipal ordinance restricted where in the city an "adult motion picture theater" could locate, but did not so restrict motion picture theaters showing other types of films. 475 U.S. 41, 44 (1986). The Supreme Court held that the ordinance was subject only to intermediate scrutiny because it was "aimed not at the *content* of the films shown at 'adult motion picture

theatres,' but rather at the *secondary effects* of such theaters on the surrounding community." *Id*. at 47. The ordinance also satisfied the applicable constitutional test of intermediate scrutiny because it was "designed to serve a substantial governmental interest and allow[ed] for reasonable alternative avenues of communication." *Id*. at 50. "[P]reserv[ing] the quality of urban life" is a substantial "governmental interest," and the ordinance also allowed adult theaters in some city zones. *Id*.

At most, the same intermediate-scrutiny standard applies here because the Act does not regulate the content of the Pornographers' websites but only the secondary effects of that content on minors. *See* pp. 3–5, *supra* (discussing effects of pornography on minors). Indeed, the Act imposes no restrictions whatsoever on the type of content the Pornographers may show on their websites; it only restricts the ability of minors to access that content as a means to avoid the serious, known consequences for minors who view such material.

The Pornographers may argue that the secondary effects doctrine does not apply because the Act is concerned with "the direct impact of speech on its audience," rather than indirect, secondary effects of speech. *See Reno*, 521 U.S. at 868 (cleaned up). But that would be a mistake. To be sure, the Act is concerned with the effect of the Pornographers' explicit content on minors. But the Pornographers' speech is wholly unprotected as to minors. To the extent any speech is protected in this case, it is speech directed at adults. And without meaningful age gating, a secondary effect of allowing the Pornographers to seek to speak to *adults* is that their material will be available to *children*. Because the Act is not aimed at the direct impact of the only speech that is conceivably protected (although the State does not concede that any of the Pornographers' offerings actually is protected), the Act properly is analyzed under the Supreme Court's secondary effects jurisprudence to the extent it is subject to First Amendment scrutiny at all.

The Act also satisfies the intermediate-scrutiny standard. The Act advances the government's substantial interest in protecting minors' physical and psychological health from the devastating consequences of pornography (an interest that is, in fact, *compelling*, not merely substantial). And the Act is tailored to its objective. Age verification is a tailored solution aimed only at preventing the identified harm (minors viewing pornographic material). It does not restrict the Pornographers' speech itself.

Invalidating Indiana's law would produce substantial tension with the Supreme Court's secondary effects jurisprudence. Indeed, in *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991), the Court rejected a First Amendment challenge to an Indiana statute banning live fully nude dancing *altogether*. It would be wholly incongruous to hold that Indiana can *ban* live nude dancing yet cannot require the Pornographers simply to *age verify* access to content that is much more explicit and harmful to children than any nude dancing performance.

### D.    Strict scrutiny does not apply, but the Act satisfies it in any event

While strict scrutiny is not the appropriate standard under which to evaluate the Act, it survives strict scrutiny in any event. Strict scrutiny "requires . . . that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (cleaned up). The Pornographers do not challenge that the State has advanced a compelling interest: protecting minors from the physical and psychological harms of pornography. PI Br. at 18. The Pornographers only claim that the Act is not the least restrictive means of protecting minors and is both over- and under-inclusive. *Id.* Not so.

1.    The Act is the least restrictive means of protecting minors from pornography online. It targets the most significant intentional purveyors of material harmful to minors and requires only that they verify the age of their viewers, not that they alter the content they offer to adults.

The Pornographers propose two less-restrictive alternatives that they claim would be superior to the Act's age-verification requirement, but the Pornographers cannot substantiate these claims, and the alternatives they propose are far less effective than the Act.

