IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF INDIANA

INDIANAPOLIS DIVISION

| | |
|---|---|
| FREE SPEECH COALITION, INC., AYLO PREMIUM LTD, AYLO FREESITES LTD, WEBGROUP CZECH REPUBLIC, A.S., NKL ASSOCIATES, S.R.O., SONESTA TECHNOLOGIES, S.R.O., SONESTA MEDIA, S.R.O., YELLOW PRODUCTION, S.R.O., PAPER STREET MEDIA, LLC, NEPTUNE MEDIA, LLC, MEDIAME SRL, MIDUS HOLDINGS, INC., <br><br>                    Plaintiff, <br><br>v. <br><br>TODD ROKITA, in his official capacity as the Attorney General of the State of Indiana, <br><br>                    Defendants. | **Declaration of Tony Allen** <br><br><br>Case No.: 1:24-cv-980-RLY-TAB <br><br>Judge |

    1.  I am over the age of 18 and have personal knowledge of the facts set forth in this Declaration.

### *Personal Background*

    2.  I am a Chartered Trading Standards Practitioner and Global Subject Matter Expert on Age Assurance Systems. I am the Technical Editor of ISO/IEC 27566 — Information security, cybersecurity, and privacy protection — Age assurance systems — Framework. I am the author of the Law of Age Restricted Sales in England and Wales.

    3.  I am also the Founder and Executive Director of the Age Check Certification Scheme, the leading UK Accreditation Service approved auditor and technology testing service for the age

1

assurance industry. I am also an audit member of the Age Verification Providers Association
(AVPA) – a global trade association representing the age assurance industry.

4.   I have personal knowledge of the history, process, and logistics of online age assurance
(as defined herein).

5.   I have also been closely involved in the development of age assurance legislation in the
United Kingdom and elsewhere in the world, including the United States of America.

*Summary*

6.   I have reviewed IC24-4-23 = Age verification for material harmful to minors, (the
"Act"), the Plaintiff's Complaint, the Plaintiffs' Memorandum of Law in Support of their Motion
for Expedited Preliminary Injunction and two Declarations in support of the Plaintiffs' Motion:
one from Richard Sonnier III (dated June, 9 2024) and one from Kian Hudson dated (dated June,
10 2024).

7.   According to the Indiana General Assembly, the Act requires an adult oriented website
operator that displays material harmful to minors to use a reasonable age verification method to
prevent a minor from accessing an adult oriented website. Creates a cause of action to permit: (1)
the parent or guardian of a child harmed by a violation of the age verification requirement to
obtain monetary damages, injunctive relief, and reasonable attorney's fees; and (2) any other
person to bring an action to obtain injunctive relief and reasonable attorney's fees. Prohibits a
person that conducts age verification from retaining the identifying information of an individual
seeking to access an adult oriented website that displays material harmful to minors, and permits
an individual whose identifying information is retained to bring an action to obtain monetary
damages, injunctive relief, and reasonable attorney's fees. Requires adult oriented website

2

operators to use commercially reasonable methods to secure all information collected and transmitted. Provides that the attorney general may bring an action to obtain an injunction, a civil penalty of not more than $250,000, or the attorney general's reasonable costs in investigating and maintaining the action. Provides that when the attorney general has reasonable cause to believe that any person has engaged in, is engaging in, or is about to engage in a violation, the attorney general is empowered to issue civil investigative demands under IC 4-6-3-3 to investigate the suspected violation. Requires verification information of minors to be kept confidential with certain exceptions. Adds verification information to the definition of "personal information". Adds a violation of IC 24-4-23 as a deceptive act.

8.  Based on my knowledge and experience, modern technology is capable of allowing providers of content, goods, and services on the internet to verify the ages of their consumers without jeopardizing either the providers or consumers' interests in both free speech and privacy.

9.  Further, the burden upon both providers of internet content, goods or services and consumers in verifying age is minimal, and reducing even further as technology evolves ever more.

10. Based on my knowledge and experience, software filters on devices, when properly installed, can be a useful parental tool in regulating a minor's online activity, but in practice only provides a partial solution. They are less effective than, and not a substitute for, website-based age assurance.

