# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

|  |  |
|---|---|
| FREE SPEECH COALITION, INC., AYLO PREMIUM LTD, AYLO FREESITES LTD, WEBGROUP CZECH REPUBLIC, A.S., NKL ASSOCIATES, S.R.O., SONESTA TECHNOLOGIES, S.R.O., SONESTA MEDIA, S.R.O., YELLOW PRODUCTION, S.R.O., PAPER STREET MEDIA, LLC, NEPTUNE MEDIA, LLC, MEDIAME SRL, MIDUS HOLDINGS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> TODD ROKITA, in his official capacity as the Attorney General of the State of Indiana, <br><br> Defendant. | Case No. 1:24-cv-00980-RLY-MG <br><br> **STATEWIDE RELIEF SOUGHT** |

## <u>PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR EXPEDITED PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................5

ARGUMENT ........................................................................................................................6

I.     INDIANA'S ARGUMENTS AGAINST STANDING ARE MISPLACED ....................6

II.    INDIANA FAILS TO REBUT PLAINTIFFS' LIKELY SUCCESS ...............................8

     A.     Indiana Fails To Ward Off Strict Scrutiny .............................................................8

          1.     Indiana Cannot Distinguish *Ashcroft* And Attendant Precedents ...............8

          2.     Indiana Fails To Refute The Act's Burden On Protected Speech .............12

          3.     Indiana Misplaces Reliance On The "Secondary Effects" Doctrine ........13

          4.     Indiana Confirms The Act's Speaker-Based Discrimination....................14

     B.     Indiana Cannot Refute Plaintiffs' Likely Success Under Strict Scrutiny .............15

          1.     Indiana Fails To Disprove Less Restrictive, Superior Alternatives..........15

          2.     Indiana Fails To Dispel The Act's Poor Tailoring....................................18

          3.     Indiana Fails To Show The General Assembly Made A Considered Judgment ...................................................................................................20

III.    THE STATE FAILS TO REBUT PLAINTIFFS' SHOWING OF IRREPARABLE, ONE-SIDED HARM ..........................................................................21

IV.    SCOPE OF THE INJUNCTION .................................................................................22

CONCLUSION....................................................................................................................22

1

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*281 Care Comm. v. Arneson*,
638 F.3d 621 (8th Cir. 2011) ....................................................................7

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) ................................................................................6

*ACLU of Illinois v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ..................................................................21

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
140 S. Ct. 2082 (2020) .............................................................................7

*Agostini v. Felton*,
521 U.S. 203 (1997) ................................................................................5

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ..............................................5, 8, 10, 11, 12, 16, 17

*Ashcroft v. ACLU*,
535 U.S. 564 (2002) ..............................................................................13

*Barnes v. Glen Theatre, Inc.*,
501 U.S. 560 (1991) ..............................................................................14

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
591 U.S. 610 (2020) ................................................................................6

*Bd. of Tr. of State Univ. of New York v. Fox*,
492 U.S. 469 (1989) ..............................................................................22

*Boos v. Barry*,
485 U.S. 312 (1988) ..............................................................................13

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ...........................................................................9, 10

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*,
363 F.3d 427 (6th Cir. 2004) ..................................................................22

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) ................................................................................13

*Ent. Software Ass'n v. Blagojevich,*
    469 F.3d 641 (7th Cir. 2006) ........................................................5, 12

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ............................................................22

*Free Speech Coal., Inc. v. Att'y Gen. U.S.,*
    825 F.3d 149 (3d Cir. 2016)..............................................................14

*Free Speech Coal., Inc. v. Colmenero,*
    689 F. Supp. 3d 373 (W.D. Tex. 2023)........................................11, 13

*Free Speech Coal., Inc. v. Paxton,*
    95 F.4th 263 (5th Cir. 2024) ............................................5, 7, 8, 9, 11

*Garden Dist. Book Shop, Inc. v. Stewart,*
    184 F. Supp. 3d 331 (M.D. La. 2016).................................................17

*Garrett v. State of Ill.,*
    612 F.2d 1038 (7th Cir. 1980) .............................................................7

*Ginsberg v. New York.,*
    390 U.S. 629 (1968).............................................................................9

*Haaland v. Brackeen,*
    599 U.S. 255 (2023).......................................................................7, 11

*Int'l Bhd. of Teamsters Airline Div. v. Frontier Airlines, Inc.,*
    628 F.3d 402 (7th Cir. 2010) .............................................................22

*Jones v. Markiewicz-Qualkinbush,*
    842 F.3d 1053 (7th Cir. 2016) ...........................................................21

*Matushkina v. Nielsen,*
    877 F.3d 289 (7th Cir. 2017) ...............................................................7

*McCullen v. Coakley,*
    573 U.S. 464 (2014)...........................................................................10

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue,*
    460 U.S. 575 (1983)...........................................................................15

*Packingham v. North Carolina,*
    582 U.S. 98 (2017).............................................................................11

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992)...........................................................................14

3

*Reno v. ACLU*,
   521 U.S. 844 (1997)..............................................................5, 8, 10, 14, 20

*Sable Comm'ns, Inc. v. FCC*,
   492 U.S. 130 (1998)...................................................................................20

*Smith v. Daily Mail Pub. Co*,
   443 U.S. 97 (1979)....................................................................................19

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)...................................................................................14

