**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| WEBGROUP CZECH REPUBLIC, A.S. and, NKL ASSOCIATES, S.R.O., | ) | |
| Plaintiffs/Counter Defendants, | ) | No. 1:24-cv-00980-RLY-MG |
| v. | ) | |
| TODD ROKITA, in his official capacity as the Attorney General of the State of Indiana, | ) | |
| Defendant/Counter Claimant. | | |

## AMENDED ANSWER

Defendant, Todd Rokita, in his official capacity as the Attorney General of the State of Indiana, answers the plaintiffs' complaint as follows:

## NATURE OF THE ACTION

1. On March 13, 2023, the Indiana governor signed into law Senate Bill 17 ("the Act"), which goes into effect July 1, 2024. The Act joins a long tradition of unconstitutional—and ultimately failed—governmental attempts to regulate and censor free speech on the internet. The Act in effect requires Plaintiffs to block access to their websites in Indiana wholesale, unless they implement a system that requires all visitors to transmit their personal information to verify that they are at least eighteen years old. The Act's requirements are enforceable by the Indiana Attorney General. The requirements are unconstitutional and violate the federal Communications Decency Act. Plaintiffs thus seek to enjoin the Attorney General from enforcing the unconstitutional and preempted Act.

**ANSWER:** Defendant admits that the governor signed Senate Bill 17, but denies that it was signed on March 13, 2023. The Act was signed on March 13, 2024. Defendant admits that the Act goes into effect on July 1, 2024. The contents of the Act speak for itself.

The complaint's characterization of the lawfulness of the State's actions asserts a legal conclusion to which an answer is not required. To the extent an answer is required, defendant denies that the Act is unconstitutional or that it violates federal law.

2. Pursuant to 42 U.S.C. §§ 1983, 1988 and 28 U.S.C. §§ 2201-02, Plaintiffs seek injunctive and declaratory relief to vindicate rights, privileges, and immunities secured by the Constitution and laws of the United States. The Act violates the First, Eighth, Fifth, and Fourteenth Amendments to the United States Constitution, as well as section 230 of the Communications Decency Act.

**ANSWER:** Regarding the first sentence, the complaint speaks for itself. Regarding the second sentence, the complaint's characterization of the lawfulness of the State's actions asserts a legal conclusion to which an answer is not required. To the extent an answer is required, defendant denies the allegations.

3. The Act violates the First Amendment in two fundamental ways.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegation.

4. First, the Act's age verification requirement is a content- and speaker-based restriction that fails strict scrutiny. Despite impinging on the rights of adults to access protected speech, it fails strict scrutiny by employing the least effective and yet also the most restrictive means of accomplishing Indiana's stated purpose of allegedly protecting minors. Indeed, minors can use proxy servers, virtual private networks ("VPNs"), the "Tor" browser, and numerous other circumventions to bypass the Act's verification requirements with ease; the law excludes search engines and most social media sites even though they pose a greater risk of exposure to adult content; and protected speech will be chilled as adults refuse to risk exposing their personal information that could lead to financial or reputational harm. In contrast, content filtering at the browser and/or the device level allows

anyone wishing to implement that technology on minors' devices to block access to any unwanted site, including adult sites, without impairing free speech rights or privacy. But such far more effective and far less restrictive means don't really matter to Indiana, whose true aim is not to protect minors but to squelch constitutionally protected free speech that the State disfavors.

**ANSWER:** This paragraph asserts legal conclusions regarding strict scrutiny to which no answer is required. Defendant denies the remaining allegations.

5. Second, under the heightened scrutiny required by the First Amendment, the Act is incurably vague as to its fundamental requirements, providing neither a coherent standard for assessing to which websites it applies, nor adequate guidance on what "age verification" entails.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations.

6. The Act further violates the Supremacy Clause by violating section 230 of the Communications Decency Act, which prohibits treating website operators as if they were responsible for alleged harm caused by content created and uploaded by third parties.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations.

7. The Act violates the Fourteenth Amendment in multiple ways, too. First, the Act's indecipherable vagueness violates the basic tenets of procedural due process. Second, by destroying Plaintiffs' protected property right in the goodwill of Indiana viewers without a rational basis, it violates the substantive component of the Due Process Clause. Third, because of its arbitrary exceptions for search engines and most social media sites, it violates the Equal Protection Clause, even under rational basis review. Finally, the Act violates the Takings Clause of the Fifth Amendment, depriving Plaintiffs of their private property interests in their businesses without just compensation

by forcing platforms to adopt age verification protocols they cannot afford and will cause a mass exodus of customers.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations.

8. The Act also violates the Excessive Fines Clause of the Eighth Amendment, because it imposes fines that are grossly disproportionate to the unproven, fabricated harms it purports to protect against.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations.

9. Accordingly, Plaintiffs seek to have the Indiana Attorney General enjoined from enforcing the Act—both preliminarily, pending the hearing and determination of this action, and permanently. Plaintiffs also seek declaratory relief, as well as damages, costs, and attorneys' fees.

**ANSWER:** This paragraph's descriptions of the complaint speak for themselves. To the extent an answer is required, defendant denies the allegations.

## JURISDICTION AND VENUE

10. This case presents federal questions within this Court's jurisdiction pursuant to Article III of the United States Constitution and 28 U.S.C. §§ 1331 and 1343(3). Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988 (deprivation of rights, privileges, and immunities secured by the Constitution and federal law) and 28 U.S.C. §§ 2201-02 (declaratory judgment as to an actual controversy).

**ANSWER:** The complaint and the cited statutes speak for themselves. Defendant admits that this complaint raises federal questions but denies this Court has subject-matter jurisdiction over all claims raised by all plaintiffs.

11. Venue is proper pursuant to 28 U.S.C. § 1391(b). The challenged law was passed in Indianapolis, Indiana, which is also where the Attorney General performs his official duties.

**ANSWER:** Defendant admits that venue is proper, and admits that Indianapolis, Indiana, is one place (but not the only place) that the Attorney General performs official duties. The cited statutes speak for themselves.

## PARTIES

12. Defendant Todd Rokita a person within the meaning of Section 1983 of Title 42 of the United States Code; and he currently serves as the Attorney General of the State of Indiana. The Office of the Attorney General is in Indianapolis, Indiana. The Act expressly authorizes "[t]he attorney general [to] bring an action under this chapter to obtain … against an adult oriented website, accessible by an Indiana resident, that does not implement or properly use a reasonable age verification method: (1) An injunction to enjoin future violations of this chapter. (2) A civil penalty of not more than two hundred fifty thousand dollars ($250,000). (3) The attorney general's reasonable costs." I.C. 24-4-23 § 15. The Attorney General of Indiana is thus directly responsible for the enforcement of the Act.

**ANSWER:** Defendant admits that Todd Rokita is the AG of Indiana, a person within the meaning of section 1983, and that his office is located in Indianapolis, Indiana. The Act speaks for itself. The Attorney General admits that he is a party responsible for enforcement of the Act. The Attorney General denies the allegation that he is "directly" responsible for the enforcement of the Act because this allegation is vague.

13. Plaintiff Free Speech Coalition, Inc. ("FSC") is a not-for-profit trade association organized under the laws of California with its principal place of business in Canoga Park, California. FSC assists filmmakers, producers, distributors, wholesalers, retailers, internet providers, performers,

and other creative artists located throughout North America in the exercise of their First Amendment rights and in the vigorous defense of those rights against censorship. Founded in 1991, the Free Speech Coalition represents hundreds of businesses and individuals involved in the production, distribution, sale, and presentation of constitutionally-protected adult content disseminated to consenting adults via the internet. FSC sues on its own behalf and on behalf of its members to vindicate its own constitutional rights, its members' constitutional rights, and the rights of its members' owners, officers, employees, and current and prospective readers, viewers, and customers. Many of FSC's members are individual adult performers gravely concerned about the consequences of the Act, but who fear for their safety should they come forward publicly to challenge the Act in court. FSC's members would directly benefit from an injunction enjoining the enforcement of the Act. The potential harm to FSC's members caused by the recent enactment of state age-verification statutes has caused significant concern among its members. FSC has diverted resources away from its normal day-to-day activity, which has impaired its ability to perform its usual functions. Over the last year, both FSC's Executive Director and Director of Public Affairs have had to devote more than half their time to tracking legislative developments, meeting with FSC members to discuss risks relating to age-verification statutes, meeting with litigation attorneys and advisors, and otherwise engaging in activities to minimize the risk to its members from the age-verification statutes that states, in particular Indiana, have recently enacted.

**ANSWER:** Defendant lacks sufficient information to form a belief as to the truth of the allegations in this paragraph.

14. Plaintiff Aylo Premium Ltd, is a limited liability company organized under the laws of the Republic of Cyprus, with its principal place of business in Nicosia, Cyprus, that operates SpiceVids.com ("SpiceVids"), a subscription-based website offering high quality adult content

uploaded, owned, copyrighted, and controlled by third party content creators. Aylo Premium Ltd also operates the website Brazzers.com ("Brazzers"), a subscription-based website offering high quality adult content in which Aylo Premium Ltd holds all the intellectual property rights. For shoots with adult performers, Aylo Premium Ltd writes the scripts, hires the production team, and does the pre- and post-production work. Aylo Premium Ltd uploads Brazzers content both to Brazzers.com and to the websites of other Plaintiffs, including Pornhub.com, xvideos.com, xnxx.com, and SpiceVids. In addition, Aylo Premium Ltd operates the website FakeTaxi.com ("FakeTaxi"), a subscription-based website offering high quality adult content that is produced and owned by Plaintiff Yellow Production, s.r.o., discussed below. Aylo Premium Ltd opposes the restrictions the Act would place on its ability to reach its audience.

**ANSWER:** Defendant admits that Brazzers.com and FakeTaxi.com are websites containing pornographic content and offering subscriptions. Defendant otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph.

15. Plaintiff Aylo Freesites Ltd, is a limited liability company organized under the laws of the Republic of Cyprus, with its principal place of business in Nicosia, Cyprus, that operates Pornhub.com ("Pornhub"), a popular free adult entertainment website that hosts content uploaded, owned, copyrighted, and controlled by third party content creators. Aylo Freesites Ltd opposes the restrictions the Act would place on the ability of its third party content creators to reach their audience.

**ANSWER:** Defendant admits Pornhub.com is a website containing pornographic content, at least some of which can be accessed for free. Defendant otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph.

16. Plaintiff WebGroup Czech Republic, a.s. ("WebGroup"), is a corporation organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that operates xvideos.com ("XVideos"), a popular free adult entertainment website that hosts content uploaded, owned, copyrighted, and controlled by third party content creators. WebGroup opposes the restrictions the Act would place on the ability of its third party content creators to reach their audience.

**ANSWER:** Defendant admits XVideos.com is a website containing pornographic content, at least some of which can be accessed for free. Defendant otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph.

17. Plaintiff NKL Associates, s.r.o. ("NKL"), is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that operates xnxx.com ("Xnxx"), a popular free adult entertainment website that hosts content uploaded, owned, copyrighted, and controlled by third party content creators. NKL opposes the restrictions the Act would place on the ability of its third party content creators to reach their audience.

**ANSWER:** Defendant admits xnxx.com is a website containing pornographic content, at least some of which can be accessed for free. Defendant otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph.

18. Plaintiff Sonesta Technologies, s.r.o. ("Sonesta Tech"), is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that operates the website BangBros.com ("BangBros"), a subscription-based website offering high quality adult content. Sonesta Tech opposes the restrictions the Act would place on its ability to reach its audience.