First, the Pornographers urge the State to "make freely available or require the use or pre-installation of filtering technology on minors' devices." PI Br. at 18. Merely making filtering technology "available" would not be as effective as the Act's age-verification requirement, as it would require individual consumers to have the technological skills and knowledge to obtain and properly implement the filters. Pre-installing filtering on minors' devices is not only less effective but also imposes burdens on adults. It is less effective because devices change hands within a family, and a minor could disable or circumvent pre-installed filters. Allen Decl. ¶¶ 41–43. And even if a child's parent is extremely vigilant, the same may not be true for the parents of the child's friends. Brown Decl. ¶ 5. Filters are also imperfect tools that "fail to block all harmful content," and "require[] constant updates . . . to keep up with new websites and changing content." Allen Decl. ¶¶ 47–49. Many parents do not know about or do not know how to use available filtering technology, "or discover their children also know how to use it" and "have circumvented it some other way." *Id.* ¶ 41. And pre-installed filters often overblock by preventing access to educational, informative, or harmless content and impose burdens on adults to disable pre-installed filters if unwanted. The Pornographers do not explain why preemptively filtering content available to adults, or over-filtering content available to teens, would be a "less restrictive" means of advancing the State's compelling interest in protecting minors. Nor do they explain why the State must put the burden of protecting children from the Pornographers' (admittedly unprotected) obscenity on parents, rather than on the Pornographers themselves.

The Pornographers' only support for their filtering alternative comes from *Ashcroft II*, a

case discussing factual details about how the Internet worked twenty years ago, when the introduction of the first iPhone was still three years in the future. Yet even in *Ashcroft II*, the Supreme Court acknowledged there was "a serious gap in the evidence as to the effectiveness of filtering software." *Ashcroft II*, 542 U.S. at 671. Since then, it has become clear that blocking and filtering does not effectively prevent minors' exposure to pornography online. One Oxford study concluded that "more than 99.5 percent of whether a young person encountered online sexual material had to do with factors beside their caregiver's use of Internet filtering technology." Ex. 7, Andrew K. Przybylski & Victoria Nash, *Internet Filtering and Adolescent Exposure to Online Sexual Material*, 21 CYBERPSYCHOLOGY, BEHAV. & SOCIAL NETWORKING 405, 409 (2018). That was due, in part, to the numerous ways that a minor can encounter online sexual material outside of the home, where a parent cannot control filtering. The same study concluded that "between 17 and 77 households would need to be filtered to prevent a young adolescent from encountering online sexual material." *Id.* The study authors also surveyed the existing literature on filtering and concluded that "the evidence base supporting the widespread use of Internet filtering is currently weak." *Id.* at 406. Their "evidence derived from a more stringent and robust empirical approach indicated that [filters] are entirely ineffective." *Id.* at 409.

Second, the Pornographers claim a less-restrictive alternative would be to "require internet service providers ('ISPs') to pre-block adult content, subject to an adult's un-blocking request." PI Br. at 19. The Pornographers provide no details about how this system would work, or why an adult would find it less burdensome to unblock adult content by verifying their age to an internet service provider as opposed to an adult-oriented website operator. The Pornographers also provide no explanation for how ISP-level blocking would work in a family setting, where adults may want to access adult content without making the same content available to their minor children, even as

all devices connect to the internet provided by the same ISP. The Pornographers' lone 1990 Third Circuit case about phone-sex services cannot demonstrate that ISP-level blocking would be an effective or a less-restrictive way of furthering the State's compelling interest in protecting minors. *See* PI Br. at 19. It concerns a different technology more than thirty years ago and does not account at all for the ease and safety of age verification on the internet today.

The Pornographers also mention once that the Act is "overbroad," but they make no attempt to articulate or satisfy the First Amendment overbreadth standard, nor could they. *Id*. at 12. A law may violate the First Amendment as overbroad if it "prohibit[s] a substantial amount of protected speech relative to its plainly legitimate sweep," *United States v. Hansen*, 599 U.S. 762, 781 (2023) (cleaned up), but the Act does not. The Act does not prohibit protected speech at all.