### *The availability of age assurance services and how they work.*

11. "Age Assurance" in the context of IC24-4-23 and defined more fully herein is

the process by which the provider of an adult orientated website operator ("Content Provider") or a 3rd party age verification service provider to them verifies or infers that the consumer of the content is age 18 or older.

12. Although people sometimes use the following terms interchangeably, it is helpful to distinguish among related phrases:

"Age Assurance" is the process to establish confidence that the output of a system or a method meets the requirements for an age-related eligibility decision  [ISO/IEC CD 27566 Age assurance systems – Framework, 3.1.1]. There are three categories of Age Assurance:

i.   "Age Estimation" is an age assurance method based on using inherent features or behaviors to estimate the age or age range of an individual [ISO/IEC CD 27566 Age assurance systems – Framework, 3.1.9].

ii.   "Age Verification" is an age assurance method based on calculating the difference computation between the current date and the confirmed date of birth of an individual [ISO/IEC CD 27566 Age assurance systems – Framework, 3.1.8].

iii.   "Age Inference" is an age assurance method based on confirmed information which indirectly implies that an individual is over or under a certain age or within an age range  [ISO/IEC CD 27566 Age assurance systems – Framework, 3.1.10]. )

13. Age Verification and Age Inference may be achieved by reference to drivers' licenses, passports, electoral rolls, credit reports, cell phone network records, banking, and credit card records. Users may also choose to create a digital identity, and selectively release just their age attributes. These are expressly permitted methods by IC24-4-23 Sec.7 as "reasonable age verification methods".

14. Age Estimation, on the other hand, can be achieved by analyzing facial images, voiceprints or game play. The most advanced of these, facial estimation, is accurate to within +/- 1 to 1.5 years mean absolute error, according to the latest published data by one certified age assurance provider, Yoti Limited. (https://www.yoti.com/wp-content/uploads/Yoti-Age-Estimation-White-Paper-March-2023.pdf). My certification team has independently verified and validated the results of this testing by Yoti.

15. The value of Age Estimation for both Content Providers and consumers is that it does not require consumers to submit any personal information other than a photograph or voiceprint, which is then instantly discarded.

16. It is important to be clear from the outset that age *estimation* technology is not a *recognition* technology; it detects and assesses information, to give an age estimation, it does not seek to identify who the person in the image or recording is.

17. A number of features and characteristics of people change with age. This allows for them to be analyzed to estimate age. An example of this is facial features. When facial age estimation is applied, users are either prompted to share a still or video image, or an existing profile picture can be used, and software then estimates their age. Systems learn how to do this by reviewing thousands of images of people with a known age to spot patterns common to those of the same age, and this means the technology is becoming better by the day. A live face is detected using liveness detection and then a pixel level review of the face is undertaken. The image generated by this method does not uniquely recognize any individual,

18. As stated above, facial age estimation is often falsely conflated with facial

recognition technologies. In fact, the facial estimation technique described here is quite distinct from facial recognition. No image matching takes place for the purpose of estimating age.

19. Although Content Providers may perform age assurance themselves Content Providers may, and often do, contract with third-party companies ("Third-Party Services") to perform the service for a fee. It is my understanding that under the Act and its associated rules, social media companies will be able to use Third-Party Services.

20. When using a Third-Party Service, a Content Provider directs the consumer to provide information directly to the Third-Party Servicer who performs the age assurance and then informs the Content Provider only of the result of the check – "pass" or "fail." It does not pass on any other information.

21. The Third-Party Servicer does not retain a consumer's personal information other than the date of birth, which can be used to respond to subsequent enquiries about that user's age.

22. The verification process need only be performed once per user and the verification results for any individual user may be shared with other websites, thereby minimizing the need for multiple age verification checks of the same individual, subject to effective authentication of the user on reuse.

23. Age assurance may be performed online from home or anywhere the user has access to the internet and can usually be completed in less than a minute.

### *Cost of Age Assurance*

24. The leading sector requiring robust age verification was initially online gambling.  As an

industry with a strong return per customer, it tolerated relatively high costs per age check, perhaps as much as a dollar each.  Naturally, as the Age Assurance industry grew, competition put downward pressure on pricing, and it certainly halved relatively quickly.