*St-Hilaire v. Comm'r of Indiana Bureau of Motor Vehicles*,
   2024 WL 125982 (S.D. Ind. Jan. 11, 2024).............................................22

*Surita v. Hyde*,
   665 F.3d 860 (7th Cir. 2011) ....................................................................14

*Thunder Studios, Inc. v. Kazal*,
   13 F.4th 736 (9th Cir. 2021) ........................................................................7

*Tripathy v. Lockwood*,
   2022 WL 17751273 (2d Cir. Dec. 19, 2022) ...........................................22

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994)...................................................................................11

*United States v. Playboy Ent. Grp., Inc.*,
   529 U.S. 803 (2000)...............................................................6, 10, 13, 14

*United States v. Stevens*,
   559 U.S. 460 (2010)...............................................................................5, 12

*Whole Woman's Health v. Jackson*,
   595 U.S. 30, 47 (2021)................................................................................6

*Willis v. Comm'r, Indiana Dep't of Corr.*,
   753 F. Supp. 2d 768 (S.D. Ind. 2010) .......................................................20

## **Statutes**

I.C. § 24-4-23, *et seq.*..................................................................................7, 18

I.C. § 35-49-3-2..............................................................................................12

## INTRODUCTION

Indiana's opposition confirms that Plaintiffs are likely to succeed under settled law. Indeed, for purposes of establishing Plaintiffs' *likelihood* of success, it suffices to note that Indiana's arguments in opposition are predicated on overhauling First Amendment law.  As the law stands, it is a cardinal principle of the First Amendment that "content-based laws are subject to strict scrutiny."  *Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 618 (2020) (plurality opinion) (citation omitted); *see, e.g.*, *United States v. Stevens*, 559 U.S. 460, 468 (2010).  Yet it takes Indiana 17 pages to address the Supreme Court's controlling precedents in *Reno v. ACLU*, 521 U.S. 844 (1997), and *Ashcroft v. ACLU*, 542 U.S. 656 (2004), which applied strict scrutiny to Internet regulation requiring age-verification.

When Indiana does address controlling precedents, it adopts the anomalous view of a split Fifth Circuit panel, which held that content-based burdens on protected speech receive mere *rational-basis* review whenever they aim to protect minors from sexual content, contrary to Supreme Court precedent.  Opp. (ECF 30) at 17 (citing *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 269 (5th Cir. 2024), *cert. pending*, No. 23-1122).  Only by following that path does Indiana argue that, when the Supreme Court in *Ashcroft* invalidated a materially indistinguishable law, it applied strict scrutiny erroneously because the parties neglected to urge rational-basis review.  But that reading of *Ashcroft* is foreclosed by Seventh Circuit precedent, *see Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 651 (7th Cir. 2006) (quoting *Ashcroft*, 542 U.S. 656, 665 (2004)), and contrary to the Supreme Court's instructions, *see Agostini v. Felton*, 521 U.S. 203, 237-38 (1997).

Furthermore, Indiana's opposition drives home an additional, independent reason why strict scrutiny applies:  The Act singles out Plaintiffs in a manner incompatible with its purported purpose of protecting minors from online sexual content.  In defending the Act's indifference to the principal sources of such content, such as social media platforms and search engines, Indiana

faults Plaintiffs' perceived *motives*.   Under our Constitution, however, the First Amendment's protections do not "belong only to speakers whose motives the government finds worthy, its protections belong to all, including to speakers whose motives others may find misinformed or offensive."   *303 Creative LLC v. Elenis*, 600 U.S. 570, 595 (2023) (citations omitted).   By "suppress[ing] or restrict[ing] the expression of specific speakers," the Act "contradict[s] basic First Amendment principles" and necessarily draws strict-scrutiny review.   *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000).

Just as application of strict scrutiny is dictated by governing law, the Act's likely invalidity follows in straightforward fashion.   Indeed, the Act fails such scrutiny for much the same reasons that similar laws have consistently failed before the Supreme Court and a strong of lower courts. The Act is over- and under-inclusive, bypasses alternatives that are both less restrictive and more effective, and unconstitutionally chills protected speech—all without serious discussion or fact-finding from the General Assembly.   A preliminary injunction should issue.

## ARGUMENT

## I.   INDIANA'S ARGUMENTS AGAINST STANDING ARE MISPLACED

Indiana skirmishes in vain over Plaintiffs' standing, which is readily apparent.   Indiana argues that states can insulate any statute from pre-enforcement challenge by adding a private right of action alongside a right of action for their Attorneys General.   ECF 30 at 7-9.   But Indiana cites no authority for this argument, which fails on its own terms.   For starters, the Supreme Court has rejected Indiana's basic premise.   In *Whole Woman's Health v. Jackson*, the Court held that the plaintiffs had Article III standing to sue certain licensing officials who "ha[d] authority to enforce S. B. 8.," even though the Texas abortion statute at issue made headlines by separately providing for private enforcement.   595 U.S. 30, 47 (2021). Notwithstanding the possibility of private enforcement, an injunction against the Attorney General *will* remedy imminent injuries—namely,

those traceable to the Attorney General.  A plaintiff "need not show that a favorable decision will relieve his *every* injury."  *281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011) (emphasis added) (cleaned up) (holding a plaintiff had standing to sue state actors despite the existence other civil enforcement mechanisms under the challenged statute).  Indiana even acknowledges that the Act's private and public aspects "operate independently," each giving rise to injuries not fairly traceable to the other.  ECF 30 at 8 (quoting *Haaland v. Brackeen*, 599 U.S. 255, 296 (2023) (cleaned up)).  Indeed, the injuries are different.  Only the Attorney General can obtain civil penalties up to $250,000, *compare* I.C. §§ 24-4-23-11(b)-12(b) *with -id.* at § 24-4-23-15, and only the Attorney General is likely immune from monetary claims arising from unlawful injunctions.  *See Garrett v. Illinois*, 612 F.2d 1038, 1040 (7th Cir. 1980).  There is thus no legal basis to allow states to evade constitutional challenges to their own enforcement of state laws.