**ANSWER:** Defendant admits BangBros.com is a website containing pornographic content and offering subscriptions. Defendant otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph.

19. Plaintiff Sonesta Media, s.r.o., ("Sonesta Media") is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that produces, and owns the intellectual property rights to, the content on BangBros.com. It also licenses some of its content to be uploaded to other websites, including Pornhub, XVideos, Xnxx, and SpiceVids. Sonesta Media opposes the restrictions the Act would place on its ability to reach its audience.

**ANSWER:** Defendant lacks sufficient information to form a belief as to the truth of the allegations in this paragraph.

20. Plaintiff Yellow Production, s.r.o. ("Yellow Production") is a limited liability company organized under the laws of the Czech Republic, with its principal place of business in Prague, Czech Republic, that produces, and owns the intellectual property rights to, the content on FakeTaxi. It also licenses some of its content to be uploaded to other websites, including Pornhub, Xvideos, Xnxx, and SpiceVids. Yellow Production opposes the restrictions the Act would place on its ability to reach its audience.

**ANSWER:** Defendant lacks sufficient information to form a belief as to the truth of the allegations in this paragraph.

21. Plaintiff Paper Street Media, LLC ("Paper Street"), is a limited liability company organized under the laws of Florida, with its principal place in Miami, Florida, that operates the TeamSkeet adult content network, comprised of numerous subscription-based adult websites offering high quality adult content. Paper Street owns the content on its network sites and, for shoots with adult

performers, writes the scripts, hires the production team, and does the pre- and post-production work. Paper Street also makes some of the content available on the TeamSkeet network available to other adult websites, including Pornhub, XVideos, Xnxx, and SpiceVids. Paper Street opposes the restrictions the Act would place on its ability to reach its audience.

**ANSWER:** Defendant lacks sufficient information to form a belief as to the truth of the allegations in this paragraph.

22. Plaintiff Neptune Media, LLC ("Neptune Media"), is a limited liability company organized under the laws of Florida, with its principal place of business in Miami, Florida, that operates the MYLF adult content network, comprised of numerous subscription-based adult websites offering high quality adult content. Neptune Media owns the content on its network sites and, for shoots with adult performers, writes the scripts, hires the production team, and does the pre- and postproduction work. Neptune Media also makes some of the content available on the MYLF network available to other adult websites, including Pornhub, XVideos, Xnxx, and SpiceVids. Neptune Media opposes the restrictions the Act would place on its ability to reach its audience.

**ANSWER:** Defendant lacks sufficient information to form a belief as to the truth of the allegations in this paragraph.

23. Plaintiff MediaME SRL is a limited liability company organized under the laws of Romania, with its principal place of business in Pipera, Romania, that operates the website Porndoe.com, a popular free adult entertainment websites that hosts content uploaded, owned, copyrighted, and controlled by third party content creators. MediaME opposes the restrictions the Act would place on its ability to reach its audience.

**ANSWER:** Defendant admits Porndoe.com is a website containing pornographic content, at least some of which can be accessed for free. Defendant otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph.

24. Plaintiff Midus Holdings, Inc., is a corporation organized under the laws of Florida, with its principal place of business in Coral Springs, Florida, that operates the websites Letsdoeit.com and Superbe.com, each a subscription-based website offering high quality adult content within the United States. Midus Holdings opposes the restrictions the Act would place on its ability to reach its audience.

**ANSWER:** Defendant admits Letsdoeit.com and Suberbe.com are websites containing pornographic content and offering subscriptions. Defendant otherwise lacks sufficient information to form a belief as to the truth of the allegations in this paragraph.

25. Furthermore, Plaintiffs are supported by at least three Jane Does, who are prepared to join as Plaintiffs if the Court permits them to proceed under pseudonym without disclosing their identities to the State of Indiana. Jane Doe No. 1 is a Oregon-based adult performer who produces, performs, and publishes adult content on websites that will be subject to the Act's age-verification requirements. Jane Doe No. 2 is an Indiana-based sex therapist and social worker who uses pornography in their treatment of patients and provision of sex education as a part of their employment. They will be chilled and burdened from accessing adult content essential to their work if the Act goes into effect. As a result, Jane Doe No. 2 will be impaired in providing treatment to patients, where pornography is helpful for treating sexual issues; taking required desensitization trainings, which include watching pornography, to obtain national licensure; and providing sexual health resources over telehealth appointments. Jane Doe No. 3 is an Indiana-based "cam" performer, who livestreams adult content and interacts with customers on a website that will be subject to the Act's

age verification requirements. All will be injured in their ability to share expressive speech and earn a livelihood if the Act becomes effective; none can risk disclosure of their identities to the public or the State. The risk of State retaliation or targeting in response to Does' defense of their First Amendment rights is especially concerning and chilling.

**ANSWER:** Defendant lacks sufficient information to form a belief about allegations concerning who Jane Doe No. 1, No. 2, and No. 3 are, what they do, and their beliefs. The remaining allegations assert legal conclusions to which no answer is required, but to the extent an answer is required, defendant denies those allegations.

## BACKGROUND FACTS

### I. The Act

26. During the 2024 legislative session, the Indiana Legislature passed Senate Bill 17, which: (1) amended Title 24, Article 4 of the Indiana Code to add Chapter 23; (2) amended Title 24, Article 4.9, Chapter 2, Section 10; and (3) amended Title 24, Article 5, Chapter 0.5, Section 3—herein referred to as "the Act." The Indiana Governor signed the bill into law on March 13, 2024, which goes into effect July 1, 2024. Chapter 23 of the Act provides in relevant part:

Chapter 23. Age Verification for Adult Oriented Websites

Sec. 1. "Adult oriented website" means a publicly accessible website that publishes material harmful to minors, if at least one-third (1/3) of the images and videos published on the website depict material harmful to minors.

Sec. 2. "Adult oriented website operator" means a person that owns or operates an adult oriented website. The term does not include the following:

(1) A newspaper or news service that publishes news related information through a website.

(2) A cloud service provider.

(3) An Internet provider, an affiliate or subsidiary of an Internet provider, or a search engine that:

(A) solely provides access or connection to a website or other Internet content that is not under the control of that Internet service provider, affiliate or subsidiary, or search engine; and

(B) is not responsible for creating or publishing the content that constitutes material harmful to minors.

Sec. 3. "Material harmful to minors" means matter or a performance described in IC 35-49-2-2.

Sec. 4. "Minor" means a person less than eighteen (18) years of age.

Sec. 5. "Mobile credential" has the meaning set forth in IC 9-13-2-103.4. Sec. 6. "Person" means a human being, a corporation, a limited liability company, a partnership, an unincorporated association, or a governmental entity.

Sec. 7. "Reasonable age verification method" means a method of determining that an individual seeking to access a website containing material harmful to minors is not a minor by using one (1) or more of the following methods:

(1) A mobile credential.

(2) An independent third party age verification service that compares the identifying information entered by the individual who is seeking access with material that is available from a commercially available data base, or an aggregate of data bases, that is regularly used by government agencies and businesses for the purpose of age and identity verification.

(3) Any commercially reasonable method that relies on public or private transactional data to verify the age of the individual attempting to access the material.

Sec. 8. "Transactional data" means a sequence of information that documents an exchange, agreement, or transfer between an individual, commercial entity, or third party used for the purpose of satisfying a request or event. The term includes records that relate to a mortgage, education, or employment.

Sec. 9. "Verification information" means all information, data, and documents provided by an individual for the purposes of verification of identity or age under this chapter.

Sec. 10. An adult oriented website operator may not knowingly or intentionally publish an adult oriented website unless the adult oriented website operator uses a reasonable age verification method to prevent a minor from accessing the adult oriented website.

Sec. 11. (a) If:

(1) an adult oriented website operator knowingly or intentionally publishes an adult oriented website in violation of section 10 of this chapter; and

(2) a minor accesses the adult oriented website; the parent or guardian of the minor who accessed the adult oriented website may bring an action against the adult oriented website operator.

(b) A parent or guardian who prevails in an action described in this section is entitled to:

(1) either:

(A) actual damages; or

(B) damages of up to five thousand dollars ($5,000);

(2) injunctive relief; and

(3) court costs, reasonable attorney's fees, and other reasonable expenses of litigation, including expert witness fees.

Sec. 12. (a) If an adult oriented website operator publishes an adult oriented website in violation of section 10 of this chapter, any person may bring an action to seek injunctive relief.

(b) A person that brings an action for injunctive relief under this section and prevails is entitled to:

(1) injunctive relief; and

(2) court costs, reasonable attorney's fees, and other reasonable expenses of litigation, including expert witness fees.

Sec. 13. (a) This section applies to a person that uses or purports to use a reasonable age verification method to grant or deny access to an adult oriented website.

(b) A person to which this section applies, and any third party verification service used by a person to which this section applies, may not retain identifying information of the person seeking access to an adult oriented website, unless retention of the identifying information is required by a court order.

(c) An individual whose identifying information is retained in Violation of this section may bring an action against the person that unlawfully retained the individual's identifying information. An individual who prevails in an action described in this section is entitled to:

(1) either:

(A) actual damages; or

(B) damages of up to five thousand dollars ($5,000);

(2) injunctive relief; and

(3) court costs, reasonable attorney's fees, and other reasonable expenses of litigation, including expert witness fees.

Sec. 14. Adult oriented website operators must use commercially reasonable methods to secure all information collected and transmitted under this chapter.

Sec. 15. The attorney general may bring an action under this chapter to obtain any or all of the following against an adult oriented website, accessible by an Indiana resident, that does not implement or properly use a reasonable age verification method:

(1) An injunction to enjoin future violations of this chapter.

(2) A civil penalty of not more than two hundred fifty thousand dollars ($250,000).

(3) The attorney general's reasonable costs in:

(A) the investigation of the violations under this chapter; and

(B) maintaining the action.

Sec. 16. When the attorney general has reasonable cause to believe that any person has engaged in, is engaging in, or is about to engage in a violation of this chapter, the attorney general is empowered to issue civil investigative demands under IC 4-6-3-3 to investigate the suspected violation.

Sec. 17. In an action filed under sections 11, 12, 13, and 15 of this chapter, the verification information of a minor who accessed the adult oriented website shall remain confidential. The clerk of the court shall place all records of the minor who accessed the adult oriented website in an envelope marked "confidential" inside the court's file pertaining to the minor. Records placed in the confidential envelope may only be released to:

(1) the judge or any authorized staff member; (2) a party and the party's attorney;

(3) the parents of a minor who accessed the adult oriented website; or

(4) any person having a legitimate interest in the work of the court or in a particular case as determined by the presiding judge or their successor who shall consider the best interests, safety, and welfare of the minor.

**ANSWER:** Defendant admits that the governor signed Senate Bill 17 on March 13, 2024. Defendant admits that the Act goes into effect on July 1, 2024. The Act speaks for itself.

27. The Act amends the Indiana Trade Regulation to include in the Code's definition of "personal information": "information collected by an adult oriented website operator, or their designee, under IC 24-4-23." I.C. 24-4.9-2-10(3).

**ANSWER:** The Act speaks for itself.

28. The Act further amends the Indiana Trade Regulation to include in the Code's "Enumeration of Deceptive Acts": "A violation of IC 24-4-23 (concerning the security of information collected and transmitted by an adult oriented website operator), as set forth in IC 24-4-23-14." I.C. 24-5-0.5-3(b)(42).