Nor are the Pornographers correct that the "General Assembly [s]hirked [i]ts [b]urden" when passing the Act. As even the Pornographers must acknowledge, the General Assembly "is not obligated, when enacting statutes, to make a record of the type that an administrative agency or court does." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994). "[T]he statute's purpose of protecting social order and morality" by seeking to shield Indiana's children from the hardest of hard-core porn while ensuring that adults can continue to access that content—"is clear from [the Act's] text and history." *Barnes*, 501 U.S. at 568. Furthermore, Indiana law forbids using "the content of the audio or video coverage" of legislative activities "as evidence of the legislative intent, purpose, or meaning of an act enacted . . . by the general assembly," Ind. Code § 2-5-1.1-16, or "imput[ing] to the general assembly" the "motive of individual sponsors of legislation," § 1-5-1.1-17. This not only is the law of Indiana but also sound in principle, as courts are not to "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). Yet the Pornographers purport to rely on the

25

statements of individual sponsors to discern the legislative intent, purpose, or meaning of the Act. PI Br. at 22–23. And despite the Pornographers' unsupported assertion, the General Assembly has no constitutional obligation to "try alternatives first." *Id.* at 23. The Act is amply supported by evidence of the harms pornography causes minors, and nothing about the Act's legislative history undermines its premise.

2.     The Pornographers claim the Act is not narrowly tailored because it is both over- and underinclusive, but none of the Pornographers' arguments undercut the Act's constitutionality.

*Alleged overinclusiveness.* The Act is not unconstitutionally overinclusive. The Pornographers' sole overinclusivity argument is that the statute applies to websites that meet only the Act's one-third threshold (meaning that one-third of material on the website is harmful to minors), and therefore, the Act requires age verification of websites that contain mostly harmless content. PI Br. at 20–21. But none of the Pornographers allege that their websites contain mostly harmless content (nor could they, *see* Glogoza Decl. ¶¶ 11–14 (describing extreme obscenity, including violent and nonconsensual sex acts involving "teen" girls and sex "slaves"). At most, some Pornographers have alleged that their websites contain some modicum of content that is not harmful to minors, but since Pornographers do not separate that content from the rest, it is impossible for the State to regulate material harmful to minors in a more targeted way.

*Alleged underinclusiveness.* Nor is the Act unconstitutionally underinclusive. "[T]he First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992)). "A State need not address all aspects of a problem in one fell swoop" because policymakers may properly "focus on their most pressing concerns." *Williams-Yulee*, 575 U.S. at 449. And when they do, courts have "upheld laws—even under strict scrutiny—that conceivably could have restricted

even greater amounts of speech in service of their stated interests." *Id.*

The Pornographers complain that the Act is underinclusive because it exempts search engines, does not cover most social media platforms, and addresses only "images and videos." PI Br. at 20–22. None of these alleged underinclusivities undermines the Act's constitutionality. Search engines return results associated with the Pornographers' websites and employ safe search features that blur pornographic images from being shown on the search engine page. Glogoza Decl. ¶¶ 4–5. For example, when the State's investigator searched for "hot sex" on Google, the search engine showed no images on the main search page and blurred images on the "videos" tab. *Id.* Nearly all of the search results, however, linked to the Pornographers' websites. *Id.* The State's decision to exempt search engines from the Act's coverage does not "raise doubts about whether the government is in fact pursuing the interest it invokes," because the State is, in fact, targeting the Act to the most problematic websites where minors are most likely to encounter online sexual material.

The Act does not exempt social media websites. If at least one-third of the material on any social media website is harmful to minors, that website is covered. Some of the largest and most popular social media platforms are unlikely to meet the one-third threshold because they have voluntarily undertaken efforts to protect minors from sexually explicit conduct, unlike the Pornographers. *See, e.g.*, *Community Guidelines*, INSTAGRAM, https://bit.ly/3REYV1c (last visited June 24, 2024) (prohibiting nudity); *Nudity & Sexual Content Policy*, YOUTUBE, https://bit.ly/4ce2VxV (last visited June 24, 2024) (prohibiting pornography). There is an obvious difference between websites that try to *exclude* pornographic material and websites that *intentionally deliver it to viewers*. As such, any underinclusivity that results from social media websites falling outside the Act's coverage casts no doubt on the State's sincere and compelling interest in protecting minors. Instead, the Act simply targets the State's "most pressing concern[]" when it comes to pornography

in the hands of minors. *Williams-Yulee*, 575 U.S. at 449.