25. Alongside competitive pressures, underlying costs were also falling.  The earliest age verification methods almost all relied on accessing third party databases such as credit reports for which there was a substantial cost per check.  The more successful providers secured volume discounts but were still facing a high fixed cost base. Naturally, providers looked for cheaper ways to deliver their services, so they looked beyond credit reports to banking and telecoms where good quality data was available at a much lower cost, or even at no variable cost at all.

26. As a leader of an independent conformity assessment body, I cannot speak to the specific pricing offered by individual providers, but the UK Government recently published an Impact Assessment for the Online Safety Act 2023 which estimates the cost per check to be twelve cents (converted from pence), with a caveat this cost is expected to continue to fall through innovation competition and interoperability.  I am aware of some providers who offer age verification at no cost to certain sectors as part of a wider digital identity service.

*Further Details*

27. Age Assurance is not a new or rare technology.  It is widely used by thousands of sellers and their consumers on a daily basis around the world in a variety of contexts such as alcohol and tobacco sales, gambling, gaming, social media and, to a growing extent around the world, accessing pornography.

28. In April 2024, a Global Age Assurance Standards Summit was held in Manchester, UK which generated a full compendium of the approaches to age assurance, the state of standards

development and the latest state-of-the-art (https://accscheme.com/wp-content/uploads/ACCS-GlobalSummit-Compendium-.pdf).

29. The Global Summit concluded with a Communique (https://accscheme.com/wp-content/uploads/ACCS-GlobalSummit-Communique-FINAL.pdf) with a consensus statement (including input from social media companies) that:

    a.  Age Assurance **can** be done.

    b.  Age Assurance **can** be deployed, with the right process for the right use cases, in a manner that is privacy preserving, secure, effective, and efficient.

    c.  Age assurance **can** be a valuable tool amongst a range of measures deployed to protect children in the digital environment.

    d.  This would be assisted by securing International Standards, which are implemented and respected by providers of services that are required to make age-related eligibility decisions.

    e.  Laws and regulations **can** create the legal framework with robust enforcement procedures in place to secure the protection of children from harm.

30. Further, Third-Party Servicers continue to grow in number and improve the age verification technology.  The Age Verification Providers Association (AVPA) began in 2018 with just six members.  It now has thirty members and there are at least forty providers competing in the global market.

31. A number of methods have been developed, initially to verify age exactly, and more recently, to estimate it with an ever-increasing degree of accuracy.

***The security of data.***

32. Age Assurance Providers who are members of AVPA and, thus sign up to its code of conduct, do not create new databases when conducting age checks. There are, of course, sectors such as online gambling where regulators require audit trails, but the industry's general practice is *not* to retain any personal information after an age check is completed. These audited providers do not create new databases of personal data, nor track the behavior of individuals online.

33. During age verification processes, Age Verification providers apply the same degree of security you would expect in financial transactions.

34. Specifically, age verification companies have a duty of care around the protection of personal data and demonstrate their adherence to this through various forms of certification (e.g., ISO 27001, SOC2, Cyber Essentials, BSI PAS 1296, etc.) to ensure personal data is dealt with securely.

35. There is now a global standard in IEEE 2089.1 and an emerging global certification process under that. There is also considerable work progressing on ISO/IEC 27566 – Age assurance systems – Framework, which will form part of global certification of age assurance systems.

36. Age Verification providers share with a bank or healthcare provider the same risk of attacks during these interactions with consumers, but these risks are inherent to the Internet, not unique to age verification. However, it is worth noting that there is considerably less valuable data, if any data at all, that would be useful to a hacker being held by Age Verification providers as opposed to that data held by banks or healthcare providers.

37. In addition to local laws, such as GDPR in the UK and EU, there is an industry-wide certification protocol, operated by government approved auditors, which tests providers against international standards.  This not only assesses the efficacy of the age check, but also data security and privacy measures.  Social Media companies governed by the Act may choose to use commercially available Age Verification providers certified by these regulatory bodies, not only to consolidate their defense against potential legal claims, but also to build consumer trust and confidence.

### *Effectiveness of content filtering and other methods*

38. Other methods exist to advance the goal of protecting children on the internet, including parental controls and web filtering technology. The first thing to note is that multiple methods are not mutually exclusive. There is no reason why both content filtering and age verification could not be deployed either consecutively or concurrently.