Indiana also argues that foreign Plaintiffs lack First Amendment rights, ECF 30 9-10, but that is both false and irrelevant.  It is false because foreign Plaintiffs' speech occurs in Indiana, where the First Amendment holds sway.  *See Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743, 744 (9th Cir. 2021) (citing *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 140 S. Ct. 2082, 2087 (2020)) (distinguishing *Agency for International Development v. Alliance for Open Society International*, because even though  plaintiffs "were outside the United States," "recipients of their speech and speech-related conduct were in California."); *Free Speech Coal.*, 95 F.4th at 287 (same).  It is also irrelevant because some Plaintiffs are domestic and, "[w]here at least one plaintiff has standing, jurisdiction is secure and the court will adjudicate the case whether the additional plaintiffs have standing or not."  *Matushkina v. Nielsen*, 877 F.3d 289, 292 (7th Cir. 2017) (citation omitted).

Indiana next vainly assails FSC's associational standing. ECF 30 at 10-13. Again, that is irrelevant so long as at least one Plaintiff demonstrably has standing, as is true here. *See* Decl. of Sadiq Muhamed (ECF 4-4) at ¶¶ 2, 7. Regardless, Indiana's argument boils down to the claim that FSC must identify at least one affected member. FSC has dispelled the issue by identifying Aylo Freesites, Ltd, and Paper Street Media, LLC as affected members. *See* Rebuttal Decl. of Alison Boden at ¶ 3.

Finally, Indiana misdirects its arguments as to the Doe declarants. ECF 30 at 13-14. The Does are not offered as Plaintiffs (yet), and their declarations confirm the First Amendment principle that purveyors of speech may assert the rights of third parties whose access to that speech state laws chill. All told, Plaintiffs' standing is beyond doubt.

## II.    INDIANA FAILS TO REBUT PLAINTIFFS' LIKELY SUCCESS

### A.    Indiana Fails To Ward Off Strict Scrutiny

#### 1.    Indiana Cannot Distinguish *Ashcroft* And Attendant Precedents

When Indiana addresses the controlling Supreme Court precedents in *Reno*, *United States v. Playboy Entertainment Group*, and *Ashcroft*—after taking several detours, *see infra* at 12-15— Indiana asks this Court to follow the Fifth Circuit in driving through that precedential barrier. ECF 30 at 17-18. Yet Indiana does not dispute that the Supreme Court "has unswervingly applied strict scrutiny to content-based regulations that limit adults' access to protected speech," even where those restrictions have been designed to limit minors' access to sexual content. *Free Speech Coal.*, 95 F.4th at 292 (Higginbotham, J., dissenting). Nor does Indiana dispute that the Supreme Court has twice applied strict scrutiny when reviewing laws materially indistinguishable from the Act. *See Reno v. ACLU*, 521 U.S. 844, 859-61 (1997); *Ashcroft*, 542 U.S. at 661-62. Nevertheless, Indiana relies on an anomalous reading of *Ginsberg v. New York*, which would substitute mere

rational-basis review for any laws that regulate the distribution to minors of material obscene for minors.  ECF 30 at 17 (citing *Free Speech Coal.*, 95 F.4th at 269 ).  That is misconceived.

*First*, Indiana's reading of *Ginsberg* is facially flawed.  In *Ginsberg*, the Supreme Court considered a state law that prohibited the sale to minors of magazines deemed "'harmful to'" them but "not obscene for adults."  390 U.S. 629, 633-34 (1968) (citation omitted).  The case arose when a vendor appealed his conviction on the ground that "the constitutional freedom of expression secured to a citizen to read or see material concerned with sex cannot be made to depend upon whether the citizen is an adult or a minor."  *Id*. at 636; *see* Br. for Appellant, *Ginsberg*, 390 U.S. 629 (1968) (No. 47, O.T. 1967), 1967 WL 113634, at *7 ("The appellant's position is that the restriction on the distribution of literature based on age classification is censorship, pure and simple.").  In other words, the vendor invoked the "constitutionally protected freedoms" of "minors[]." *Ginsberg*, 390 U.S. at 638.

The Court understood and rejected the argument on those terms, holding that "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults."  *Id*. at 638 (citation omitted).  *Ginsberg* thus stands for the significant but limited proposition that, as a special exception for sexual material, a state may rationally "regulate minors in ways it could not regulate adults."  *Free Speech Coal.*, 95 F.4th at 293 (Higginbotham, J., dissenting).  That is why the Supreme Court distinguished *Ginsberg* in later holding that *violent* speech remains fully protected *even for minors*.  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 793-99 (2011).