**ANSWER:** The Act speaks for itself.

**II. Communication Over the Internet**

29. The internet is a decentralized, global medium of communication that links people, institutions, corporations, and governments around the world. It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individuals' computers. The internet

connects an estimated 5.4 billion people—or 67% of the world's population[1]—and in Indiana, it is estimated that 77.5% of residents are internet users[2].

**ANSWER:** Defendant admits the internet is a computer network that is used for communication by people, institutions, corporations, and governments around the world. The cited referenced work speaks for itself. Defendant lacks sufficient information to form a belief about the remaining allegations.

30. Because the internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls the material made available on the internet or limits the ability of others to access such materials. Rather, the range of digital information available to internet users is individually created, maintained, controlled, and located on millions of separate individual computers around the world.

**ANSWER:** Defendant admits the internet contains information created by different individuals around the world and hosted on different devices. Defendant otherwise lacks sufficient information to form a belief about the allegations because they are vague and ambiguous.

31. The internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it. Unlike television, cable, radio, newspapers, magazines or books, the internet provides the average citizen and business, whether large or small, with an affordable means for communicating with, accessing, and posting content to a worldwide audience.

---

[1] *Facts and Figures 2023*, INTERNATIONAL TELECOMMUNICATION UNION, https://www.itu.int/itud/reports/statistics/2023/10/10/ff23-internet-use/ (last visited June 8, 2024).
[2] *Internet Usage Penetration in the United States in November 2021*, by State, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/184691/internet-usage-in-the-us-by-state.

Although the majority of the information on the internet does not depict or describe nudity or sexual activity, such material is indeed widely available on the internet.

**ANSWER:** Defendant admits the internet can be used to communicate, post, and access information. Defendant lacks sufficient information to form a belief as to the truth of the remaining allegations in this paragraph, several of which are vague and ambiguous.

32. An Internet Protocol ("IP") address is a unique address that identifies a connection to a device on the internet or a local network, much like a telephone number is used to connect a telephone to other telephones. In essence, an IP address is the identifier that allows information to be sent between devices on a network. Internet Service Providers ("ISPs") and telecommunications companies control "blocks" of IP addresses, and the location of an internet connection can be roughly determined according to the geo-location those companies assign to the IP address associated with a connection. In many contexts it is very common for ISPs to pre-block access to websites based on users' IP addresses, which is at least as effective as age verification by websites and harder to bypass, while still allowing adults (at non-blocked IP addresses) to freely access adult content at their discretion.

**ANSWER:** Defendant admits an IP address can be used to identify devices and that ISPs have blocks of IP addresses. Defendant denies the remaining allegations, several of which are vague and ambiguous.

33. Websites can request that their host server block traffic from particular IP address regions ("geoblocking") or pay for expensive services that rely on GPS and data modeling to increase the accuracy of geoblocking. However, satellites and cellular towers do not respect state boundaries, and many IP-address databases are highly inaccurate. The accuracy of geolocation technology is necessarily imperfect, and residents of one state, particularly near state borders, may be mistakenly

categorized as residents of another. Indeed, some blocks of IP addresses cover multiple States at once, and the accuracy of geolocating an internet user based on a user's IP address can dip as low as 55%.

**ANSWER:** Defendant admits geoblocking technology exists, and denies the remaining allegations, several of which are vague and ambiguous.

34. Virtual Private Networks ("VPNs") and proxy servers, among countless other inexpensive and easily accessible technologies, bypass geoblocking by websites. Both function as an intermediary between an individual internet-connected device and the targeted server. They hide the device's actual public IP address and instead "tunnel" traffic between the device and a remote server—the only difference being that communications sent through VPNs are encrypted. Setting up a proxy server is generally free and simple, and the same is true of VPNs. Doing so permits users to obscure their location while browsing the web, whether on wireless or cellular networks. VPNs are extremely common—used both by consumers and businesses to establish secure, remote connections to their home networks. In fact they are included by default in most consumer antivirus software.

**ANSWER:** Defendant admits VPN technology and proxy servers exist, and denies the remaining allegations, several of which are vague and ambiguous.

35. The freely available "Tor" browser, which is designed to be easily downloaded and used, also hides a user's IP address when browsing the internet.

**ANSWER:** Defendant admits users can download a browser known as "Tor," and denies the remaining allegations, several of which are vague and ambiguous.

36. Even remote and virtual desktop services, which are popular among university students, allow users to appear to internet websites as though they were located wherever the cloud server (in the case of virtual desktops) or the actual computer (in the case of remote desktops) appears to be

located. In all cases, the user can appear to be located in a different state or country whose laws do not require age verification by websites.

**ANSWER:** Defendant admits there are virtual desktop services, and denies the remaining allegations, several of which are vague and ambiguous.

**III. The Minimal Benefits of Age Verification Under the Act**

37. Minors are more at risk of exposure to adult content from social media sites and search engines than traditional adult websites like Plaintiffs.[3] Search engines, by design, enable anyone to access troves of adult images and videos in seconds—content that is no less explicit than that found directly on Plaintiffs' websites. Even where adult websites implement age verification, a simple image or video search for sexually explicit terms on a search engine will yield millions of thumbnail photos and videos of content drawn from these sites.

**ANSWER:** The cited work speaks for itself. Defendant denies the remaining allegations, several of which are vague and ambiguous.

38. Social media sites are no different. Facebook alone flagged a staggering 73.3 million pieces of content under "child nudity and sexual exploitation" from Q1 to Q3 of 2022 alone, not including sexually explicit content involving adults.[4] Recent research[5] found a majority of children under 13 had their own profile on at least one social media application or site and one third of children between the ages of 8 and 17 with a social media profile signed up with a false birthdate.

---

[3] Neil Thurman and Fabian Obster, *The regulation of internet pornography: What a survey of under-18s tells us about the necessity for and potential efficacy of emerging legislative approaches*, 13 POLICY & INTERNET 415, 417 (2001).
[4] *See* Paul Bischoff, *The Rising Tide of Child Abuse Content on Social Media*, COMPARITECH, (Jan. 25, 2023), https://www.comparitech.com/blog/vpn-privacy/child-abuseonline-statistics/.
[5] *See Children and Parents: Media Use and Attitudes Report 2022*, OFCOM, (Mar. 30, 2022), https://www.ofcom.org.uk/__data/assets/pdf_file/0024/234609/childrens-media-use-andattitudesreport-2022.pdf.

**ANSWER:** The cited works speak for themselves. Defendant lacks sufficient information to form a belief as to the truth of the assertions in the works, and defendant denies the allegation that "[s]ocial media sites are no different," which is vague and ambiguous.

39. Because most social media sites contain so much content that they will not meet the Act's "more than one-third" threshold for "sexual material harmful to minors," the Act effectively exempts most social media sites, in addition to its explicit exemption for search engines.

**ANSWER:** Defendant lacks sufficient knowledge and information to form a belief as to the truth about whether "most social media sites" would be excluded from the Act—an allegation that is vague and ambiguous. This paragraph further asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations.

40. The Act also exempts erotica and other written sexually explicit material by limiting its "one-third" content threshold to adult "images and videos."

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent this allegation references the Act, it speaks for itself.

41. There are also far riskier ways to obtain adult content, such as through the Dark Web (via the freely downloadable "Tor" browser), which is replete with more extreme adult content and also a range of black markets for ransomware, sex trafficking, drugs, and even hitmen. Those determined to access adult content are likely to be pushed by the Act towards unregulated platforms, which is a more dangerous environment for users, including underage users, who would then be exposed to far more problematic online environments.

**ANSWER:** Defendant denies the allegation that the Act pushes people "towards unregulated platforms." For the remaining allegations, Defendant lacks sufficient information to

form a belief as to the truth of the allegations in this paragraph, which are vague and ambiguous.

42. In addition to these alternative pathways to adult content, state-specific restrictions on traditional adult websites can be easily bypassed by VPNs and proxy servers.

**ANSWER:** Defendant denies the allegation, which is vague and ambiguous.

43. All of this is magnified by the fact that minors are more tech-savvy than adults, especially older adults. Evaders of the law at the end-user level will thus largely be comprised of minors.

**ANSWER:** Defendant denies the allegations, which are vague and ambiguous.

### IV. The Burdens and Risks of Age Verification

#### A. The Risks to Adults

44. While rapid technological progress might suggest it's easy to verify age, in fact there is no method that does not carry inherent, unacceptable disadvantages and harms.[6] Nor does technological progress excuse First Amendment violations, or make the Act any more effective at protecting kids, or any less invasive of people's privacy, or any less dangerous in light of the broadly recognized misuse of such data[7] and vulnerability to hackers and cybersecurity attacks.

---

[6] *See, e.g.*, Jason Kelley and Adam Schwartz, *Age Verification Mandates Would Undermine Anonymity Online*, ELECTRONIC FRONTIER FOUNDATION, (Mar. 10, 2023), https://www.eff.org/deeplinks/2023/03/age-verification-mandates-would-undermine-anonymityonline (explaining the flaws of age verification systems and why they are the wrong approach to protecting young people online, as they would force websites to require visitors to prove their age by submitting information such as government-issued identification. "This scheme would lead us further towards an internet where our private data is collected and sold by default. The tens of millions of Americans who do not have government-issued identification may lose access to much of the internet. And anonymous access to the web could cease to exist.").

[7] *See, e.g.*, 8 F.R. 51273 (available at https://www.federalregister.gov/documents/2022/08/22/2022-17752/trade-regulation-rule-on-commercial-surveillance-and-data-security) (requesting public comment on the prevalence of commercial surveillance and data security practices that harm consumers, and inviting comment on whether it should implement new trade regulation rules or other regulatory alternatives concerning the ways in which companies collect, aggregate, protect, use, analyze, and retain consumer data, as well as transfer, share, sell, or otherwise monetize

**ANSWER:** The cited works speak for themselves. This paragraph otherwise asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations.

45. Hackers are targeting information shared on the Internet at exponentially high rates, including data kept in the safest locations—including federal and state agencies, which have themselves been subjected to multiple breaches.[8]

**ANSWER:** The cited authority speaks for itself. Defendant admits there are hackers but denies the remaining allegations as vague and ambiguous.

46. Any claimed benefit of age verification imposed by the Act does justify the burdens imposed on adults—the vast majority of whom value their online privacy and do not wish to expose exploitable personal data simply to view constitutionally-protected material they have every right to view. The high risk of data breaches and leaks resulting from compliance with the Act serves as an unavoidable barrier preventing adults from divulging their information over the internet. If that is set as a condition to view legal adult content, users will simply go elsewhere for that content instead (especially since that content is available elsewhere on the Internet, not just on adult entertainment websites targeted by the Act).

**ANSWER:** Defendant denies the allegations in this paragraph, many of which are vague and ambiguous.

---

that data in ways that are unfair or deceptive, recognized, among others, that data is regularly collected for one purpose and used for another).

[8] *See e.g.*, Kevin Collier, *U.S. Government Says Several Agencies Hacked As Part Of Broader Cyberattack*, NBC NEWS, (June 15, 2023), https://www.nbcnews.com/tech/security/usgovenment-agencies-hacked-cyberattack-moveit-rcna89525 (discussing a hack of several U.S. agencies, as part of a broader cyberattack that hit dozens of companies and organizations through a previously unknown vulnerability in a popular file sharing software).