Nor does the Act's application to "images and videos" cast doubt on the sincerity of the State's compelling interest in protecting minors. Unlike written obscenity, images and videos are uniquely accessible and titillating to minors and especially susceptible to accidental viewing. Research provides ample evidence of the harm that pornographic images and videos in particular cause to minors. A picture is worth a thousand words—and a video much more.

*Alleged vagueness*. The Pornographers also allege that the Act's definition of material harmful to minors is "hopelessly opaque" and "vague[]," PI Br. 16–17, but it is not. The Act's definition of obscenity is "virtually identical to the Supreme Court's . . . statement of the elements of obscenity." *Ginsberg*, 390 U.S. at 643; *compare Miller*, 413 U.S. at 24–25, *with* Ind. Code § 35-49-2-2. It therefore "gives . . . adequate notice of what is prohibited and does not offend the requirements of due process." *Ginsberg*, 390 U.S. at 643 (cleaned up). Applying that the Act's definition to "minors" requires nothing more than the fact-finding already built into the definition and endorsed by the Court. *Miller*, 413 U.S. at 31–32 (describing that "community standards" require jury fact-finding). Moreover, the Pornographers have not and cannot allege that the content on *their* websites constitutes an edge case as to which the Act is vague. The Pornographers' websites contain abundant material that easily meets the Act's definition of material harmful to minors (and, indeed, that also satisfies the definition of unprotected obscenity for adults).

*The Act is narrowly tailored*. The Act is narrowly tailored because it restricts no more than necessary to advance the government's compelling interest. The Pornographers can post content of their choosing to their websites; the Act only requires that the Pornographers check the age of their audience before displaying material that is harmful to minors. The Act requires commercially

reasonable age verification methods, with which consumers are already familiar, as they are regularly employed in other internet transactions, including online purchases and transactions involving the sale of alcohol, tobacco, firearms and other regulated goods. Allen Decl. ¶ 23. Some online pornographers, including plaintiffs Aylo Premium and Aylo Freesites, already deploy age-verification technologies in other jurisdictions, like Canada. *Id*. ¶ 55. These technologies are becoming more prevalent among other types of websites, too, including social-media platforms and gaming sites. *Id*.

These age-verification methods are also affordable, costing as little as twelve cents for one verification, which may be defrayed across a hundred websites relying on the same verification. *Id*. ¶¶ 22, 26, 56. It is also likely that this already-affordable cost will further decrease over time through innovation, interoperability, and competition. *Id*.

Age verification is also in keeping with the kind of personal information users already give up when patronizing the Pornographers' websites. These websites invite users to convey personal information, whether to enroll in a subscription, Glogoza Decl. ¶¶ 17–18, or to access premium content through the Pornographers' paid services, *id*. ¶ 19. Even when the Pornographers offer "free" videos to their website visitors, they "require users to watch an advertisement at the beginning of the video," which often invites a commercial transaction in which personal information is exchanged. *Id*. ¶ 20. "Free" users also consent to allow the Pornographers to collect data about them and their usage of the Pornographers' websites merely by using them, which means adults using these websites are far from anonymous, whether they choose to engage in a commercial transaction or not. In other words, the Pornographers themselves demand or encourage their users to provide precisely the same kind of personally identifying information that they complain the Act requires for age verification purposes. And the Act additionally builds in privacy protections

for age-verification information, which further demonstrates that the Act does not restrict speech more than is necessary to serve the government's substantial interest in protecting minors. The Act *prohibits* the Pornographers or the third parties they contract with from retaining age-verification information they receive. Ind. Code § 24-4-3-13(b).