39. The Plaintiff's claim makes a number of correct positive assertions about content filtering technology, but it is rather one-sided, so in addition to those observations, I further observe some of the challenges associated with content filtering. A more neutral analysis of content filtering can be found in a report for the European Parliament's Policy Department for Citizens' Rights and Constitutional Affairs[1].

40. It should also be noted that content filtering is nothing new. Software to allow for filtering of adult content (including detection of the Restricted to Adults (RTA)[2] tag) has been

---

[1] https://www.europarl.europa.eu/RegData/etudes/STUD/2020/657101/IPOL_STU(2020)657101_EN.pdf

[2] https://www.rtalabel.org/

around for many years. There is substantial evidence (described below) that it is not having any appreciable impact on reducing the access children have to offensive sexual material.

41. Filtering applied in the home, on the router or on laptops, tablets, and smartphones, is generally managed by parents. We know from repeated research by the UK's telecom's regulator, OFCOM, that many parents are unaware of this technology. And those aware of it often do not know how to use it, or discover their children also know how to use it or have circumvented it some other way. And finally, those who know about it and know how to use it, must still choose to use it. "Just over a quarter of parents used content filters provided by their broadband supplier, where the filters apply to all devices using that service (27%). A much larger proportion (61%) said they were aware of this feature, showing that not all parents are adopting this potentially useful control."[3] Children can be very persuasive, and parents might release the controls to allow them to access various content. A survey of US parents by Kapersky in 2021 found just 50% used any kind of parental controls.[4]

42. Directions on how to circumvent parental controls are easily available on the internet.

43. And children are succeeding at getting around parental control features.[5]

44. Some parents describe supervising the children's internet usage as "a full-time job"[6] and that they are losing the "technological arms race over parental controls in the home."[7]

---

[3] (https://www.ofcom.org.uk/__data/assets/pdf_file/0024/234609/childrens-media-use-and-attitudes-report-2022.pdf)
[4] (https://usa.kaspersky.com/about/press-releases/2021_study-finds-50-of-parents-use-parental-control-apps)
[5] *See, e.g.*, "Tech-Savvy Kids Defeat Apple's and Others' Parental-Control Features," Wall Street Journal, December 19, 2021.
[6] *Id.*
[7] https://lifehacker.com/how-your-kids-are-outsmarting-all-your-parental-control-1848249586.

45. One study has found that 86% of parents support laws restricting children's access to social media.[8]

46. Content filtering software often overblocks, preventing access to educational, informative, or harmless content. This can limit children's learning opportunities and access to useful resources, which is considered in itself to be a direct breach of a child's rights to have age-appropriate access to a digital environment. See the United Nations Committee on the Rights of a Child General Comment 25[9].

47. Filtering software is also an imperfect solution. Despite advancements, many filters fail to block all harmful content, allowing some inappropriate material to slip through and many filtering tools collect data on browsing habits. This information can be mishandled or accessed by unauthorized parties. The privacy infringement concerns raised about age verification apply also to content filtering, particularly as children reach adolescence and maturity where constant surveillance of content filtering can undermine trust between children and their guardians. Research on Internet Filtering and Adolescent Exposure to Online Sexual Material[10] concluded that caregiver's use of Internet filtering had inconsistent and practically insignificant links with young people reports of encountering online sexual material.

48. Filtering software can reflect the biases of its developers, resulting in the blocking of content based on cultural or ideological standards that may not align with the values of all users.

---

[8] *See* https://www.security.org/digital-safety/parents-react-to-social-media-legislation/.
[9] (https://www.ohchr.org/en/documents/general-comments-and-recommendations/general-comment-no-25-2021-childrens-rights-relation).
[10] Przybylski AK, Nash V. Internet Filtering and Adolescent Exposure to Online Sexual Material. Cyberpsychol Behav Soc Netw. 2018 Jul;21(7):405-410. doi: 10.1089/cyber.2017.0466. PMID: 29995533; PMCID: PMC6101267. (https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6101267/)

Overzealous filtering can infringe on children's rights to access diverse viewpoints and information, which is essential for developing critical thinking skills and understanding the world.

49. The dynamic nature of the internet requires constant updates to filtering algorithms to keep up with new websites and changing content. This maintenance is resource-intensive and often lags behind the creation of new harmful content. Filtering software can cause compatibility problems with other applications and devices, leading to a frustrating user experience.