*Second*, Indiana's aberrant reading of *Ginsberg* upends several-decades-worth of subsequent First Amendment precedents.  Taken by its terms, *Ginsberg* fits within the Supreme Court's ensuing jurisprudence.  Were Indiana correct, however, then *Sable Communications v. FCC*, *Playboy*, *Reno*, and *Ashcroft* would all have been wrongly decided.  After all, each applied

strict scrutiny to regulations that restricted minors' access to sexually explicit expression.  This is especially stark for *Reno* and *Ashcroft*, which applied strict scrutiny to Internet restrictions that made age verification an affirmative defense—thereby prohibiting, like the Act, the distribution of sexual content without age verification.

Nor do Indiana's purported distinctions of *Reno*, *Playboy*, and *Ashcroft* hold water.  Indiana attempts to distinguish *Reno* on various fact- and record-specific grounds—most significantly, that the law at issue purportedly applied to more content than either this Act or the law challenged in *Ginsberg*.  ECF 30 at 17-18.  But Indiana misses *Reno*'s overarching point:  When a content-based law aimed at protecting minors exerts a "chilling effect" on speech that is protected for adults, "[t]hat burden on adult speech is unacceptable" unless the law survives strict scrutiny.  *Reno*, 521 U.S. at 871-72, 874.  As to Indiana's attempted distinction of *Playboy,* it is refuted by *Playboy* itself.  While Indiana characterizes *Playboy* as addressing a ban, ECF 30 at 19, the Court in *Playboy* stated the opposite and held that that a government's "content-based burdens must satisfy the same rigorous scrutiny as its content-based bans."  *Playboy*, 529 U.S. at 812.  Indiana does not dispute that the Act answers to the former description, given the serious chills and burdens that Internet-based age verification inflicts.  *See* Br. (ECF 5) at 16.

Then there is *Ashcroft*, which is directly on point in applying strict scrutiny to invalidate a materially indistinguishable law.  542 U.S. at 666.  Attempting to distinguish *Ashcroft*, Indiana suggests that *Ashcroft* applied strict scrutiny solely because the United States, represented by Solicitor General Theodore B. Olson, acquiesced.  ECF 30 at 18.  But nothing in the Court's decision supports that hypothesis.  The *Ashcroft* Court did not "assume, without deciding, that" a particular "level of scrutiny" applied.  *See McCullen v. Coakley*, 573 U.S. 464, 478 (2014).  Nor did it suggest that it was deferring to the parties' presentation of the arguments. *Cf. Haaland*, 599

U.S. at 279-80. Instead, the Court applied strict scrutiny, *Ashcroft*, 542 U.S. at 670; Justice Breyer's dissent, joined by Chief Justice Rehnquist and Justice O'Connor, applied strict scrutiny, *id*. at 677; and Justice Scalia dissented on the substantive ground that strict scrutiny should not apply, *id*. at 676. It is incorrect that the Court addressed the level of scrutiny so extensively—with eight of nine Justices applying it and one vigorously disputing it—only for the sake of parroting the parties' position.

Taking another tack, Indiana argues that changes in technology since *Ashcroft* warrant lesser scrutiny. ECF 30 at 18. But the Supreme Court has never held that the level of constitutional scrutiny varies (let alone plummets from the highest tier to the lowest) based on technological evolution. To the contrary, it has repeatedly held that the protections of the First Amendment, like those of other constitutional provisions, endure as technology evolves. *See, e.g.*, *Packingham v. North Carolina*, 582 U.S. 98, 104-05 (2017); *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 637 (1994). If anything, technological change further buttresses Plaintiffs' position, because "[t]he risks of compelled digital verification are just as large, if not greater, than those in *ACLU v. Ashcroft*." *Free Speech Coal., Inc. v. Colmenero*, 689 F. Supp. 3d 373, 400 (W.D. Tex. 2023) (so finding on a virtually identical record) *vacated in part on other grounds*, *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024), *cert. pending*, No. 23-1122. Nor can allegedly varying gradations between laws' penalties and contours justify displacing strict scrutiny, which the Supreme Court has held applies categorically to any "content-based speech restriction." *Ashcroft*, 542 U.S. at 665. That noted, no amount of technological change can affect how *Ginsberg* is properly read from 1968 forward and whether *Ashcroft* misstated the standard of review the day it was decided, as Indiana contends.

**Third**, even assuming *arguendo* that *Ginsberg* stands in tension with later precedent and announces a better rule, *Reno*, *Playboy*, and *Ashcroft* remain binding. The Seventh Circuit has already interpreted *Ashcroft* to mean what it says. *See Blagojevich*, 469 F.3d at 651. Moreover, *Ashcroft* further held, and Indiana does not contest, that courts should err on the side of protecting the First Amendment "[i]f the underlying constitutional question is close." 542 U.S. at 664. As explained *supra*, the question here is not close. If it were, however, grant of a preliminary injunction would still be the correct result at this stage.

## 2.    Indiana Fails To Refute The Act's Burden On Protected Speech

Indiana argues that Plaintiffs' challenge should fail on the alleged ground that all their speech is obscene and thus "wholly unprotected." ECF 30 at 16. That is incorrect both legally and factually.