47. Online age-verification is fundamentally different from an employee at a brick-and mortar store checking a driver's license. Online and offline age verification do not share the same risks. Offline age verification does not carry the threat of producing an accessible ledger of adults that view adult content (or adults whose identity has been stolen and used to view adult content) or of creating a digital trail that could expose an individual to financial or reputational harm. Someone can enter a brick-and-mortar adult bookstore or sex shop merely by briefly displaying their license, for a human worker's real-time review. No record is made or kept, and that is the end of the matter. Online age verification, in contrast, carries the real risk that the viewer's digital "fingerprint" will take on a life of its own, enabling a third party to determine the viewer's identity, expose the viewer as a viewer of adult content, and steal the viewer's identity to commit financial fraud, extortion, and other crimes.[9]

**ANSWER:** The cited research speaks for itself. Defendant otherwise denies the allegations in this paragraph.

48. This risk is not hypothetical. Louisiana recently passed an age verification law that provides for age verification utilizing a state-maintained database of digital driver's licenses. After going live, that database was breached almost immediately[10], exposing the information of everyone who

[9] *See, e.g.*, Kim Zetter, *Hackers Finally Post Stolen Ashley Madison Data*, WIRED, (Aug. 18, 2015), https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashleymadison-data (discussing Ashley Madison data breach and hackers' threat to "release all customer records, including profiles with all the customers' secret sexual fantasies and matching credit card transactions, real names and addresses."). The Ashley Madison breach is associated with at least two suicides. *See* Morgan Sharp, *Two People May Have Committed Suicide After Ashley Madison Hack: Police*, REUTERS, (Aug. 24, 2015), https://www.reuters.com/article/usashleymadisoncybersecurity-idUSKCN0QT1O720150824//.

[10] *See* Connor Van Lighten, *Major Cyber Attack Exposes Louisiana Residents' Data – Here's What You Should Do Now*, 4WWL, (June 16, 2023), https://www.wwltv.com/article/news/crime/louisiana-cyber-attack-omv-data-breach-driver-license-id-exposed-information/289-3d263eff-2ace41b8-98c2-a6ba174935cc.

enrolled in Louisiana's optional digital identification program for the purposes of accessing adult content. It is no coincidence that the number of identity thefts in Louisiana have increased since the age verification law became effective.

**ANSWER:** The cited article speaks for itself. The Defendant lacks information to form a belief regarding whether any identity theft in Louisiana is related to its age-verification law. Defendant denies the remaining allegations in this paragraph.

49. Data minimization is the principle that reducing the amount of data collected in the first place reduces subsequent risk.[11] This is true, for instance, in the case of a disreputable adult site that might take advantage of the age verification law's requirements to force visitors to provide personal information that can be used for marketing, sold to data brokers, or stolen by attackers. This problem is exacerbated for certain vulnerable adult populations, such as the elderly, who are more susceptible to online hacks and scams.[12] Online age verification does not comport with the principle of data minimization.

**ANSWER:** The cited works speak for themselves. Defendant denies the remaining allegations as vague and ambiguous.

[11] *See, e.g.*, Shoshana Weissmann, *Age-Verification Legislation Discourages Data Minimization, Even When Legislators Don't Intend That*, RSTREET, May 24, 2023, https://www.rstreet.org/commentary/age-verification-legislation-discourages-data-minimization-even-when-legislators-dontintend-that/ (discussing how data minimization lessens the potential of data breach); see also *Data Minimization Principle*, THE INTERNATIONAL ASSOCIATION OF PRIVACY PROFESSIONALS, https://iapp.org/resources/article/data-minimization-principle/

[12] See, e.g., Emma Fletcher, *Older Adults Hardest Hit By Tech Support Scams*, FEDERAL TRADE COMMISSION CONSUMER PROTECTION, (Mar. 7, 2019), https://www.ftc.gov/newsevents/data-visualizations/data-spotlight/2019/03/older-adults-hardesthit-tech-support-scams (finding that "[o]lder adults face unique barriers to adoption, ranging from physical challenges to a lack of comfort and familiarity with technology.").

50. The Act's nominal data-deletion requirement brings the problem into stark relief. Such requirement is not technologically possible. Furthermore, that requirement binds the regulated website and any third-party verification service, such entities remain free to transmit adults' sensitive information to unregulated third parties.

**ANSWER:** Defendant denies these allegations.

51. That the Act provides a cause of action to victims of hacks or leaks is but a consolation prize to victims, given the time and expense of burdensome litigation. I.C. 24-4-23-8.

**ANSWER:** The defendant denies the characterization of the Act. The Act speaks for itself.

**B. Risks to Minors**

52. The Act's "solution" is far worse than the purported problem it aims to solve. Today's children are "digital natives." They are only more likely than adults to try to circumvent the Act, and thus be pushed to Tor and the Dark Web—and thus be exposed to illegal activities and more extreme material, including violent pornography and criminal gang activities.[13]

**ANSWER:** The allegations are vague, and to the extent an answer is required, defendant denies them.

**C. The Burden on Websites**

53. Commercially available age verification services that are reputable are also exorbitantly expensive. For instance, Trustmatic, the cheapest option in the table below, still costs $40,000 per 100,000 verifications and intrusively requires users to upload pictures of their face.

---

[13] *See* Kate McCann, *Warning that Age-Checks on Porn Sites Risks Pushing Children to Dark Web*, TELEGRAPH, (Jan. 5, 2018), https://www.telegraph.co.uk/news/2018/01/05/warningage-checksporn-sites-risks-pushing-children-dark-web/

| Vendor | Website (pricing) | $ per verification | 100M verifications | 5M verifications | 100k verifications |
|---|---|---|---|---|---|
| Yoti | https://www.yoti.com/business/identity-verification/ | £1.20 | £120,000,000 | £6,000,000 | £120,000 |
| Ondato | https://ondato.com/plans-pricing/ | €0.95 | €95,005,180 | €4,750,259 | €95,005 |
| Stripe | https://stripe.com/identity#pricing | $1.50 | $150,000,000 | $7,500,000 | $150,000 |
| veriff | https://www.veriff.com/plans | $0.80 | $80,000,000 | $4,000,000 | $80,000 |
| Trustmatic* | https://trustmatic.com/pricing | €0.40 | $40,000,000 | $2,000,000 | $40,000 |
| Faceki | https://apps.faceki.com/pricing | $0.93 | $93,000,000 | $4,650,000 | $93,000 |

* as of August 2023; it appears that Trustmatic now hides its pricing model.

**ANSWER:** The attached graph speaks for itself. Defendant denies that these commercially available age-verification services are "exorbitantly expensive."

**V. A Less Restrictive Alternative: Blocking and Filtering**

54. Improvements in technology have not made online age verification superior to other alternatives, which have also improved and do not share the same vulnerabilities and ease-of evasion.

**ANSWER:** Defendant denies the allegations in this paragraph.

55. Content filtering at the browser and/or the device level allows anyone wishing to implement that technology on minors' devices to block access to any unwanted site, including adult sites. These methods are more effective and less restrictive in terms of protecting minors from adult content. While adults have every reason to be concerned about providing their personal information online, parents, who should be the first line of protective defense of their children, have many tools available to them to protect their children from inappropriate adult content.

**ANSWER:** The allegations are vague, and to the extent an answer is required, defendant denies them. Defendant denies that browser or device-level content filtering is more effective and less restrictive than age verification.

56. Virtually every available electronic device capable of accessing content online already has built-in parental controls. Internet service providers are also capable of filtering unwanted content and do so every day. And there are additional software and apps freely available on the market allowing for more advanced parental control features, including, for example, from

https://www.qustodio.com, https://www.bark.u, https://us.norton.com/products/norton-family, https://usa.kaspersky.com/safe-kids, https://kidlogger.net/, https://www.mobicip.com/, https://www.eset.com, https://www.webwatcher.com/, and https://www.spyrix.com/.

**ANSWER:** Defendant admits parental control software is available on the internet, including through some of the websites listed. The remaining allegations are vague and ambiguous, and to the extent an answer is required, defendant denies them.

57. There are websites devoted to evaluating different parent control applications, such as parentalcontrolnow.org.[14] Similarly, buyersguide.org even offers a chart to compare filtering services:

| | 1. ĀURA | 2. bark | 3. gabb | 4. kaspersky | 5. Qustodio | 6. norton |
|---|---|---|---|---|---|---|
| **Monitors** | Online activity, online gaming, app usage, online chatting (voice and text) | Texts, emails, social media, and app usage | Phone calls, texting, location, and contacts | Digital activity (app, web, and YouTube), screen time, and location | Browsing history, YouTube views, social media use, location | View child's search terms, videos watched, age-appropriate content, location |
| **Devices** | iOS and Android devices. Safe Gaming available on Windows PC | Android, iPhone, iPad, Chromebook, Kindle Fire | Gabb Phone, Gabb Phone Plus, Gabb Watch 2 | Windows, Mac, iOS, Android | Windows, Mac, iOS, Android, Chromebook, Kindle | Windows PC, Android, or iOS |
| **Time Limits** | Yes. Pause the Internet and set time limits for app and website usage | Yes. Set up customizable screen time rules and schedules | Lock mode available on watches during school and focus time | Yes, including daily time limits for specific apps and overall device use time limits | Yes. Set time limits for screen usage and pause internet access | Yes. Set time limits, schedule days and times for usage |
| **Content Limits** | Yes. Block inappropriate content from all devices where Aura parental controls are enabled | Yes. Block specific websites and apps on phone, gaming consoles, TV, and more | Yes. Gabb devices have simplified parental controls as they come without internet, social media, gaming, time consuming or dangerous apps | Yes, block harmful content with Safe Search and block specific apps | Yes. Filter websites, apps and games | Yes. Block certain content during schooltime, app supervision, block inappropriate sites |
| **Alerts** | Cyberbullying alerts, online usage insights and alerts, online predator alerts, personal information request alerts, and alert parents if a child deleted the app | Cyberbullying, online predators, suicidal ideation, sexting, and more | Safe zone location alerts, SOS emergency call option on watch devices, usage summaries and call/text logs available in the parent account | Low battery alerts for your child's device; web and app use reports | Receive weekly and monthly reports and set alerts for activity you want to know about in real time | Internet usage, search terms, app downloads and installs |
| **Includes** | Safe browsing, dark web monitoring and data breach alerts, password manager, antivirus, anti-malware, anti-spyware protection | Website filters, screentime schedules, location alerts, saved photo and video monitoring, child-psychologist advice and tips | Not applicable | | Call tracking and SMS for Android and iOS, location alerts, block inappropriate apps, games and websites | Antivirus, VPN, identity protection, password manager, reputation defender |

**ANSWER:** The Defendant admits there are websites that evaluate parental control software. The chart depicted speaks for itself.

58. The two major personal computer operating systems, Microsoft and Apple, include parental control features by default, straight out of the box, at no additional cost. All major browsers, including Google Chrome, Mozilla Firefox, Microsoft Edge, and Apple's Safari, also have parental

[14] 4 See, e.g., Best Parental Control Apps for 2023, PARENTAL CONTROL NOW, https://parentalcontrolnow.org/best-parental-control-appsus/?gclid=EAIaIQobChMIqf6xyuKg-gAMVxgCtBh3m6g3YEAMYASAAEgJXt_D_BwE.

control options. If parents want to add additional parental control features, they may easily purchase supplementary software like Bark or NetNanny or even download additional software for free, including Questodio, Kaspersky Safe Kids, FamilyKeeper, and others. These features enable parents to block access to sexually explicit materials on the Web, prevent minors from giving personal information to strangers by e-mail or in chat rooms, limit a child's screentime, and maintain a log of all online activity on a home computer. Parents can also use screening software that blocks messages containing certain words, as well as tracking and monitoring software. A parent also may restrict and observe a child's use of the internet merely by placing a computer in a public space within the home. All of these methods constitute "less restrictive means" for accomplishing the same ends.