Lastly, *even if* some of the Pornographers' users would be deterred by a requirement to transmit identification documents to a third party before accessing online pornography, age-verification alternatives exist that offer users choice and do not require document-based approaches. Allen Decl. ¶ 56.

## III.   The Remaining Preliminary-Injunction Factors Favor the State

### A.   The Pornographers Cannot Show Irreparable Harm

To obtain a preliminary injunction, the Pornographers must show that they will be irreparably harmed absent any relief because "traditional legal remedies, i.e., money damages, would be inadequate." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of Am., Inc.*, 549 F.3d 1079, 1095 (7th Cir. 2008), *abrogated on other grounds by Anderson v. Jeanpierre*, No. 23-1807, 2023 WL 1478029 (7th Cir. Apr. 5, 2024). They cannot make this showing. The Pornographers assert their "loss of First Amendment freedoms" as their irreparable injury, PI Br. at 23, but as already explained, the Act does not violate Pornographers' First Amendment freedoms at all. Nor can they prove a "loss of goodwill and reputation," *id.*, resulting from the Act's implementation. The Pornographers *admit* that the content on their websites is not suitable for children. Implementing age verification to protect minors from exposure to pornography should only *promote* goodwill and the reputation of the Pornographers and their websites. And because the Pornographers already require private, personal details from their users in order to access subscription and premium services, it is implausible to infer that their users will "abandon" Pornographers' platforms if required to verify their age with similar details, and the Pornographers supply no evidence to the contrary.

PI Br. at 23–24.

### B.    The Balance of Equities Favors the State

Because the Pornographers have failed to demonstrate a likely First Amendment violation or irreparable harm, the Court need not balance the equities. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086. But the equities nevertheless favor the State. "[T]he inability to enforce its duly enacted [laws] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). This is especially true here. The Act advances a most compelling government interest: protecting minors from the documented harms of online pornography, which negatively affects them in large numbers. *See* pp. 3–5, *supra*. A preliminary injunction would injure the State's sovereignty and expose Indiana minors to suffer the negative effects of continued exposure to internet pornography. Meanwhile, the Pornographers, especially the foreign ones, have not proven any countervailing First Amendment violation that could outweigh these harms, and any harm they allege is overcome by their delay in filing their complaint and preliminary injunction motion. *See Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1062 (7th Cir. 2016) (a three-month delay in seeking a preliminary injunction "outweighed any countervailing harm to" plaintiffs).

## IV.    Any Relief Should Be No Broader Than Necessary

To the extent that the Court determines the requirements for injunctive relief are met, any relief must be "no greater than necessary to protect the rights of the prevailing litigants." *Doe v. Rokita*, 54 F.4th 518, 519 (7th Cir. 2022); *see L.W. v. Skrmetti*, 83 F.4th 460, 489–90 (6th Cir. 2023), *cert. granted* (June 24, 2024). Should the Pornographers prevail on the argument that S.E.A. 17 violates *their rights*, an injunction limited to them would provide complete relief—and it should apply only to those plaintiffs found to have standing. The Supreme Court has cautioned against reaching "overbreadth issue[s] unnecessarily." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989).

In all events, the Court cannot enjoin private enforcement of the Act. No private persons are parties to this litigation who are capable of being enjoined. *See* Fed. R. Civ. P. 65(a)(1), (d)(2). Further, "no court may lawfully enjoin the world at large, or purport to enjoin challenged laws themselves." *Whole Woman's Health*, 595 U.S. at 44 (cleaned up).

## CONCLUSION

The Court should deny the motion for a preliminary injunction.

Dated: June 24, 2024

Respectfully submitted,

Theodore E. Rokita
Indiana Attorney General

By:   /s/ James A. Barta
James A. Barta
Solicitor General

Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-0709
Fax: (317) 232-7979
Email: James.Barta@atg.in.gov

Jenna M. Lorence
Deputy Solicitor General

Katelyn E. Doering
Deputy Attorney General

*Counsel for Defendant*