50. High-quality filtering software can be expensive typically in the range of $4-5 per month per license.

51. Relying solely on content filtering software can lead to complacency among parents and guardians, who may mistakenly believe that the software provides complete protection. This can result in a lack of active engagement and communication with children about safe online behaviors.

52. So, although content filtering has a role to play in an overall protective approach to preventing minors from accessing sexually explicit material, it needs to form part of a response by responsible parents and guardians and augmented with responsibility by adult content providers and governments to reduce and limit the options and availability of routes to access the material including age verification.

### *What we've learned and what's changed in the last decade*

53. The age-assurance methods discussed above do not necessarily add a new step to a user's visit to a new website or app because through re-usability and interoperability, one age check can be used across multiple sites seamlessly.

54. The user need only complete the age-assurance process once before they can reach their subsequent objectives. For websites and apps where users create accounts, the users may only have to complete the age-assurance process one time. After that, the website or app can store that the user is old enough to access it and authenticate the user when the user presents the login credentials associated with the account. Websites and apps that do not have user accounts need not force their users to repeat age-assurance process each time the user tries to access the website or app because they can recognize when a user has previously completed an age check and rely on that check again.

55. Some adult content and social media companies are already using age assurance technology in some contexts. For example:

  a. Aylo Inc, one of the Plaintiffs in this case, is already deploying age verification technologies in other jurisdictions, including in its home state country of Canada, as found recently by the Office of the Privacy Commissioner of Canada (https://www.priv.gc.ca/en/opc-actions-and-decisions/investigations/investigations-into-businesses/2024/pipeda-2024-001/?wbdisable=true)

  b. Meta Inc have deployed age assurance measures on Instagram using Yoti as a provider (see https://about.fb.com/news/2022/06/new-ways-to-verify-age-on-instagram/);

  c. PlayStation have deployed age assurance measures also using Yoti (https://www.playstation.com/en-gb/support/account/age-verification-

14

faq/#:~:text=Age%20verification%20allows%20us%20to,by%20our%20service %20provider%2C%20Yoti.)

d.  Content verification is also now available on social media and adult content websites through services like VerifyMy (https://verifymy.io/).

56. Over the past 25 years, the age verification industry has developed a wider range of ways to verify age which offer users choice, including those who do not own or choose to use identity document-based approaches.  They can choose, for example, age estimation techniques which do not require ownership or use of a document where the image is instantly deleted. Many hundreds of millions of age assurance checks are now undertaken globally each year. The cost has dropped dramatically, with reusability likely to lead to that trend continuing so there are no longer undue burdens on Web publishers due to the high costs of implementing age verification technologies. Nor would there necessarily be any significant loss of traffic resulting from the use of these technologies, except of course from children for whom the sites are unsuitable.   The UK Government estimated in the Impact Assessment for legislation already approved by the House of Commons a cost per check of twelve cents and lower for high volume platforms, but noted cost may reduce further through interoperability and growing competition.  The cost of that one 12 cent check may be defrayed across 100 websites before it might need to be repeated to maintain the ongoing integrity of the age verification ecosystem, and that is only if businesses determine that periodic re-validation is prudent.

57. Concerns about anonymity have also been addressed by developing age verification technology. The age verification sector was created specifically to enable users to access the sites they wished to access through the data minimized sharing of age.  By selecting a trusted third

15

party, even when selective disclosure from full identity document or digital identity wallet is used to prove age, the provider then only confirms "yes" or "no" when a website enquires "is this user an adult?"  In Europe, users are given further reassurance by the enforcement of the General Data Protection Regulations (GDPR) but in the United States, contractual commitments to maintain secrecy and the threat of civil damages claims if that is not applied offer similar protection. Also, age assurance standards allow for vouching where a user with no documentary proof of age can ask a respected member of their community such as a teacher or doctor to confirm their age.

58. Whether or not privacy laws apply, globally AVPA members must adhere to a Code of Conduct[11] that requires privacy and data security.

## DECLARATION UNDER PENALTY OF PERJURY

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the above statements are true and based upon my personal knowledge.

/s/ *Tony Allen*
Tony Allen (Jul 26, 2024 14:31 GMT+1)

Tony Allen, Subject Matter Expert

---

[11] https://avpassociation.com/membership/avpa-code-of-conduct/

16