As a legal matter, Indiana does not dispute that the Act reaches substantial amounts of non-obscene content. The Act does not target obscenity for adults; it regulates websites where at least one-third of the material is "harmful to minors," without requiring that any of the material be obscene for adults. In fact, Indiana regulates obscenity *separately*. *See* I.C. § 35-49-3-2. The Act's entire point is thus to regulate material that is deemed harmful for minors but constitutionally protected for adults. This is the definition of facial overbreadth— "a substantial number of [the Act's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (cleaned up). The "construction" of the Act is enough to "decide[] the constitutional question," *id.* at 474, 481-82, which hinges on whether the Act "effectively suppresses a large amount of speech that adults have a constitutional right to receive," *Ashcroft*, 542 U.S. at 665 (citation omitted). Indiana's argument against overbreadth, *see* ECF 30 at 25, rests on the incorrect premise that the overbreadth doctrine applies only to laws that outright "prohibit protected speech." *See Ashcroft*, 542 U.S. at 664 (affirming that a law effectively

requiring online age-verification was "overbroad"); *see also Playboy*, 529 U.S. at 812 ("The distinction between laws burdening and laws banning speech is but a matter of degree.").

As a factual matter, Indiana does not seriously dispute that Plaintiffs' websites host substantial amounts of non-obscene content. *See Colmenero*, 689 F. Supp. 3d at 391 (concluding the same on a virtually identical record). Plaintiffs' websites include, for example, sexual health and wellness blog posts, Decl. of Andreas Andreou (ECF 4-2) at ¶ 12, and the content on one of Plaintiffs' websites is exclusively "soft core" nude modeling. Decl. of Phillippe Craveiro-Romão (ECF 4-11) at ¶ 9. In dismissing such evidence, Indiana cherry-picks certain content and fails to apply the *Miller* test—omitting, for example, any argument as to how all Plaintiffs' content is "patently offensive" under contemporary community standards. *See Ashcroft v. ACLU*, 535 U.S. 564, 576 n.7 (2002). Instead, Indiana asserts that Plaintiffs' "*entire* websites" are obscene, allegedly because they appeal to the prurient interest when taken as a whole. ECF 30 at 15 (alternation in original). But that argument does not square with the Act's text, which directs any *Miller* inquiry to discrete "images and videos" on a website, *not* websites taken as a whole. The Act's text and the record thus amply suffice to establish—at least at the preliminary-injunction stage—that the Act is facially overbroad under settled First Amendment jurisprudence.

### 3.    Indiana Misplaces Reliance On The "Secondary Effects" Doctrine

Finally, Indiana invokes the "secondary effects" doctrine and attendant intermediate scrutiny. ECF 30 at 20-22. As Indiana acknowledges, however, the seldom-used doctrine is confined to physical zoning, addressing such things as "prevent[ing] crime" and "maintain[ing] property values." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986). Here, the Act aims not at secondary effects but at "prevent[ing] the psychological damage" allegedly "associated with viewing adult movies," i.e., "the direct impact of a particular category of speech." *Boos v. Barry*, 485 U.S. 312, 321 (1988). Indiana's response on this point lacks substance, *see* ECF 30 at

13

21 ("without meaningful age gating, a secondary effect of allowing the Pornographers to seek to speak to *adults* is that their material will be available to *children*" (alteration in original)), and its stray citation to *Barnes v. Glen Theatre, Inc*. is irrelevant, concerning, as it does, a general ban on public nudity, which was upheld as a permissible "time, place, and manner" restriction. 501 U.S. 560, 562-64, 566-67, 572 (1991).

In any event, the "secondary effects" doctrine has been held inapplicable in this setting. When the government has regulated electronic media on behalf of minors, the Supreme Court has rejected attempted extension of the "secondary effects" doctrine. *See Free Speech Coal., Inc. v. Att'y Gen. U.S*., 825 F.3d 149, 161-63 (3d Cir. 2016) (limiting the "secondary effects" doctrine to physical zoning restrictions). Thus, in *Playboy*, in invalidating a law requiring cable operators to scramble adult channels when minors would likely be awake, the Court "made clear that the lesser scrutiny afforded regulations targeting the secondary effects of crime or declining property values has no application to content-based regulations targeting the primary effects of protected speech." 529 U.S. at 815 (citation omitted). The same held in *Reno*: Because "the purpose of the CDA is to protect children from the primary effects of 'indecent' and 'patently offensive' speech … the CDA is a content-based blanket restriction on speech, and, as such, cannot be 'properly analyzed as a form of time, place, and manner regulation.'" 521 U.S. at 868 (citation omitted). In other words, Supreme Court precedent forecloses Indiana's argument in this respect, too.

### 4.    Indiana Confirms The Act's Speaker-Based Discrimination

Setting aside why *Reno*, *Ashcroft*, and *Playboy* call for strict scrutiny, Indiana all but confirms another, independent basis for strict scrutiny—the Act's discrimination against disfavored speakers. *See Surita v. Hyde*, 665 F.3d 860, 870 (7th Cir. 2011); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391, 393-94 (1992). Indiana asserts that, as a factual matter, coverage of search engines would be redundant. ECF 30

at 19.  But Plaintiffs' Internet and security expert—whom Indiana ignores—already refuted that, explaining how age verification will not restrict the content available through search engines, even when the content originates from Plaintiffs' websites.  ECF 4-9 at ¶¶ 31-33 (further noting that "safe search" features are easily deactivated).  Indiana also argues that the Act's *de facto* exclusion of social media platforms is not a speaker-based distinction because it results from the Act's operative definitions.  ECF 30 at 19-20.  But Indiana's premise that a statute must *name* disfavored speakers in order to discriminate against them is out of step with common sense as well as precedent.  *See Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (noting speaker-based discrimination in a law that applied only after $100,000 of ink and paper were consumed in a year).  Moreover, Indiana's defense of the Act proves Plaintiffs' point, as Indiana defends the exclusion of social media by decrying "pornographers," *e.g.*, ECF 30 at 19-20, and claiming that these speakers alone "*intentionally*" provide sexual content.  ECF 30 at 27 (alteration in original).  That attempted distinction does not align with the  Act's avowed purpose, which is to protect minors from sexual content over the Internet, irrespective of its source.  To single out one set of speakers under the guise of a speaker-neutral purpose is even more invidious than doing so openly, *see Minneapolis Star*, 460 U.S. at 591, and further confirms why strict scrutiny is essential here.