**ANSWER:** Defendant admits there is parental control software available for free or for purchase, but denies the remaining allegations in this paragraph, many of which are vague and ambiguous.

59. Filtering technology carries an additional benefit, in that a seventeen-year-old is very different than a twelve-year-old. Parents of an older minor can tailor exceptions for websites that offer, for instance, sexual education materials of clear benefit to an older minor but potentially inappropriate for a younger minor.

**ANSWER:** The allegations are vague and ambiguous, and to the extent an answer is required, defendant denies them.

60. Filtering technology is available for smartphones and cellular networks as well, such as on the Android operating system.

**ANSWER:** The allegations are vague and ambiguous, and to the extent an answer is required, defendant denies them.

61. Filtering technology includes not only Domain Name System (DNS) filtering but also artificial intelligence (AI). DNS filtering blocks websites based on how their domain names are categorized. This filtering is dynamic in that once the user blocks a category like adult content, the DNS filtering services constantly scan the Internet and update that category with the latest websites. In fact, uncategorized websites can be blocked as well, given that newly registered websites are the most common source of malware, viruses, and other malicious content. For families, Cisco Systems, one of the largest companies for Internet technologies, provides DNS filtering free of charge via its OpenDNS FamilyShield service. AI is also being incorporated into filtering technology, enabling dynamic, real-time scanning and filtering of website content to block specific images, videos, and text within a webpage that are identified as falling under a blocked category.

**ANSWER:** Defendant admits there is DNS filtering technology, but lacks sufficient information to form a belief as to the truth of the allegations in this paragraph, several of which are vague and ambiguous.

**VI. A Less Restrictive Alternative: Verifying Age at the Device Level**

62. Allowing parents to verify their child's age at the device level is also a viable alternative. Rather than requiring a user to verify with a website, an application can be installed on children's' devices that allows parents to input their child's age. Requests to visit a website coming from the device can imbed that information and allow the website to reject the request if the child is underage for the website.[15] The privacy advantages of this are palpable, as protecting minors using this system would not rely on collecting even more data that can be used for malicious purposes.

---

[15] *See* Tonya Riley, *Nationwide Push to Require Social Media Age Verification Rasies Questions About Privacy, Industry Standards*, CYBERSCOOP, (May 8, 2023), https://cyberscoop.com/ageverfication-schatz-cotton-social-media/.

**ANSWER:** The cited authority in the footnote speaks for itself. Defendant denies that the methods described are viable, more advantageous, or less restrictive alternatives.

**VII. The Act Discriminates Against Adult Content Industry Speakers**

63. The Act, by singling out adult content websites for its onerous age verification requirements, while exempting other obvious sources of sexual content online, engages in speaker-based discrimination. The Act ignores search engines explicitly, as well as social media sites, which will not meet the "one-third" threshold of adult content, despite that these sites contain copious amounts of sexually explicit content. Further, search engines and social media sites are where minors most commonly encounter adult content on the Internet.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations in this paragraph.

**VIII. Plaintiffs' Additional Injuries**

64. The age verification provisions of the Act deprive Plaintiffs and other adult entertainment providers of the goodwill of their Indianan customers, due to the burden age verification imposes and the risks it carries.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations in this paragraph.

**IX. The Act's Vagueness**

65. Because many of the terms in the Act are vague, the Act further chills the speech of providers of content online and restricts the availability of certain material to those entitled and wishing to receive it. The Act is riddled with vague words, phrases, and requirements, including but not limited to the following:

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations in this paragraph.

66. The phrase "considered as a whole" in the definition of "material harmful to minors" is vague because what constitutes the "whole" is unclear in the context of the internet generally, or a particular website more specifically. See I.C. 24-4-23-3, 35-49-2-2. Should one consider only a specific article, certain text, or an individual image on a website? Or should one consider the web page on which that text or image appears? Or the entire website? And should one include linked material? The Act does not say, and Plaintiffs are left only to guess.

**ANSWER:** The Act speaks for itself. This paragraph otherwise asserts legal argument to which no answer is required. To the extent an answer is required, defendant denies the allegations in this paragraph.

67. The phrases "of minors" and "for minors" in the definition of "material harmful to minors" are also vague because the Act defines a minor as anyone under the age of eighteen. See I.C. 24-4-23-4. But sexual material harmful to an 8-year-old may not be harmful to a 17-year-old. The definition of "material harmful to minors" provides no way to make this distinction, rendering the definition inherently confusing and potentially self-contradictory.

**ANSWER:** The Act speaks for itself. This paragraph otherwise asserts legal argument to which no answer is required. To the extent an answer is required, defendant denies the allegations in this paragraph.

68. The statutory catch-all permitting "[a]ny commercially reasonable method that relies on public or private transactional data" as a means of verifying a user's age provides no guideposts whatsoever, as "commercially reasonable" is a vague term not defined by the Act.

**ANSWER:** The Act speaks for itself. This paragraph otherwise asserts legal argument to which no answer is required. To the extent an answer is required, defendant denies the allegations in this paragraph.

69. The Act does not even explain how often age verification must occur. Individuals can access a website more than once, and from different devices and browsers. Must age verification recur every hour; every time a web browser is closed and reopened; just once, if the website operator can find a way to link a particular verification to a particular device; or something else?

**ANSWER:** The Act speaks for itself. This paragraph otherwise asserts legal argument to which no answer is required. To the extent an answer is required, defendant denies the allegations in this paragraph.

**X. The Need for Injunctive Relief**

70. The passage of the Act has placed Plaintiffs in reasonable fear that, if they continue their current course of conduct as they intend, they will be sued under the Act. Indeed, the Act squarely targets Plaintiffs, the core entities whose behavior the Act aims to change. Enforcement against other entities would constitute enforcement merely on the fringes of the adult industry, which the Act targets.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations.

71. The Act impinges on the constitutional right to access protected speech and expressive conduct, in violation of the First Amendment.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations.

72. The Act authorizes a lawsuit in violation of section 230, which provides Plaintiffs with immunity to court proceedings that will be irretrievably lost if the Attorney General is permitted to enforce the Act.

**ANSWER:** The Act speaks for itself. This paragraph otherwise asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations.

73. The Act will destroy Plaintiffs' goodwill in Indiana by forcing Plaintiffs to either withdraw from Indiana or comply with the Act and nevertheless lose a vast number of new and longstanding adult visitors to their websites. The age verification provisions of the Act deprive Plaintiffs and other adult entertainment providers of the goodwill of their Indianan customers, due to the burden age verification imposes and the risk it carries.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations.

74. Plaintiffs thus have no adequate remedy at law.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations.

**COUNT I**

**(42 U.S.C. § 1983 (All Plaintiffs))**

**(The First Amendment)**

75. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

**ANSWER:** The complaint speaks for itself. Defendant incorporates his answers to the foregoing paragraphs by reference. Judgment has been entered for Defendant on this claim.

76. The Act is facially overbroad in violation of the First Amendment (made applicable to the states through the Fourteenth Amendment) because its age verification requirement is substantially overbroad, is not narrowly tailored, and does not pursue a compelling state interest. It is substantially overbroad because it imposes a barrier to the rights of adults to access speech that is constitutionally protected for them. It not narrowly tailored, because there are at least two superior, less restrictive alternatives: pre-blocking by internet service providers and the use of filtering technology by parents or others at the device level. It does not pursue a compelling state interest, because it is dramatically underinclusive, exempting internet search engines, most social media sites, news media and written sexually explicit material, and is targeted against adult entertainment websites.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. Judgment has been entered for Defendant on this claim.

77. The Act is further overbroad because it does not satisfy the First Amendment's heightened standards for clarity. It is incurably vague regarding to whom it applies and what it requires, thus chilling protected speech as website operators seek to avoid liability by steering clear of the law by a wider margin than would otherwise be required.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. Judgment has been entered for Defendant on this claim.

78. Plaintiffs are thus entitled to injunctive relief to preclude the Indiana Attorney General from depriving Plaintiffs of their rights guaranteed by the Constitution.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. Judgment has been entered for Defendant on this claim.

**COUNT II**

**(42 U.S.C. § 1983 (All Plaintiffs))**

**(The Fourteenth Amendment Amendment)**

79. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

**ANSWER:** The complaint speaks for itself. Defendant incorporates his answers to the foregoing paragraphs by reference. This claim has been dismissed.

80. The Act violates the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment (procedural component) because it is impermissibly vague and fails to provide a person of ordinary intelligence fair notice of what is prohibited.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed.

81. The Act violates the rights of Plaintiffs under the Due Process Clause of the Fourteenth Amendment (substantive component) because it deprives Plaintiffs of a protected property right, in the form of their goodwill in Indiana, without a rational basis.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed.

82. The Act violates the Equal Protection Clause of the Fourteenth Amendment because, with no rational basis for doing so, it exempts, for example, internet search engines and most social media sites while targeting adult entertainment platforms.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed.

83. Plaintiffs are thus entitled to injunctive relief to preclude the Indiana Attorney General from depriving Plaintiffs of their rights guaranteed by the Constitution.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed.

## COUNT III

**(42 U.S.C. § 1983 (All Plaintiffs))**

**(The Eighth Amendment)**

84. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

**ANSWER:** The complaint speaks for itself. Defendant incorporates his answers to the foregoing paragraphs by reference. This claim has been dismissed.

85. Plaintiffs have a right against Excessive Fines under the Eighth Amendment.

**ANSWER:** The Constitution speaks for itself. This claim has been dismissed.

86. The Act authorizes civil penalties of $250,000 per violation.

**ANSWER:** The Act speaks for itself. This claim has been dismissed.

87. These penalties are grossly disproportionate to any putative harm addressed by the Act.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed.

88. Plaintiffs are thus entitled to injunctive relief to preclude the Indiana Attorney General from depriving Plaintiffs of their rights guaranteed by the Constitution.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed.

**COUNT IV**

**(42 U.S.C. § 1983 (All Plaintiffs))**

**(The Fifth Amendment)**

89. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

**ANSWER:** The complaint speaks for itself. Defendant incorporates his answers to the foregoing paragraphs by reference. This claim has been dismissed.

90. Plaintiffs have a right against unconstitutional takings of "private property" for "public use, without just compensation" under the Fifth Amendment.

**ANSWER:** The Constitution speaks for itself. This claim has been dismissed.

91. Under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978), a regulatory taking violates the Fifth Amendment where: (a) "[t]he economic impact of the regulation"; (b) "the extent to which the regulation has interfered with reasonable investment-backed expectations"; and (c) "the character of the governmental action." The Act inflicts a regulatory taking under each factor.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed.

92. The Act imposes a regulatory taking at least by forcing Plaintiffs to implement age verification at exorbitant costs that some cannot afford, either by building infrastructure within their own websites or contracting with a third-party provider.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed.

93. Plaintiffs have a substantial property interest in and associated with their websites and businesses, and, if the Act becomes effective, the Act will deprive Plaintiffs of that property protected by the Takings Clause.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed.

94. The Act does not compensate Plaintiffs, let alone justly, for the destruction of their businesses.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed.

95. Plaintiffs are thus entitled to appropriate monetary relief lest the Indiana Attorney General deprive Plaintiffs of their rights guaranteed by the Constitution.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed.

**COUNT V**

**(42 U.S.C. § 1983 & 47 U.S.C. § 230 (Plaintiffs FSC, Aylo Premium as to SpiceVids, Aylo Freesites as to Pornhub, WebGroup, NKL, and MediaME))**

96. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

**ANSWER:** The complaint speaks for itself. Defendant incorporates his answers to the foregoing paragraphs by reference. This claim has been dismissed as to all Plaintiffs except WebGroup and NKL.