## B.    Indiana Cannot Refute Plaintiffs' Likely Success Under Strict Scrutiny

There is no dispute that governments have a compelling interest in preventing minors from accessing sexually explicit content.  But Indiana has not carried its burden to prove narrow tailoring and its use of the least-restrictive means to achieve its avowed end.

### 1.    Indiana Fails To Disprove Less Restrictive, Superior Alternatives

The  Act's  age-verification  requirement  does  not  withstand  the  Supreme  Court's instructions in *Ashcroft* and the present evidentiary record.  In *Ashcroft*, the Court determined that

content filtering, which Indiana could be helping parents to adopt and use or requiring manufacturers to pre-install on minors' devices, is a presumptively superior alternative to age-verification mandates.  542 U.S. at 667-69.  Against this backdrop, it falls to Indiana to show otherwise, and Indiana has not made the requisite showing, at least at this stage.

Indiana misses the mark in its attempt to impugn content-filtering as too ineffective compared to the Act's age verification mandate.  According to Indiana's brief, "parents do not know about" content-filtering.  ECF 30 at 23.  But Indiana has not tried to fill that gap by informing them.  Indiana claims that parents would need the "knowledge" to "properly implement the filters." *Id.*  Again, Indiana could provide that.  Indiana notes that filters can "overblock." *Id.*  But parents can enable access.  Indiana worries that minors might get around filters.  *Id.*  But evading age verification online is even easier.  ECF 4-9 ¶¶ 21-33.  Indiana also asserts, counterfactually, that Plaintiffs "only support" comes from *Ashcroft*, ECF 30 at 23, even though Indiana's own expert on age verification recognizes that Plaintiffs' Internet and security expert "makes a number of correct positive assertions about content filtering technology."  Decl. of Tony Allen (ECF 30-3) ¶ 39.

By contrast, Indiana does not cite any jurisdiction that has tried content filtering and found it wanting, nor even examination by its Legislature.  Rather, Indiana's cited evidence against content filtering consists of a study, *see* ECF 30 at 24, that defines "failure" as allowing just one instance of nudity to slip through over the span of an entire year.  *See* Przybylski & Nash, "Internet Filtering and Adolescent Exposure to Online Sexual Material," 21 CYBERPSYCH, BEHAV., AND SOC. NETWORKING 405, 407 (2018)).  The State's evidence thus depends on an unachievable metric of success.  Proper tailoring analysis requires weighing *practical* alternatives, yet the State here faults one alternative for being imperfect, as will always be true.  *See Garden Dist. Book*

16

*Shop, Inc. v. Stewart*, 184 F. Supp. 3d 331, 339 (M.D. La. 2016). The lone imperfection the State attributes to content-filtering (a single instance of nudity) would not be caught by the Act.

Nor does Indiana have a satisfying response to the availability of age verification at the level of internet service providers ("ISPs") or on consumer devices. Indiana gets things backwards in trying to offload to Plaintiffs the burden to "provide" more "detail" and "explanation" on this point. ECF 30 at 24-25. Under strict scrutiny, *Indiana* bears the burden. *Ashcroft*, 542 U.S. at 669. And it cannot meet its burden by distinguishing the latter-day analogue to age verification by ISPs—age verification by phone companies—by observing it was "more than thirty years ago," without identifying any material intervening change. ECF 30 at 25.

Unable to impugn available alternatives, Indiana argues that age verification over the Internet is no burden at all, a conclusion that does not fit the evidence. ECF 30 at 28-30. Indiana compares the Act to similar online requirements for gambling or purchasing alcohol. ECF 30 at 29. But those activities are not protected by the First Amendment. Nor is the willingness of certain adults to submit to age verification in those contexts relevant to whether *other* adults are chilled from accessing the sensitive and potentially compromising expression at issue here when age verification is required. The answer to that question is not only clear but uncontested: Plaintiffs explained the resulting chill in their moving papers, *see* ECF 5 at 16, and Indiana makes no effort to refute it. *See also* Decl. of Kian Hudson (ECF 4-10), Ex. 1 ("2 out of 3 Americans are not comfortable sharing their identification document … [or] biometric information with platforms"); Decl. of Doe No. 2 (ECF 4-7) at ¶¶ 6, 12-19; ECF 4-1 at ¶¶ 5-6.[1] Nor is Indiana correct in claiming

---

[1] While Indiana points to the use of verification technologies by certain Plaintiffs in Canada, ECF 30 at 29, Indiana's own evidence shows that this is for verifying the age of *performers*, not visitors. ECF 30-3 at ¶ 55. Nor does Canada have the First Amendment.

that third-party age-verification services are "affordable," ECF 30 at 29, especially for smaller businesses.  ECF 4-1 at ¶ 11.