97. Under the Supremacy Clause of the United States Constitution, the laws of the United States are "the supreme law of the land."

**ANSWER:** The Constitution speaks for itself. This claim has been dismissed as to all Plaintiffs except WebGroup and NKL.

98. Federal law confers a personal right of immunity against proceedings where the theory of liability equates websites with third-party publishers. 47 U.S.C. § 230(c)(1) states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(e)(3) states: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

**ANSWER:** The cited statute speaks for itself. This claim has been dismissed as to all Plaintiffs except WebGroup and NKL.

99. Plaintiffs WebGroup, NKL, FSC, Aylo Premium, Aylo Freesites, and MediaME, as website platforms, are providers of an "interactive computer service" under section 230.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed as to all Plaintiffs except WebGroup and NKL.

100. As applied to these Plaintiffs, the Act is preempted through the Supremacy Clause as a violation of section 230, because it imposes liability on website operators for putative harm caused by the content of third-party publishers.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed as to all Plaintiffs except WebGroup and NKL.

101. Plaintiffs are thus entitled to injunctive relief to preclude the Indiana Attorney General from depriving Plaintiffs of their rights guaranteed by the Constitution and federal law.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed as to all Plaintiffs except WebGroup and NKL.

## COUNT VI

### (42 U.S.C. § 1983 & 28 U.S.C. §§ 2201-02 (All Plaintiffs))

### (Declaratory Judgment)

102. Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth entirely herein.

**ANSWER:** The complaint speaks for itself. Defendant incorporates his answers to the foregoing paragraphs by reference. This claim has been dismissed as to all Plaintiffs except WebGroup and NKL.

103. There is a present and justiciable dispute as to whether enforcement of the Act by Defendant violates the Plaintiffs' rights under the U.S. Constitution and federal law, as stated in Counts I-V.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed as to all Plaintiffs except WebGroup and NKL.

104. The interests of Plaintiffs, on the one hand, and Defendant, on the other, are real and adverse.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed as to all Plaintiffs except WebGroup and NKL.

105. Absent court intervention, which would resolve the dispute over the Act's lawfulness, Defendant will proceed to enforce the Act even though the Act is unconstitutional and void.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed as to all Plaintiffs except WebGroup and NKL.

106. Plaintiffs are accordingly entitled to a declaration of rights in the form of a declaratory judgment that the Act is unconstitutional and unenforceable and, to the extent it is enforceable, a violation of the Takings Clause entitling Plaintiffs to just compensation.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed as to all Plaintiffs except WebGroup and NKL.

107. Plaintiffs are entitled to all further necessary and proper decrees of relief based on the foregoing declaration of rights.

**ANSWER:** This paragraph asserts legal conclusions to which no answer is required. To the extent an answer is required, defendant denies the allegations. This claim has been dismissed as to all Plaintiffs except WebGroup and NKL.

## GENERAL DENIAL

Defendant denies any and all remaining allegations in the complaint not herein previously admitted or denied.

## AFFIRMATIVE DEFENSES

1. This Court lacks subject-matter jurisdiction to decide plaintiffs' claims.

2. Plaintiffs fail to state a claim on which relief can be granted.

3. The Act is constitutional in all respects and consistent with federal law.

4. Defendants reserve the right to assert any and all additional affirmative defenses that may become apparent based on information learned during discovery or other appropriate reasons and also reserve the right to amend the answer to assert those defenses.

## AMENDED COUNTERCLAIMS

1. Counter-Plaintiff Todd Rokita, in his official capacity as the Attorney General of the State of Indiana brings claims against the Counterclaim Defendants NKL Associates, s.r.o. and Webgroup Czech Republic, a.s. (collectively the "Pornographers") as follows:

## NATURE OF THE ACTION

2. Online pornographic material has never been more accessible than it is today. The abundance of internet pornography combined with the almost unlimited access that minors have to pornographic websites raises serious concerns about the long-term effects of minors viewing sexually explicit material. Pornographic content emphasizes extreme forms of obscenity, including sexual violence, choking, rape fantasies, sex slavery, and sex with teen girls. Indeed, one study found that 35 percent of XVideos.com scenes contained aggression, including spanking, gagging,

slapping, hair pulling, and choking, with women as the target of the physical aggression in 97 percent of scenes. Evidence shows that minors are accessing this material in large numbers. The average age of first exposure to internet pornography is 11, and by age 18, more than 72 percent of adolescents (and more than 90 percent of boys) say they have viewed pornography online.

3. Adolescent exposure to pornography carries severe physical and psychological harms. It makes boys more likely to perpetrate sexual violence and girls more likely to be sexually victimized. It promotes unhealthy beliefs about sexual relationships, leads to earlier and riskier sexual experiences, negatively affects social integration and mental health, and causes behavioral problems. It also encourages adolescents to create, send, and share child sexual abuse material as sexually explicit images and recordings of themselves (sexting).

4. Despite these known harms to minors, the Pornographers' websites are pumping enormous amounts of pornographic content onto the internet, where minors can and do freely access it. XVideos.com is currently the 24th most popular website globally and received approximately 1.08 billion visits in November 2025. XNXX.com is currently the 34th most popular website globally and received approximately 655.8 million visits in November 2025. Unlike the dirty magazines and VHS tapes of yesteryear, pornography today consists of high-definition videos that are affordable to access (XVideos.com and XNXX.com are mostly free), available from virtually any device without restriction, and depict unlimited sexual content, including risky or illegal sexual practices.

5. In light of the extreme harms online pornography inflicts on minors, the Indiana General Assembly enacted Senate Bill 17 to require age verification before an individual accesses material harmful to minors online. 2024 Ind. Legis. Serv. P.L. 98-2024 (S.E.A. 17), codified at Ind. Code §§ 24-4-23-1–17. Indiana's age-verification law applies to any "[a]dult oriented website," defined

as "a publicly accessible website that publishes material harmful to minors, if at least one-third (1/3) of the images and videos published on the website depict material harmful to minors." Ind. Code § 24-4-23-1. The law prohibits operators of these websites from "knowingly and intentionally publish[ing] an adult oriented website unless the adult oriented website operator uses a reasonable age verification method to prevent a minor from accessing the adult oriented website." Ind. Code § 24-4-23-10. Reasonable age-verification methods include mobile credentials, third-party services that compare identifying information that an individual provides with material in a commercially available database that is regularly used by government agencies and business for the purpose of age and identity verification, or any commercially reasonable method that relies on public or private transactional data to verify the age of the individual. Ind. Code § 24-4-23-7.

6. On a motion from the Pornographers, this Court enjoined Indiana's age-verification law before it took effect. The United States Court of Appeals for the Seventh Circuit later stayed that injunction pending the decision of the Supreme Court of the United States in *FreeSpeech Coalition v. Paxton*, 145 S. Ct. 2291 (2025), but the Pornographers have nevertheless defied Indiana's age-verification law ever since. Even after the Supreme Court confirmed the constitutionality of a functionally identical Texas age-verification law in *Paxton*, the Pornographers persist in their violations of Indiana's age-verification law.

7. To protect minors in Indiana from the harms visited on them by the Pornographers' obscene content and flagrant disregard for Indiana law, the Attorney General brings these counterclaims against the Pornographers for violations of Indiana's age-verification law. Ind. Code § 24-4-23-10. The Attorney General seeks an injunction that requires the Pornographers to comply with Indiana's age-verification law, civil penalties up to $250,000 per violation, and to recover the costs

incurred to investigate the Pornographers' violations and maintain this action against them. In support, the Attorney General alleges the following:

**PARTIES**

8. The Attorney General is authorized to bring actions on behalf of the State of Indiana pursuant to Ind. Code § 4-6-3-2.

9. The Attorney General is authorized to bring actions to enforce Indiana's age-verification law pursuant to Ind. Code § 24-4-23-15.

10. Counterclaim Defendant NKL Associates, s.r.o. ("NKL") is a pornographic media company with its principal place of business at Krakovská 1366/25, Nové Město, 110 00 Prague, Czech Republic.

11. Counterclaim Defendant Webgroup Czech Republic, a.s. ("Webgroup") is a pornographic media company with its principal place of business at Krakovská 1366/25, Nové Město, 110 00 Prague, Czech Republic.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over the counterclaims under 28 U.S.C. §§ 1332(a), 1367(a).

13. This Court has personal jurisdiction over the Pornographers because they filed this action in this Court and based on their business activities in the state.

14. The Attorney General realleges and incorporates by reference the allegations made by the Pornographers that venue is proper under to 28 U.S.C. § 1391(b). Compl. ¶ 11.

15. The challenged conduct occurs in Indiana.

## INDIANA'S AGE-VERIFICATION LAW

16. Ind. Code § 24-4-23-10 provides that an adult oriented website operator may not knowingly or intentionally publish an adult oriented website unless the adult oriented website operator uses a reasonable age-verification method to prevent a minor from accessing the adult oriented website.

17. Ind. Code § 24-4-23-2 defines "adult oriented website operator" as a person that owns or operates an adult oriented website. An "adult oriented website operator" does not include a newspaper or news service, a cloud service provider, or internet providers or search engines that solely provide access to websites and are not responsible for creating or publishing the content that is harmful to minors.

18. Ind. Code § 24-4-23-1 defines an "adult oriented website" as a publicly accessible website that publishes material harmful to minors, if at least one-third (1/3) of the images and videos published on the website depict material harmful to minors.

19. Ind. Code § 24-4-23-3 defines "material harmful to minors" as matter or a performance described in Ind. Code § 35-49-2-2, which includes matters or performances that:

> (1) describe or represent, in any form, nudity, sexual conduct, sexual excitement, or sadomasochistic abuse;
>
> (2) considered as a whole, appeal to the prurient interest in sex of minors;
>
> (3) are patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and
>
> (4) considered as a whole, lacks serious literary, artistic, political, or scientific value for minors.

20. Ind. Code § 24-4-23-7 defines "reasonable age verification method" as "a method of determining that an individual seeking to access a website containing material harmful to minors is not a minor by using one (1) or more of the following methods:

(1) A mobile credential.

(2) An independent third party age verification service that compares the identifying information entered by the individual who is seeking access with material that is available from a commercially available data base, or an aggregate of data bases, that is regularly used by government agencies and businesses for the purpose of age and identity verification.

(3) Any commercially reasonable method that relies on public or private transactional data to verify the age of the individual attempting to access the material."

21. Pursuant to Ind. Code § 24-4-23-15, the Attorney General may bring an action for an injunction to enjoin future violations of Indiana's age-verification law, a civil penalty of up to two hundred fifty thousand dollars ($250,000), and the Attorney General's reasonable costs in investigating violations and maintaining such actions.

## PROCEDURAL HISTORY

22. The Indiana General Assembly enacted Senate Enrolled Act 17, Indiana's age-verification law, to address the harms to minors caused by freely available, graphic internet pornography.

23. Senate Enrolled Act 17 was signed into law by Governor Holcomb on March 13, 2024, and was set to become effective on July 1, 2024.

24. The Pornographers filed this action on June 10, 2024.

25. The United States District Court for the Southern District of Indiana issued a preliminary injunction that temporarily prevented the enforcement of Indiana's age-verification law on June 28, 2024.