Indiana also claims that Plaintiffs "themselves demand or encourage their users to provide *precisely the same kind of personally identifying information* that they complain the Act requires for age verification purposes."  ECF 30 at 29 (emphasis added).  Indiana offers no evidence to support that inaccurate assertion.[2]  Much the same goes for Indiana's recitation that the Act "builds in privacy protections."  ECF 30 at 29.  Plaintiffs noted the critical flaws inherent in those fig-leaf "protections," *see* ECF 5 at 16 and & n.3, but Indiana offers no substantive response.  ECF 30 at 29-30.  In fact, Indiana's expert *concedes* that the Act will create at least "the same risk of [cyber]attack" borne by a "bank or healthcare provider."  ECF 30-3 at ¶ 36; *see also* Decl. of Kian Hudson, Ex. 5 (describing data breach of age verification provider).  That is a chilling prospect.

Indiana concludes its defense of the Act by positing that the Act permits less invasive "age-verification alternatives" termed "Age Estimation," ECF 30-3 at ¶ 12.i., that "do not require document-based approaches."  ECF 30 at 30.  But the Act requires age "verification," not "estimation."  I.C. § 24-4-23-10.  As Indiana's expert acknowledges, Age Estimation is outside the Act's "expressly permitted methods."  ECF 30-3 at ¶¶ 13, 14.  To the extent Indiana here effectively rewrites the Act in an effort to defend it, Indiana is only confirming the Act's infirmity and the warrant for preliminarily enjoining its enforcement

### 2.    Indiana Fails To Dispel The Act's Poor Tailoring

Indiana fares no better in addressing tailoring defects.  It contests the Act's over-inclusiveness only on the grounds that "none" of the Plaintiffs' websites comprise mostly non-

---

[2]  Visitors to the subscription websites are free to browse examples of the available content without needing to submit payment information, as they may later do if and only if they choose to access the full site.  By comparison, the Act requires age verification the moment one enters a website, thereby blocking potential customers from perusing free samples anonymously.

obscene content.  ECF 30 at 26.  That is factually false—*see, e.g.*, ECF 4-11 ¶ 9—and beside the point.  By its design and by its terms, the Act facially applies to websites where two-thirds of the content is constitutionally protected even for minors.  If, by analogy, the Act regulated movie theaters, it would require theaters to tally up their R-rated movies and impose age verification regardless of the movie a customer wanted to see.  Such an approach necessarily yields sweeping over-inclusivity, which content filtering would avoid.

Indiana similarly contests the Act's glaring under-inclusiveness, on the grounds that it targets "the most problematic websites where minors are most likely to encounter online sexual material."  ECF 30 at 27.  That, too, is factually false.  *See* ECF 4-9 at ¶¶ 32, 34; ECF 4-10, Ex 4 at 417.  Nor does Indiana's explanation fit the Act's purpose of protecting minors from sexual content on the Internet, irrespective of its particular source.  Indiana makes no effort to distinguish the on-point authorities Plaintiffs cited, including *Brown*, 564 U.S. at 802, and *Smith v. Daily Mail Publication Company*, 443 U.S. 97, 105.  *See also* ECF 5 at 20-22.  Moreover, content filtering shows its virtue in this respect too, blocking all sources of sexual content on the Internet, including those left unregulated by the Act.

Finally, Indiana does not address the Act's failure to clarify which age groups within the category of "minors" count for determining whether material is "harmful," even though sexual material that may be appropriate for 17-year-olds may not be appropriate for 11-year-olds.  ECF 5 at 16-17.  In contrast, content filtering solves the problem, allowing parents to tailor the available content to children of different ages.  ECF 4-9 at ¶ 55.  Indiana's attempt to fault *Plaintiffs* for not "segregating" their content to allow Indiana to enact a more targeted age-verification law, ECF 30 at 26, not only improperly shifts the burden, but also runs against precedent pointing to the

unconstitutionality of any such imposition.  At best, Indiana's defense is circular, depending on the premise that the Act should withstand First Amendment scrutiny.

### 3. Indiana Fails To Show The General Assembly Made A Considered Judgment

As Plaintiffs noted, ECF 5 at 22-23, a law cannot withstand strict scrutiny where, as here, the General Assembly has not made a considered judgment.  That is, the General Assembly cannot regulate without assessing evidence and alternatives, then dispatch its lawyers to make *post hoc* arguments about why its laws should survive.  *See Willis v. Comm'r, Indiana Dep't of Corr.*, 753 F. Supp. 2d 768, 780 (S.D. Ind. 2010) (ruling that the government failed strict scrutiny by not meeting "its burden of demonstrating that it considered and rejected the many obvious alternatives").  As the Supreme Court noted in *Reno*, "[t]he lack of legislative attention" to a statute's tailoring, and the consequent failure to "present a considered judgment," make a statute especially vulnerable to invalidation.  521 U.S. at 876 n.41 (quoting *Sable Comms., Inc. v. FCC*, 492 U.S. 115, 130 (1998)) ("the congressional record presented to us contains no evidence as to *how* effective or ineffective the FCC's most recent regulations were or might prove to be." (alteration in original)).