26. However, on August 16, 2024, the United States Court of Appeals for the Seventh Circuit stayed the preliminary injunction, ruling that Indiana's age-verification law is fully enforceable pending the ruling from the Supreme Court of the United States in *Free Speech Coalition v. Paxton*, an action that challenged a "functionally identical" Texas law:

> Indiana's statute is functionally identical to one adopted by Texas. That statute has been held to be valid. *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024), *cert. granted*, No. 23–1122 (July 2, 2024). Free Speech Coalition, Inc., which is a plaintiff in both the Indiana case and the Texas case, asked the Supreme Court to prevent enforcement of the Texas statute while that litigation continued. That application was denied, No. 23A925 (Apr. 30, 2024), so the Texas statute is now in force. We do not see any adequate reason why Texas's law may be enforced pending the decision on the merits in *Free Speech Coalition v. Paxton*, while Indiana's may not be enforced. Functionally identical statutes should be treated the same while the Supreme Court considers the matter. Accordingly, Indiana's request for a stay is granted. The stay will remain in effect until the Supreme Court has issued its mandate in *Free Speech Coalition v. Paxton*.

Order, *Free Speech Coalition v. Rokita*, No. 24-2174 (7th Cir. Aug. 16, 2024), Dkt. 16.

27. During oral argument at the Supreme Court in *Paxton*, counsel for the Pornographers conceded that it is a "fair guess" that more than 50 percent of his "clients' materials" is "obscene for minors," and it "may be correct" that more than 70 percent is obscene as to minors. Transcript of Oral Argument at 20–21, *Free Speech Coal. v. Paxton*, No. 23-1122, 145 S. Ct. 2291 (2025). That concession establishes that at least one-third (1/3) of the images and videos published on the Pornographers' websites depict graphic and obscene pornographic material that is harmful to minors under Ind. Code § 24-4-23-3.

28. The Supreme Court issued its opinion in *Paxton* on June 27, 2025. The Supreme Court ruled that the "functionally identical" Texas law was subject to intermediate scrutiny because it had only an incidental effect of protected speech. The Supreme Court further ruled that the Texas

law satisfied intermediate scrutiny because it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Paxton*, 145 S. Ct. at 2302 (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)).

29. Notwithstanding the Seventh Circuit's ruling that Indiana's age-verification law has been fully enforceable since August 16, 2024, beginning on or around July 23, 2025, the Office of the Indiana Attorney General became aware that the Pornographers have failed to implement reasonable age-verification methods in violation of Ind. Code § 24-4-23-10.

**<u>THE PORNOGRAPHERS VIOLATE INDIANA'S AGE VERIFICATION LAW</u>**

**I. NKL**

30. NKL owns and operates the pornographic website XNXX.com, a publicly accessible website that publishes graphic and obscene pornographic material.

31. On July 23, 2025, an investigator employed by the Office of the Indiana Attorney General accessed XNXX.com from Indiana and discovered that the website lacked a reasonable form of age verification to prevent minors from accessing the harmful sexual material published on the website.

32. On July 23, 2025, the State's investigator could access XNXX.com by entering XNXX.com in the URL bar. No age verification was required to access the website.

33. When the investigator accessed XNXX.com on July 23, 2025, they observed on the homepage at least fifty (50) pornographic video previews with hyperlinks to the pornographic videos. When the investigator hovered over the previews with their computer mouse, they depicted pornographic scenes of sexual intercourse.

34. When the investigator clicked on one of the videos previews on the homepage, it took them to a webpage with a pornographic video, which depicted oral sex and vaginal intercourse.

When they scrolled down on the same webpage where the video was playing, there were rows of other pornographic videos, each of which depicted material harmful to minors.

35. The investigator also navigated to the "doggystyle" category on XNXX.com. Each video preview in this category depicted pornographic content. When the investigator clicked on a video preview in this category, the video depicted a scene of sexual intercourse and oral sex. Below the video were fifteen (15) more pornographic video previews, including "amateur teen getting fucked", "athletic teen fucks in the kitchen", and "amateur teen get banged in the kitchen."

36. The XNXX.com homepage included thumbnails with explicit images corresponding to different categories of pornography. Amongst other categories, "Anal Sex" had 355,987 videos, "Pussy licking" had 394,442 videos, "Big Ass" had 391,991 videos, "Pussy" had 611,715 videos, and "Fucking" had 366,074 videos.

37. On July 28, 2025, an investigator employed by the Office of the Indiana Attorney General again accessed XNXX.com in Indiana and confirmed that the website still lacked any form of reasonable age verification to prevent minors from accessing the harmful sexual material published on the website. The homepage again displayed thumbnails for different categories of pornography, which displayed material harmful to minors. Amongst other categories, "Masturbation" had 265,245 videos, "Big Ass" had 391,769 videos, "Big dick" had 679,375 videos, "Sexy Girls" had 224,629 videos, and "Cum in mouth" had 565,201 videos.

38. When the investigator navigated to the "real orgasm" category on XNXX.com, a video immediately began showing a scene of sexual intercourse. Below the video, there were fifteen (15) more pornographic thumbnails. The content included in this category was over one-third (1/3) material harmful to minors.

39. To the right of the "real orgasm" video was an advertisement with an image of a woman with what appeared to be male ejaculate on her face, and the advertisement read, "Come fuck me…at my place in Indianapolis (2 Miles away)". Another advertisement above the video featured a nude woman and read, "Mary (29) Indianapolis 'Come fuck me…at my place'". When the investigator navigated to another video, it again depicted sexual intercourse.

40. The investigator also clicked on a "pornstars" hyperlink. At least one-third (1/3) of the images displayed on the "pornstars" page were pornographic.

41. On August 12, 2025, the State's investigators could still access XNXX.com by entering its URL in the URL bar. XNXX.com still did not require age verification to access the pornographic previews available on the homepage.

42. On December 29, 2025, an investigator employed by the Office of the Indiana Attorney General again accessed XNXX.com in Indiana and confirmed that the website still lacked any form of reasonable age verification to prevent minors from accessing the harmful sexual material published on the website.

43. The XNXX.com homepage again displayed thumbnails with explicit images corresponding to different categories of pornography. Amongst other categories, "Cum in pussy" had 631,935 videos, "Wet pussy" 217,179 videos, and "Big Tits" had 127,868 videos.

44. When the State's investigator accessed the "tags" webpage from the XNXX.com homepage, it displayed a list of the categories of content available on the website. The "tags" webpage listed 2,000 distinct pornographic categories.

45. Of all the categories listed in the "tags" section, at least 800 of the 2,000 categories (at least 40%) described content that is unquestionably obscene. For example, these categories included "Cum in mouth," "Anal Sex,", "Big Cock Porn," "Straight in the Ass," "Fuck Her Hard,"

"Piss in Ass" and other categories that describe content that is clearly pornographic in nature. The total number of tags from each category added together equaled approximately 104 million tags. Of those, approximately 66 million (around 63%) were tags describing content that is unquestionably pornographic – *i.e.* in categories like "Cum in mouth," "Anal Sex,", "Big Cock Porn," "Straight in the Ass," "Fuck Her Hard," and "Piss in Ass."

46. The investigator then visited several webpages in the "Today's selection" category. Each webpage in this category depicted at least one-third (1/3) pornographic images and videos. When the investigator clicked on a video in this category, it depicted oral sex and sexual intercourse. The investigator viewed several videos, each of which displayed pornographic material.

47. On January 7, 2026, an investigator employed by the Office of the Indiana Attorney General again accessed XNXX.com in Indiana and confirmed that the website still lacked any form of reasonable age verification to prevent minors from accessing the harmful sexual material published on the website.

48. The State's investigator searched "bang bros" on XNXX.com, which returned 27,644 results. At least one-third (1/3) of the video previews from this search displayed pornographic content. The investigator accessed a video from the "Bang Bros" channel, which depicted oral sex and sexual intercourse. Bang Bros is an independent content studio that produces exclusively pornographic content.

49. The State's investigator also searched for "girls gone wild," which returned 58,652 results. When the investigator clicked on the "Girls Gone Wild" channel, the channel listed 219,569,428 video views. The investigator selected a video from the Girls Gone Wild channel, which depicted group sex. As far as the investigator could scroll, this channel contained exclusively pornographic content with no "neutral" content displayed.

50. On July 16, 2026, an investigator employed by the Office of the Indiana Attorney General again accessed XNXX.com in Indiana and confirmed that the website still lacked any form of reasonable age verification to prevent minors from accessing the harmful sexual material published on the website.

51. The XNXX.com homepage again displayed thumbnails with explicit images corresponding to different categories of pornography. Among the categories, "Pussy eating" had 149,878 videos, "hard and fast fucking" had 507,305 videos, "Free sex" had 179,022 videos, and "cum inside" had 113,824 videos. The images and videos in these categories contained well over one-third (1/3) material harmful to minors.

52. Even categories that seemed neutral contained over one-third (1/3) material harmful to minors. The "exercise" category had 1,993 videos, and over one-third (1/3) of the videos in the category were pornographic. The category "chat" included 11,899 videos, the majority of which, again, were pornographic in nature and harmful to minors.

53. The "family" category contained over 223 pages of content associated with that tag. The investigator clicked through more than 200 pages of the "family" category and confirmed that the content displayed was over one-third (1/3) pornographic in nature. In fact, the investigator was unable to identify a single non-pornographic video in this category.

54. Navigating to the "Pictures" tab from XNXX.com displayed hundreds of pornographic images per page. The content on each page was almost exclusively pornographic in nature, and well over one-third (1/3) of the images were material harmful to minors.

55. The top of the homepage on XNXX.com featured a "Safe for work" thumbnail. However, even when clicking on a "Safe for work" video, the website displayed fourteen (14) pornographic videos directly below one "Safe for work" video. The "Safe for work" video also displayed

a pornographic advertisement prior to the beginning of the video that depicted material harmful to minors. The investigator viewed several "Safe for Work" videos, each of which included previews to other videos that were at least one-third (1/3) pornographic content. The pornographic previews were displayed directly underneath the supposed "Safe for Work" content.

56. On July 16, 2026, another investigator employed by the Office of the Indiana Attorney General accessed XNXX.com in Indiana and confirmed that the website lacked any form of reasonable age verification to prevent minors from accessing the harmful sexual material published on the website.

57. Again, even the most neutral sounding categories contained at least one-third (1/3) material harmful to minors. For instance, the category "Family" had 30,081 videos, over one-third (1/3) of which was material harmful to minors.

58. Other categories like "skinny" and "blonde" also displayed content that was well over the one-third (1/3) threshold for material harmful to minors. The State's investigator was unable to identify a single video that did not contain material harmful to minors in either category.

59. XNXX.com is a pornography website. Since July 23, 2025, on every date when the State's investigators have accessed XNXX.com, virtually all of the content the investigator was able to view was clearly pornographic.

60. XNXX.com continues to target Indiana residents with advertisements, which often include material harmful to minors.

61. NKL has not implemented any form of age verification on its website XNXX.com as required by Ind. Code § 24-4-23-10.

62. NKL is aware that Indiana residents, including minors, are still able to access the sexually explicit material on its website.

63. NKL is in violation of Ind. Code § 24-4-23 by operating an adult website that knowingly publishes sexually explicit material that is harmful to minors without implementing reasonable age-verification methods.

**II. Webgroup**

64. Webgroup owns and operates the website XVideos.com, a publicly accessible website that publishes graphic and obscene pornographic material.

65. On July 23, 2025, an investigator employed by the Office of the Indiana Attorney General accessed XVideos.com in Indiana and discovered that the website lacked any form of reasonable age verification to prevent minors from accessing the harmful sexual material published on the website.

66. The State's investigator navigated to the homepage of XVideos.com by entering XVideos.com in the URL bar, which led the investigator directly to the website's homepage. The homepage did not require any form of age verification.