Indiana cites state-law guideposts for how to interpret statutes, ECF 30 at 25-26, but those cannot chart a path around constitutional strictures.  The First Amendment requires that the General Assembly consider practical alternatives.  While Indiana faults Plaintiffs for identifying portions of the legislative history that suggest no such effort was made, *id.*, Indiana identifies nothing that points to the contrary.  If anything, Indiana reinforces Plaintiffs' position:  The General Assembly's apparent disregard for obvious alternatives—including the very one spotlighted by the Supreme Court—is itself fatal under strict scrutiny, at least when assessing Plaintiff's likelihood success.

III.     **THE STATE FAILS TO REBUT PLAINTIFFS' SHOWING OF IRREPARABLE, ONE-SIDED HARM**

Indiana does not dispute that a likely First Amendment violation entails irreparable harm, ECF 30 at 31, which suffices to end the inquiry.  *See ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589, 589 (7th Cir. 2012) (citation omitted) ("loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").   Indeed, the State has no cognizable interest in singling out disfavored viewpoints and speakers for condemnation, even as the same content continues to flow freely to minors through other channels like search engines and social media.

Indiana's partial attack on Plaintiffs' loss of goodwill, ECF 30 at 30, also fails.  Indiana's unsupported suggestion that age verification will *increase* goodwill is belied by the likelihood that many adults will not submit to age verification.  The same is true of Indiana's suggestion that age verification will cause little change for subscription-based websites, which are only a subset of the websites at issue.  In fact, requiring age verification will likely drive down initial enrollment by requiring information to be submitted before users can browse the available content—particularly since users are likely to be more protective of their government identification than their credit card information.

Finally, Indiana briefly notes Plaintiffs' alleged delay as a reason to doubt Plaintiffs' irreparable harm, *id.* at 31, but the Act has yet to go into effect and, as Plaintiffs explained at the scheduling conference, Plaintiffs moved as quickly as they could.  While Indiana cites *Jones v. Markiewicz-Qualkinbush*, this was a voting rights case that was brought so late that entering a preliminary injunction would have caused irreversible "harm to the electoral system."  842 F.3d 1053, 1060-62 (7th Cir. 2016).  *Jones* was an application of *laches*, where delay caused harm, *id.* at 1060; it has no application where, as here, irreparable First Amendment harms loom not only

for Plaintiffs, but also innumerable adult Hoosiers. *See, e.g.*, *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) (upholding preliminary injunction to prevent First Amendment harm despite six-month delay); *Tripathy v. Lockwood*, 2022 WL 17751273, at \*2 (2d Cir. Dec. 19, 2022) (same despite *29-month* delay).

Plaintiffs amply satisfy the requirements for a preliminary injunction, and this Court should preserve the status quo pending further proceedings and the ultimate adjudication of the merits. *See Int'l Bhd. of Teamsters Airline Div. v. Frontier Airlines, Inc.*, 628 F.3d 402, 404-05 (7th Cir. 2010) (citation omitted) ("A federal district court can issue an injunction to preserve the status quo," i.e., "the conditions … on the eve of the action that precipitated the dispute").

## IV.   SCOPE OF THE INJUNCTION

Indiana argues that any injunction should protect Plaintiffs alone.  However, the Seventh Circuit holds otherwise in the context of a facially invalid statute, where "the claimed constitutional violation inheres in the terms of the statute, not its application." *See Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011); *see, e.g.*, *St-Hilaire v. Comm'r of Ind. Bureau of Motor Vehicles*, 2024 WL 125982, at \*22 (S.D. Ind. Jan. 11, 2024) (enjoining all enforcement). While Indiana cites *Board of Trustees of State University of New York v. Fox*, that case does not address the scope of relief.  492 U.S. 469, 485 (1989).  An injunction should bar enforcement by the Attorney General of an Act that is likely unconstitutional and that threatens to chill protected expression throughout the State.  At the same time, Indiana's interests can be properly protected through an expeditious march to final judgment, which Plaintiffs stand ready to facilitate.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court preliminarily enjoin enforcement of the Act pending a final determination of this action.

Dated:  June 26, 2024

Derek L. Shaffer (*pro hac vice*)
derekshaffer@quinnemanuel.com
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
1300 I Street NW, Ste 900
Washington, DC 20005
Telephone: (202) 538-8000
Fax:  (202) 538-8100

Taylor E. Comerford (*pro hac vice*)
taylorcomerford@quinnemanuel.com
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Ave Ste 520
Boston, MA 02199
Telephone: (617) 712-7100
Fax:  (617) 712-7200

Jeffrey Keith Sandman (*pro hac vice forthcoming*)
jeff.sandman@webbdaniel.law
WEBB DANIEL FRIEDLANDER LLP
5208 Magazine St Ste 364
New Orleans, LA 70115
Phone: (978) 886-0639

By         /s/    *Kian Hudson*

Kian Hudson (Bar No. 32829-02)
Kian.hudson@btlaw.com
BARNES & THORNBURG LLP
11 S Meridian St
Indianapolis, IN 46204
Telephone: (317) 236-1313
Fax: (317) 231-7433

Michael T. Zeller (*pro hac vice*)
Arian Koochesfahani (*pro hac vice*)
michaelzeller@quinnemanuel.com
ariankoochesfahani@quinnemanuel.com
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017-2543
Telephone: (213) 443-3000
Fax: (213) 443-3100

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2024 a copy of the foregoing was filed electronically.

Service of this filing will be made on all ECF-registered counsel by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.


*/s/ Kian Hudson*
Kian Hudson
*Attorney for Plaintiffs*