67. When the investigator accessed XVideos.com on July 23, 2025, they observed on the homepage at least fifty (50) pornographic video previews with hyperlinks to the pornographic videos. When the investigator hovered over the previews with their computer mouse, they depicted pornographic scenes of sexual intercourse.

68. When the investigator clicked on one of the videos previews on the homepage, it took them to a webpage with a pornographic video, which depicted oral sex and vaginal intercourse. The investigator scrolled to the bottom of the video's webpage, and there were more videos below depicting sexual intercourse and other pornographic scenes. The investigator clicked on another video, which again depicted oral and vaginal sex.

69. On July 28, 2025, an investigator employed by the Office of the Indiana Attorney General again accessed XVideos.com in Indiana and confirmed that the website still lacked any form of reasonable age verification to prevent minors from accessing the harmful sexual material published on the website. The XVideos.com homepage displayed over fifty (50) pornographic video previews, all of which displayed material harmful to minors.

70. When the investigator clicked on a pornographic video preview on the homepage, a video played depicting oral and group sex. When the investigator returned to the homepage and navigated to another video, that video also depicted sexual intercourse. Below the second video were twelve (12) more pornographic video previews, all but one showing a pornographic preview image. The investigator clicked on one of these video previews, and the video depicted group sex.

71. On August 12, 2025, the State's investigators could still access XVideos.com by entering its URL in the URL bar. XVideos.com still did not require age verification to access the more than fifty (50) pornographic previews available on the homepage.

72. On September 15, 2025, an investigator employed by the Office of the Indiana Attorney General again accessed XVideos.com in Indiana and confirmed that the website still lacked any form of reasonable age verification to prevent minors from accessing the harmful sexual material published on the website. The homepage again displayed over fifty (50) pornographic video previews, and the entire website contained 20,000 pages of "Adult Content."

73. When the investigator clicked on a video on the XVideos.com homepage, it depicted sexual intercourse and group sex. Below the video were twelve (12) pornographic video previews, each displaying a pornographic image.

74. On December 29, 2025, an investigator employed by the Office of the Indiana Attorney General again accessed XVideos.com in Indiana and confirmed that the website still lacked any

form of reasonable age verification to prevent minors from accessing the harmful sexual material published on the website. The homepage displayed over fifty (50) pornographic video previews, and the website contained 20,000 pages of "Adult Content."

75. On December 29, 2025, the State's investigator visited several pages on XVideos.com, each of which included at least one-third (1/3) pornographic images and videos. When the investigator clicked on a video accessible from the homepage, it depicted sexual intercourse. Below the video were twelve (12) pornographic video previews, all showing a pornographic or sexually explicit image. Each of the videos the investigators clicked on depicted sexual intercourse.

76. On January 7, 2026, an investigator employed by the Office of the Indiana Attorney General again accessed XVideos.com in Indiana and confirmed that the website still lacked any form of reasonable age verification to prevent minors from accessing the harmful sexual material published on the website.

77. On July 17, 2026, an investigator employed by the Office of the Indiana Attorney General again accessed XVideos.com in Indiana and confirmed that the website still lacked any form of reasonable age verification to prevent minors from accessing the harmful sexual material published on the website.

78. On July 17, 2026, the XVideos.com website contained 11,848 pages of pornographic content. The State's investigator viewed thousands of pages of XVideos.com. The investigator clicked through more than 7,000 pages and confirmed that over one-third (1/3) of the content displayed on each page depicted material that is harmful to minors either in the form of a pornographic video or an advertisement that was pornographic in nature.

79. The XVideos.com website contained 2,000 different "tags", each signifying a different pornographic category. Amongst other categories, "anal-porn" had 150,397 videos, "ass-fuck" had

212,074 videos, “boy-fuck-girl” had 167,280 videos, “cum-on-pussy” had 308,856 videos, and “fat-pussy” had 121,277 videos.

80. Even when searching for tags without an obvious sexual or pornographic connotation, the search returned pornographic results. For example, when the State’s investigator accessed the “punk” tag, it returned 663 results. All of the videos the investigator saw in the “punk” category were pornographic. The first video the investigator accessed in this category displayed a scene of masturbation, oral sex, and group sex. Below that video were twelve (12) more pornographic videos. The State’s investigator also accessed the tag “shoplifting”, which returned 4,621 results. When the investigator clicked on a video in this category, it displayed a scene of sexual intercourse. Below that video were twelve (12) more pornographic videos.

81. The top of the homepage on XVideos.com contained two rows of “Soft Content.” However, even when clicking on a “Soft Content” video”, the website displayed twelve (12) pornographic videos below the “Soft Content” video. The “Soft Content” video also displayed a pornographic advertisement prior to the beginning of the video. Over one-third (1/3) of the content displayed after navigating to the “Soft Content” was pornographic in nature.

82. On July 17, 2026, another investigator employed by the Office of the Indiana Attorney General accessed XVideos.com in Indiana and confirmed that the website lacked any form of reasonable age verification to prevent minors from accessing the harmful sexual material published on the website.

83. The XVideos.com homepage displayed over 100 rows of content with five (5) videos in each row. Every single video on the homepage depicted a pornographic scene.

84. When the State’s investigator navigated to the “tags” section from the XVideos.com homepage, it displayed a list of the categories of content available on the website. Of all the

categories listed in the “tags” section, at least 800 of the 2,000 tags (at least 40%) described content that is unquestionably obscene. For example, these tags included the categories "cum-in-pussy", "big-cock-porn", "hot-girls-getting-fucked", "squirting-from-ass-fucking", "cum-on-belly-button", "free-hard-core-porn", "oral-sex-videos", "free-blow-job-video." The total number of tags from each category added together equaled approximately 102 million tags. Of those, approximately 68 million (around 67%) were tags describing content that is unquestionably pornographic – *i.e.* in categories like "cum-in-pussy", "big-cock-porn", "hot-girls-getting-fucked", "squirting-from-ass-fucking", "cum-on-belly-button", "free-hard-core-porn", "oral-sex-videos", and "free-blow-job-video."

85. Even categories that seemed neutral contained over one-third (1/3) material harmful to minors. For instance, the category “athletic body” included 22,971 videos, and when the State’s investigator clicked on the category, more than one-third (1/3) of the videos displayed with this tag were pornographic. Similarly, at least one-third (1/3) of the videos included in the categories “beach” and “leggings” were material harmful to minors. In fact, all three of these supposedly “neutral” categories (“athletic body”, “beach”, and “leggings”) displayed content that was exclusively pornographic in nature.

86. When the State’s investigator navigated to the “Channels” menu on XVideos.com, the webpage displayed the top channels viewed in the United States at that time. Each of these top channels contained content that was more than one-third (1/3) material harmful to minors.

87. When the State’s investigator searched for “Girls Gone Wild” using the search bar function on XVideos.com, the search returned 102,109 video results, and well over one-third (1/3) of the content displayed from this search was material harmful to minors. As far as the investigator could scroll, the search results displayed exclusively pornographic content.

88. XVideos.com is a pornography website. Since July 23, 2025, on every date when the State's investigators have accessed XVideos.com, virtually all of the content the investigator was able to view was clearly pornographic.

89. XVideos.com also continues to target Indiana residents with advertisements, which often include material harmful to minors.

90. Webgroup has not implemented any form of age verification on its website XVideos.com as required by Ind. Code § 24-4-23-10.

91. Webgroup is aware that Indiana residents, including minors, are still able to access the sexually explicit material on its website.

92. Webgroup is in violation of Ind. Code § 24-4-23 by operating an adult website that knowingly publishes sexually explicit material that is harmful to minors without implementing reasonable age-verification methods.

**COUNT I**
**VIOLATION OF IND. CODE § 24-4-23-10**
**NKL**

93. The Attorney General realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.

94. NKL owns and operates a publicly accessible adult-oriented website that publishes material harmful to minors.

95. NKL's website is not a newspaper, news service, cloud service provider, internet provider, or search engine.

96. Since at least July 23, 2025, at least one third (1/3) of the images and videos published on NKL's website depict material that is harmful to minors, which (a) describe or represent nudity, sexual conduct, sexual excitement, or sado-masochistic abuse; (b) appeal to minors' prurient interest in sex; (c) are patently offensive to prevailing standards in the adult community as a whole

as to what is suitable for minors; and (d) lack serious literary, artistic, political, or scientific value for minors.

97. Notwithstanding Indiana's age-verification law, NKL's website lacks any reasonable age-verification method.

98. NKL knowingly or intentionally operates its website without reasonable age-verification methods in violation of Ind. Code § 24-4-23-10.

99. Pursuant to Ind. Code § 24-4-23-15, the Attorney General is entitled to an injunction against NKL's violations of Indiana's age-verification law, civil penalties and recovery of the reasonable costs to investigate NKL's violations and maintain this action.

**COUNT II**
**VIOLATION OF IND. CODE § 24-4-23-10**
**WEBGROUP**

100. The Attorney General realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs.

101. Webgroup owns and operates a publicly accessible adult-oriented website that publishes material harmful to minors.

102. Webgroup's website is not a newspaper, news service, cloud service provider, internet provider, or search engine.

103. Since at least July 23, 2025, at least one third (1/3) of the images and videos published on Webgroup's website depict material that is harmful to minors, which (a) describe or represent nudity, sexual conduct, sexual excitement, or sado-masochistic abuse; (b) appeal to minors' prurient interest in sex; (c) are patently offensive to prevailing standards in the adult community as a whole as to what is suitable for minors; and (d) lack serious literary, artistic, political, or scientific value for minors.

104. Notwithstanding Indiana's age-verification law, Webgroup's website lacks any reasonable age-verification method.

105. Webgroup knowingly or intentionally operates its website without reasonable age-verification methods in violation of Ind. Code § 24-4-23-10.

106. Pursuant to Ind. Code § 24-4-23-15, the Attorney General is entitled to an injunction against Webgroup's violations of Indiana's age-verification law, civil penalties, and recovery of the reasonable costs to investigate Webgroup's violations and maintain this action.

## PRAYER FOR RELIEF

Wherefore, the Attorney General respectfully request that this Court enter judgment against the Pornographers, and enter an Order:

A. Finding that Pornographers violated Ind. Code § 24-4-23-10 by failing to implement reasonable age-verification methods;

B. Permanently enjoining the Pornographers from violating Ind. Code § 24-4-23-10 and requiring the Pornographers to implement reasonable age-verification methods for their adult oriented websites;

C. Ordering the Pornographers to pay civil penalties pursuant to Ind. Code § 24-4-23-15(2), payable to the Office of the Indiana Attorney General;

D. Ordering the Pornographers to pay the State's reasonable costs for the investigation and maintenance of this action pursuant Ind. Code § 24-4-23-15(3); and

E. Granting any such further relief as the Court may deem appropriate.

## JURY DEMAND

The Attorney General demands a trial by jury.

Dated: July 31, 2026

Respectfully submitted,

Theodore E. Rokita
Indiana Attorney General

/s/ Jackson K. Yerkes
Jackson K. Yerkes
Deputy Attorney General

James A. Barta
Solicitor General

Douglas Swetnam
Section Chief, Data Privacy & ID Theft Unit

Alyssa Rogers
Deputy Attorney General

Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 459-8951
Fax: (317) 232-7979
Email: Jackson.Yerkes@atg.in.gov

David H. Thompson*
Peter A. Patterson*
Brian W. Barnes*
Megan M. Wold*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: dthompson@cooperkirk.com

*Admitted *pro hac vice*

*Counsel for Defendant/Counter Claimant*